THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
DAVID P. KOWAL (Cal. Bar No. 188651)
RASHA GERGES (Cal. Bar No. 218248)
Assistant United States Attorneys
OCEDTF Section
        1400 United States Courthouse
        312 North Spring Street
        Los Angeles, California  90012
        Telephone:  (213) 894-5136/6530
        Facsimile:  (213) 894-0142
        E-mail:   david.kowal@usdoj.gov
        E-mail:   rasha.gerges@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>               v.<br><br>CHARLES C. LYNCH, and<br>ARMOND TENNYSON TOLLETTE, JR.,<br><br>                    Defendants. | CR No.  07-689-GW<br><br>GOVERNMENT'S OPPOSITION TO<br>DEFENDANT LYNCH'S MOTION TO<br>SUPPRESS DEFENDANT'S STATEMENT<br>AND EVIDENCE; MEMORANDUM OF<br>POINTS AND AUTHORITIES;<br>DECLARATIONS OF WILLIAM<br>TORRENCE AND NICK FONTECCIO IN<br>SUPPORT THEREOF<br><br>Hearing Date: July 7, 2008<br>Hearing Time: 8:00 a.m. |

Plaintiff, United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California, hereby files this Opposition to

//

//

//

//

the motion of defendant Charles Lynch ("defendant") to Suppress
Defendant's Statement and Evidence, and the exhibits thereto.
The motion is based on the attached memorandum of points and
authorities and declarations, all the files and records of this
case, and such other oral and written argument that is permitted
by the Court.

Dated: June 23, 2008                  Respectfully submitted,
                                      THOMAS P. O'BRIEN
                                      United States Attorney

                                      CHRISTINE C. EWELL
                                      Assistant United States Attorney
                                      Chief, Criminal Division

                                      _____/S/_____

                                      DAVID P. KOWAL
                                      RASHA GERGES
                                      Assistant United States Attorneys
                                      OCEDTF Section

                                      Attorneys for Plaintiff
                                      United States of America

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . .  ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .  1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . .  2

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .  6

      A.   ALTHOUGH THE GOVERNMENT DOES NOT INTEND TO USE
           DEFENDANT'S STATEMENT ABOUT THE SAFE COMBINATION
           AT TRIAL, THE STATEMENT WAS NOT PROVIDED IN
           VIOLATION OF MIRANDA . . . . . . . . . . . . . . . .  6

      B.   BECAUSE LAW ENFORCEMENT WOULD HAVE INEVITABLY
           OBTAINED THE PHYSICAL EVIDENCE FROM THE SAFE
           PURSUANT TO A VALID WARRANT ANY PUTATIVE MIRANDA
           VIOLATION IS OF NO CONSEQUENCE . . . . . . . . . .  10

      C.   ALTERNATIVELY, THE EVIDENCE TAKEN FROM THE SAFE
           SHOULD NOT BE SUPPRESSED BECAUSE THE FRUIT OF
           THE POISONOUS TREE DOCTRINE DOES NOT EXTEND TO
           PHYSICAL EVIDENCE SEIZED AS A RESULT OF A MIRANDA
           VIOLATION . . . . . . . . . . . . . . . . . . . . .  14

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .  18

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                  PAGE(S)

Colorado v. Connelly,
    479 U.S. 157 (1986) . . . . . . . . . . . . . . . .   17

Greenawalt v. Ricketts,
    943 F.2d 1020 (9th Cir. 1991) . . . . . . . . . .   17

Michigan v. Tucker,
    417 U.S. 433 (1974) . . . . . . . . . . . . . . . .   16

Mincey v. Arizona,
    437 U.S. 385 (1978) . . . . . . . . . . . . . . . .   16

Murray v. United States,
    487 U.S. 533 (1988) . . . . . . . . . . . . . . . .   12

Nix v. Williams,
    467 U.S. 431 (1984) . . . . . . . . . . . . .   10, 11

Oregon v. Elstad,
    470 U.S. 298 (1985) . . . . . . . . . . . . . . . .   16

Rhode Island v. Innis,
    446 U.S. 291 (1980) . . . . . . . . . . . . . . . .    7

Segura v. United States,
    468 U.S. 796, 104 S. Ct. 3380,
    82 L. Ed. 2d 599 (1984) . . . . . . . . . . . . .   11

Townsend v. Sain,
    372 U.S. 293 (1963) . . . . . . . . . . . . . . . .   16

United States v. Andrade,
    784 F.2d 1431 (9th Cir. 1986) . . . . . . . . . .   10

United States v. Boatwright,
    822 F.2d 862 (9th Cir. 1987) . . . . . . . . . . .   12

United States v. Booth,
    669 F.2d 1231 (9th Cir. 1981) . . . . . . . . . . .    6

United States v. Disla,
    805 F.3d 1340 (9th Cir. 1986) . . . . . . . . . .   12

United States v. Fleck,
    413 F.3d 883 (8th Cir. 2005) . . . . . . . . . . 7, 8, 9

United States v. Giberson,
    ___ F.3d ___, 2008 WL 2221008 (9th Cir. May 20, 2008) . .   12

United States v. Gomez-Soto,
    723 F.2d 649 (9th Cir. 1984) . . . . . . . . . . .   13

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                               **PAGE(S)**

United States v. Henley,
    984 F.2d 1040 (9th Cir. 1993) . . . . . . . . . . . 7, 8, 9

United States v. Merriweather,
    777 F.2d 503 (9th Cir. 1985) . . . . . . . . . . . 10, 12

United States v. Patane,
    542 U.S. 630 (2004) . . . . . . . . . 14, 15, 16, 17, 18

United States v. Pinion,
    800 F.2d 976 (9th Cir. 1986) . . . . . . . . . . . . 16

United States v. Turner,
    926 F.2d 883 (9th Cir. 1991) . . . . . . . . . . . . 17

United States v. Washington,
    431 U.S. 181 (1977) . . . . . . . . . . . . . . . . 16

Wong Sun v. United States,
    361 U.S. 471 (1963) . . . . . . . . . . . . . . . . . 2

Wong Sun v. United States,
    371 U.S. 471 (1963) . . . . . . . . . . . . . . . . 14

**FEDERAL STATUTES**

21 U.S.C. §841(a)(1) . . . . . . . . . . . . . . . . . 1

21 U.S.C. §§ 846, 841(a)(1) . . . . . . . . . . . . . 1

21 U.S.C. § 856(a)(1) . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . 1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Defendant Lynch ("defendant") is charged with owning and operating a marijuana store in San Luis Obispo County, specifically, Morro Bay, California.  He is charged in each count of a six count indictment, specifically with participation in a narcotics conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1), 856, and 859 (Count One); aiding and abetting in the sale of marijuana to minors, in violation of 21 U.S.C. §§ 841(a)(1), 859(a), and 18 U.S.C. § 2 (Counts Two and Three); possession of marijuana with intent to distribute, in violation of 21 U.S.C. 841(a)(1) (Count Four); operation and use of a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count Five); and criminal forfeiture (Count Six).

These charges arise, in part, from two searches executed by law enforcement on March 29, 2007 at defendants' residence in Culver City, and at his marijuana store in Morro Bay.  During the search of his residence, defendant told law enforcement the combination of two locked safes located at the marijuana store. Using the combination, law enforcement at the store opened the safes and items of physical evidence including written records of the sales and operation of defendant's marijuana store.

In his Motion to Suppress Defendant's Statement and Evidence (the "motion") defendant moves to suppress his statement about the combination to the safes as made in violation of his Miranda rights.  (Mot. at 5).  He further moves to suppress the physical evidence found in the safe under the "fruit of the poisonous

1

tree" doctrine, see Wong Sun v. United States, 361 U.S. 471
(1963), as the fruit of his illegally obtained statement.  (Id.
at 5, 8).  Defendant's motion should be denied.  The government
does not intend to use in its case-in-chief defendant's statement
regarding the combination, which, in any event, was not obtained
in violation of Miranda because it was not in response to a
question designed to obtain an incriminating response.  Even if
there was a technical violation of Miranda in obtaining the
statement about the combination, law enforcement intended and was
prepared to open the safes under the authority of its valid
search warrant, and thus suppression of the physical evidence in
the safe is prohibited by the inevitable discovery doctrine.  In
addition, the Supreme Court has held that the fruit of the
poisonous tree doctrine does not apply to physical evidence
obtained in violation of Miranda, and for this alternative reason
the evidence in the safes should not be suppressed.

## II.

### FACTUAL BACKGROUND

On Thursday, March 29, 2007, Special Agents (SAs) from the
DEA Ventura office and detectives from the San Luis Obispo County
Sheriff's Department executed a federal search warrant at 780
Monterey Avenue, Suite B, Morro Bay, California, a marijuana
store owned and operated by defendant.[1]  At the same time, they
also executed a warrant at defendant's home in Culver City.  Both
warrants were issued by the Honorable Fernando M. Olguin based on

---

[1]  Unless otherwise stated all facts come from the
Declarations of William Torrence and Nick Fonteccio filed
concurrently herewith.

2

1    an affidavit by the case agent, SA Burkdoll.

2       Agents entered defendant's home at approximately 11:00 a.m.
3    Soon after the initial entry, SA Torrence entered the home and
4    found defendant on the ground near the door where he had been
5    told to wait when agents entered the home. SA Torrence stayed
6    with defendant until other agents completed their security sweep
7    and declared the location clear. While agents had guns drawn
8    upon entry into the location -- as is typical for execution of a
9    warrant -- once the location was deemed safe agents put away
10   their weapons. After allowing defendant to dress, SA Torrence
11   escorted defendant to his kitchen.

12       In defendant's kitchen SA Torrence informed defendant that
13   agents were executing a federal search warrant and offered to
14   read the warrant to defendant. Defendant declined a reading, and
15   SA Torrence provided defendant with a copy of the search warrant,
16   and switched the handcuffs on defendant from behind defendant to
17   the front in order for defendant to hold the search warrant, and
18   be more comfortable. Defendant read the warrant while sitting at
19   the kitchen table, and asked SA Torrence a question about the
20   warrant during that time.

21       Once defendant was finished reading, SA Torrence read
22   defendant his <u>Miranda</u> rights verbatim from a card. SA Torrence
23   then asked defendant if defendant wanted to cooperate and
24   defendant said that he would like to speak with his lawyer first.
25   SA Torrence therefore ceased all questioning. Defendant and SA
26   Torrence then sat at the kitchen table while the search was
27   conducted by other agents. They made small talk about issues not
28   related to the investigation such as the view from defendant's

3

1   home and defendant's interest in music.

2       At the marijuana store, Detective Nick Fontecchio of the San
3   Luis Obispo County Sheriff's Department was executing a warrant
4   along with other members of the Sheriff's Department and federal
5   agents.  During the search of the location, law enforcement
6   seized marijuana from some of the store's safes.  They also found
7   two additional locked black safes resting on top of each other
8   ("the safes").  Detective Fontecchio believed the safes might
9   contain evidence responsive to the search warrant such as
10  marijuana or records of marijuana sales given that law
11  enforcement had found marijuana in other safes at the location
12  and because the safes were in a room set up like an office with
13  items like computers, fax machines, and office supplies.  The
14  search warrant for the marijuana store specifically called for
15  law enforcement to seize, among other things, "controlled
16  substances, including marijuana. . . controlled substance
17  paraphernalia. . . equipment used for the cultivation of
18  marijuana. . . receipts, invoices, ledgers, tally sheets, and
19  other papers relating to the transportation, ordering or
20  purchasing and/or distribution of controlled substance.  . . ."
21  (Fonteccio Decl., Ex. A at 3 ("Items to be Seized")).  Thus,
22  Detective Fontecchio sought to open the safes.

23      Detective Fontecchio was prepared to and intended to have
24  the safes opened by force.  Law enforcement had at the location a
25  large metal ram and a large metal pick that, in Detective
26  Fontecchio's training and experience, would be able to pry open
27  the safes.  However, before breaking open the safes, as a
28  courtesy and to prevent unnecessary destruction of property, it

1  was the Detective's standard practice during a search warrant
2  operation to ask a property owner whether they would provide a
3  combination or key before breaking open a safe or similar
4  container by force.  Detective Fontecchio knew from his personal
5  involvement in the investigation including surveillance,
6  undercover sales at the store, and review of business records,
7  among other things, that defendant was the owner of the store,
8  that defendant worked there much of the time it was open, that
9  defendant was present during marijuana sales, and, Detective
10 Fontecchio believed that defendant was in charge of, among other
11 things, bringing marijuana to and from the dispensary on a daily
12 basis.  (See Fontecchio Decl. ¶ 6 & Ex B. (warrant affidavit)
13 ¶¶ 15, 24, 38, 44-50, and 52)).  Thus, when law enforcement was
14 unable to find the combination from the search at the store or by
15 talking to any of defendant's employees on scene, Detective
16 Fontecchio asked that a call be made to defendant about the
17 combination.

18      At defendant's residence, SA Torrence received a call
19 regarding the combination to the safes.  It had been over any
20 hour since defendant had finished reading the warrant and SA
21 Torrence was still sitting at the kitchen table with defendant
22 while agents completed the search.  SA Torrence informed
23 defendant that agents at the marijuana store were going to break
24 open a safe, and they wanted to know if defendant would be
25 willing to provide the combination for the safe in lieu of a
26 forced entry.  At no point did SA Torrence shout or threaten
27 defendant during this discussion about the combination nor were
28 there any guns drawn.  Defendant provided the combination which

1  SA Torrence relayed to officers at the store.  SA Torrence
2  thought the exchange neither incriminating nor relevant to the
3  investigation, and therefore did not note it in his report
4  regarding the search of defendant's residence.

5      At the marijuana store, law enforcement opened the safes and
6  found daily sales ledgers for the store dating back to April
7  2006.  (See Def. Mot., Ex. D at 2 (DEA Property Report)).

III.

ARGUMENT

**A.  ALTHOUGH THE GOVERNMENT DOES NOT INTEND TO USE DEFENDANT'S STATEMENT ABOUT THE SAFE COMBINATION AT TRIAL, THE STATEMENT WAS NOT PROVIDED IN VIOLATION OF MIRANDA**

To avoid any potential appellate issue, and because
defendant's custody and control of the marijuana store and the
items within the store can be proved through extensive additional
evidence -- and was in fact well-known to law enforcement at the
time of the searches (see Fonteccio Decl. ¶ 6) -- the government
does not intend to offer in its case-in-chief defendant's
statement regarding the combination to the safes.  However, even
if the government were to concede for the purpose of this motion
that defendant was in "custody" for Miranda purposes and also
unambiguously invoked his Miranda right to counsel after SA
Torrence read defendant his rights, defendant's subsequent
response to SA Torrence's question about the combination to the
safes did not violate Miranda, because it was not the result of
police interrogation.

"[N]ot every question posed in a custodial setting is
equivalent to 'interrogation.'"  United States v. Booth, 669 F.2d
1231, 1237 (9th Cir. 1981).  The Supreme Court has held that

6

1  "interrogation" subject to <u>Miranda</u>'s protective requirements only
2  occurs when the police use words or action that they "should have
3  known were reasonably likely to elicit an incriminating response"
4  from the subject.  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301
5  (1980).  Thus, for example, routine booking questions or requests
6  for consent to search a location by law enforcement do not
7  qualify as interrogation protected by <u>Miranda</u>.  <u>See</u> <u>United States</u>
8  <u>v. Henley</u>, 984 F.2d 1040, 1042-43 (9th Cir. 1993).

9       <u>United States v. Fleck</u>, 413 F.3d 883 (8th Cir. 2005) is
10  analogous to the present case.  In <u>Fleck</u>, two defendants were in
11  custody after one had given consent to search their home.  <u>Id.</u> at
12  888.  During the search, detectives came across a padlocked
13  bedroom.  Without being provided with <u>Miranda</u> warnings,
14  detectives asked defendants whose bedroom it was, and in
15  response, one defendant admitted it was his room and provided the
16  key.  <u>Id.</u>  Guns were discovered in the bed room, and defendants
17  moved to suppress evidence of the guns as the fruit of a non-
18  Mirandized statement about their ownership of the bedroom.  <u>Id.</u>
19  The Court of Appeals held, however, that the police request for
20  the key to the bedroom did not constitute interrogation.  <u>Id.</u> at
21  893.  The court found that the question about the bedroom, though
22  direct, was "not the kind of investigative questioning intended
23  to elicit an incriminating response."  <u>Id</u>. at 893 n.2.  The
24  court reasoned that defendants' authority over the padlocked
25  bedroom had already been established by defendants' consent to
26  search the home, and no further information was obtained by
27  admitting ownership over the bedroom.  <u>Id.</u>
28       Like the questioning about the bedroom in <u>Fleck</u>, law

enforcement's questioning of defendant about the combination to the safes did not have an investigative purpose and was not interrogation.  Just as the officers in <u>Fleck</u> already knew before questioning who was the owner of the house from the defendants' consent to search, so to in this case did law enforcement already know from extensive past investigation that defendant Lynch had ownership and control of the marijuana store.  Among other things, law enforcement knew that defendant Lynch's control of the premises from reviewing the store's business licence, from surveillance on defendant and the store, and from undercover operations at the store. (<u>See</u> Fontecchio Decl. ¶ 6 & Ex. B ¶¶ 15, 24, 38, 44-50, and 52).  The fact that Detective Fontecchio knew to call defendant at his home about the combination further demonstrates that law enforcement already knew that defendant was the property owner of the safes.  Further, SA Torrence who was present with defendant at the time, saw nothing incriminating or of any investigative value in defendant's statement and thus chose not include the information in his report on the search of defendant's home.  (Torrence Decl. ¶ 9).  Indeed, law enforcement's prior knowledge of the ownership and control of the safe was even more extensive in this case then that regarding the padlocked bedroom in <u>Fleck</u>.  As in <u>Fleck</u>, the questioning at issue does not constitute interrogation, and therefore the response by defendant was not given in violation of <u>Miranda</u>.

The Ninth Circuit's opinion in <u>Henley</u> is also instructive, but distinguishable from the present case.  There, FBI agents investigating a bank robbery found the getaway car and arrested the defendant.  <u>Henley</u>, 984 F.2d at 1041.  Without providing

1   _Miranda_ warnings, the agents asked defendant Henley who owned the
2   vehicle, and Henley admitted that he was the owner.  Inside the
3   car was a variety of evidence tied to the robbery including a
4   gun.  _Id._  Henley moved to suppress his statements regarding
5   ownership of the car and the Ninth Circuit reversed the district
6   court's decision denying the motion, finding instead a _Miranda_
7   violation in the police questioning.  _Id._ at 1043.  In coming to
8   this conclusion the court noted that the agent who had questioned
9   the defendant "knew that there was some doubt about who owned the
10  vehicle."  _Id._  The court thus reasoned that an officer "who has
11  the getaway car but isn't sure who owns it should well know that
12  asking a suspect if he's the owner of the vehicle is reasonably
13  likely to elicit an incriminating answer."  _Id._  In light of
14  this context, the Ninth Circuit found that Henley had been
15  subjected to "interrogation within the meaning of _Miranda_."  _Id._

16      _Henley_ is distinguishable from the present case and _Fleck_
17  because the subject matter of the police questioning in _Henley_
18  concerned an important area of open investigation about which
19  there was doubt or scarce information, the ownership of the
20  getaway car.  By contrast, in this case, there was no doubt who
21  owned and controlled the safes, just as there was no question in
22  _Fleck_ who lived in the padlocked bedroom.  Thus, only in _Henley_
23  could the police questioning have been reasonably likely to
24  elicit an incriminating answer.  In present case, by contrast,
25  the questioning was only likely to prevent the unnecessary
26  destruction of the safes, and defendant's response regarding the
27  combinations is accordingly not subject to suppression as
28  obtained in violation of _Miranda_.

9

B.    **BECAUSE LAW ENFORCEMENT WOULD HAVE INEVITABLY OBTAINED THE PHYSICAL EVIDENCE FROM THE SAFE PURSUANT TO A VALID WARRANT ANY PUTATIVE MIRANDA VIOLATION IS OF NO CONSEQUENCE**

Even if, contrary to the analysis above, law enforcement obtained the combination to the safes from defendant in violation of Miranda, under the inevitable discovery doctrine the evidence found in the safes should not be suppressed.  Without a doubt, Detective Fontecchio and other law enforcement officers intended to lawfully open the safes by force had they not received the combination information provided by defendant, and they had equipment on site to accomplish this.  Thus, the physical evidence in the safes would have been inevitably discovered irrespective of the challenged statements.  Therefore, the evidence found in the safes was not the fruit of a Miranda violation and may not be suppressed.

Under the inevitable discovery doctrine, evidence that was illegally obtained will not be suppressed if the government can prove by a preponderance of the evidence that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation.  United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir. 1986); see generally Nix v. Williams, 467 U.S. 431, 444 (1984).  For example, in United States v. Merriweather, 777 F.2d 503 (9th Cir. 1985), the Ninth Circuit applied the inevitable discovery doctrine to admit evidence found during an illegal search of a motel room.  In that case, officers went into the motel room without a warrant in order to perform a "security check."  During the "security check" one of the officers looked in a toilet tank and found money that had been taken in a bank robbery.  The officers subsequently obtained a

10

1  valid search warrant and found the money in the toilet tank. The
2  defense sought to suppress the money.

3       The government conceded that the initial warrantless search
4  of the motel room was illegal, because by looking in the toilet
5  tank, the officer exceeded the scope of a "security check" to see
6  if other persons were in the room.  Even though there was no
7  question that the warrantless search was illegal, the Ninth
8  Circuit affirmed the district court's decision to admit the money
9  as evidence, because the money was found independent of the
10 illegal search.   The court wrote:

11         Under the inevitable discovery doctrine as recently
           adopted by the Supreme Court, even if evidence is
12         initially obtained by unlawful government conduct,
           "[i]f the prosecution can establish by a preponderance
13         of the evidence that the information ultimately or
           inevitably would have been discovered by lawful means
14         . . . then the deterrence rationale [for the
           exclusionary rule] has so little basis that the
15         evidence should be received." Nix v. Williams, 467
           U.S. 431, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).
16         In this case, the warrant for the second search was not
           invalidated by the illegality of the first search,
17         because none of the information relied on by the
           magistrate in issuing the warrant came from the illegal
18         entry.  Segura v. United States, 468 U.S. 796, 104
           S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984).  Nor was the
19         securing of the room while waiting for the warrant an
           unreasonable continuing seizure that invalidated the
20         second search, given the fact that the police had
           probable cause to believe that evidence of a crime was
21         within the room. . . .  The prosecution has carried its
           burden of proof on the factual issue of inevitable
22         discovery by its showing that the second lawful search,
           which was carried out by agents ignorant of the
23         existence and location of the money, also resulted in
           discovery of the money.  Thus, we affirm the district
24         court's decision to admit the money.

25 Merriweather, 777 F.2d at 506.

26      The inevitable discovery doctrine is "an extrapolation from
27 the independent source doctrine," and flows from the same
28 principle, if evidence has no more than a tenuous connection to

11

1  an illegal search or seizure, the evidence should not be

2  excluded.  <u>Murray v. United States</u>, 487 U.S. 533, 538-39 (1988)

3  (holding that the independent source doctrine may apply to

4  "evidence acquired by an untainted search which is identical to

5  the evidence unlawfully acquired").  In order to qualify for this

6  exception, "the fact or likelihood that makes the discovery

7  inevitable [must] arise from circumstances other than those

8  disclosed by the illegal [conduct] itself."  <u>United States v.</u>

9  <u>Boatwright</u>, 822 F.2d 862, 864-65 (9th Cir. 1987).

10      Here, the evidence seized from the safes would have been

11  inevitably been discovered under the warrant for the marijuana

12  store.  Magistrate Judge Olguin did not base his decision to

13  issue the search warrant for the store on the actions challenged

14  by defendant in this motion.  Furthermore, the scope of the

15  search permissible under that warrant would have led law

16  enforcement agents to discover the challenged physical evidence

17  in the safes under the authority of the warrant.  The Ninth

18  Circuit has "long held that a search warrant authorizing the

19  seizure of materials also authorizes the search of objects that

20  could contain those materials."  <u>United States v. Giberson</u>, __

21  F.3d __, No. 07-10100, 2008 WL 2221008, (9th Cir. May 20, 2008);

22  <u>United States v. Disla</u>, 805 F.3d 1340, 1236 (9th Cir. 1986)

23  ("Police may search all items which legitimately <u>might</u> contain

24  the objects specified in the warrant") (emphasis added); <u>United</u>

25  <u>States v. Gomez-Soto</u>, 723 F.2d 649, 652 n.** (9th Cir. 1984)

26  (warrant authorizing seizure of "[b]ooks, papers, records,

27  receipts, documents, notation, diaries, journals, or ledgers"

28  authorized search of locked briefcase that defendant refused to

1   open).   The warrant for the marijuana store authorized the

2   seizure of numerous items that could have been (and in several

3   cases were, in fact) found in the safes including, among other

4   things: "controlled substances, including marijuana. . .

5   controlled substance paraphernalia. . . equipment used for the

6   cultivation of marijuana. . . receipts, invoices, ledgers, tally

7   sheets, and other papers relating to the transportation, ordering

8   or purchasing and/or distribution of controlled substance.   . .

9   ."   (Fonteccio Decl., Ex. A at 3 ("Items to be Seized")).

10      In addition, it is indisputable that law enforcement fully

11  intended to open the safes as part of their execution of the

12  warrant had defendant not provided the combination.   (Fonteccio

13  Decl. ¶¶ 4-7).   Law enforcement at the marijuana store had

14  equipment on hand to open the safes, and called defendant about

15  the combination only to avoid necessary destruction of the safes

16  themselves.   (Id.).   Thus, even had defendant said nothing

17  regarding the combination, the safes would have been opened and,

18  inevitably the physical evidence in them discovered.   Thus, the

19  Court should not suppress the evidence seized from the safes at

20  the marijuana store.

21

22

23

24

25

26

27

28

C.   **ALTERNATIVELY, THE EVIDENCE TAKEN FROM THE SAFE SHOULD NOT BE SUPPRESSED BECAUSE THE FRUIT OF THE POISONOUS TREE DOCTRINE DOES NOT EXTEND TO PHYSICAL EVIDENCE SEIZED AS A RESULT OF A <u>MIRANDA</u> VIOLATION**

The Supreme Court's opinion in <u>United States v. Patane</u>, 542 U.S. 630 (2004) regarding the fruit of the poisonous tree doctrine provides a second, independent reason why suppression of the evidence from the safe is not warranted even assuming defendant's statement about the combination was obtained in violation of <u>Miranda</u>. <u>Patane</u> holds that a statement obtained in violation of <u>Miranda</u> does not require suppression of physical evidence obtained from that statement under <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963) and its progeny, so long as the statement was voluntary. <u>See</u> <u>Patane</u>, 542 U.S. at 634, 641-43. As defendant's statements in this case were voluntary and not coerced by police action, even if defendant's statements were the product of a <u>Miranda</u> violation, the physical evidence obtained in the safe as a result of those statements is not subject to suppression.

In <u>Patane</u>, a police detective engaged in on-the-scene questioning of a defendant about a gun believed to be illegally possessed by the defendant without first providing the defendant with complete <u>Miranda</u> warnings. <u>Id.</u> at 635. After an initially equivocal response, the detective persisted, and the defendant admitted that the gun was in his bedroom. <u>Id.</u> The district court suppressed the firearm as the fruit of a <u>Miranda</u> violation, and the Court of Appeals affirmed. <u>Id.</u> The Supreme Court reversed. In the lead opinion joined by two other Justices, Justice Thomas noted that the <u>Miranda</u> rule protects against

14

violations of the Self-Incrimination Clause.   Important to the
Court was whether despite the lack of _Miranda_ warnings, a
defendant's statements were not involuntary.   The Court stated,
"The Self-Incrimination Clause, however, is not implicated by
admission into evidence of the physical fruit of a voluntary
statement.   Accordingly there is no justification for extending
the _Miranda_ rule in this context."   _Patane_, 542 U.S. at 637.   The
opinion held that the Self-Incrimination Clause of the
Constitution "cannot be violated by the introduction of
nontestimonal evidence obtained as a result of voluntary
statements."   _Id._   The Court reasoned that extension of _Miranda_
beyond the context of a testimonial self-incrimination "must be
justified by its necessity for the protection of the actual right
against compelled self-incrimination."   _Id._ at 639.   Given that
the concern of _Miranda_ is with the statement made by a defendant
being offered at trial, a voluntary statement, the "nontestimonal
fruit of a voluntary statement" like the defendant's gun, "does
not implicate the Self-Incrimination Clause" and should not be
suppressed.   _Id._   at 643.

Justice Kennedy, joined by Justice O'Connor, concurred in
the judgement reached by the lead opinion.   _Patane_, 542 U.S. at
644-45 (Kennedy, J., concurring).   Although not adopting
Justice's Thomas framework for analyzing _Miranda_ rules by tying
their scope closely to the Self-Incrimination Clause, or even
agreeing that a _Miranda_ violation had occurred in the case, the
concurring opinion recognized that the _Miranda_ doctrine "must be
accommodated to other objectives of the criminal justice system."
_Id_. at 644.   It noted that the Court had in previous cases

allowed to be admitted into evidence statements obtained
following statements made in violation of Miranda based "in large
part" on such concerns.  Id. (citing Oregon v. Elstad, 470 U.S.
298 (1985) and Michigan v. Tucker, 417 U.S. 433 (1974)).  Justice
Kennedy found such concerns even more pronounced in Patane where
the fruit of the Miranda violation is "nontestimonal physical
fruits" because it "does not run the risk of admitting into trial
an accused coerced incriminating statements."  Thus, a clear
majority of the Court found suppression of physical evidence
obtained in violation of Miranda unwarranted, so long as the
statements were voluntary.  Moreover, though Patane concerned a
failure to give Miranda warnings, nothing in its reasoning
suggests the result would be different where Miranda was violated
after warnings were provided.

Even if provided in violation of the Miranda right to
counsel, defendant's statement to Special Agent Torrence
regarding the combination of his safe was not involuntary.  Thus,
under Patane the physical fruits of those statements should not
be suppressed.  A defendant acts voluntarily when he makes a
statement with a "rational intellect and a free will."  Mincey v.
Arizona, 437 U.S. 385, 398 (1978); Townsend v. Sain, 372 U.S.
293, 307 (1963).  Only by overbearing a defendant's will do the
police coerce him into making an involuntary statement.  Id.;
United States v. Washington, 431 U.S. 181, 190 (1977). In
determining whether a defendant's statements were voluntary,
courts consider all the circumstances surrounding the making of
the statements.  See Mincey, 437 U.S. at 401; Washington, 431
U.S. at 188; United States v. Pinion, 800 F.2d 976, 980 (9th Cir.

16

1  1986).  "A statement cannot be deemed involuntary absent
2  coercion, intimidation, or deception by the interrogating
3  officer."  Colorado v. Connelly, 479 U. S. 157, 170 (1986);
4  Greenawalt v. Ricketts, 943 F.2d 1020 (9th Cir. 1991).  Indeed
5  "coercive conduct by police must have caused [defendant] to make
6  the statements" in order for them to be considered involuntary.
7  United States v. Turner, 926 F.2d 883, 888 (9th Cir. 1991)
8  (citations omitted).[2]

9      Here, law enforcement officers did not overbear defendant's
10  will to obtain the statement about the combination.  There is no
11  evidence that in asking about the combination law enforcement
12  used any intimidation, deception, or coercion.  Prior to asking
13  about the combination, Agent Torrence did not ask defendant a
14  question even remotely connected to the investigation for over an
15  hour, and had not asked any questions before reading defendant
16  his rights.  The answer to the question about the safe thus was
17  not the product of repeated questioning or law enforcement
18  pressure.  Agent Torrence had previously even answered a question
19  of defendant about the search warrant.  (Torrence Decl. ¶ 4).
20  While defendant was handcuffed, defendant was sitting in the
21  familiar surroundings of his kitchen and Agent Torrence was
22  speaking in a casual tone of voice.  (Id. ¶ 7).  Agent Torrence
23  did not threaten defendant, shout, or confront defendant with
24  evidence of his guilt or the potential consequences of the

25

26

27  [2]  While violation of Miranda rules is often stated to
    create a "generally irrebuttable" presumption of coercion, Patane
28  makes clear that such a presumption exists only "for the purposes
    of the prosecution's case in chief."  Patane, 542 U.S. at 639.

17

1   charges he might face. (<u>Id.</u>).  Nor was the questioning
2   immediately after law enforcement had made entry into defendant's
3   home.  Finally, the fact that law enforcement was about to open
4   defendant's safes did not put overbear defendant's will.  The
5   potential destruction of the safes is certainly not sufficient
6   duress to make defendant's choice to give law enforcement the
7   combination anything other than the product of a "rational
8   intellect" exercising "free will."

9       In sum, even if provided in violation of <u>Miranda</u>,
10  defendant's statement about the safe combination was voluntary.
11  Accordingly, while the statement itself cannot be admitted in the
12  government's case in chief, the evidence taken from the safe may
13  not also be suppressed as the fruit of a <u>Miranda</u> violation.
14  <u>Patane</u>, 542 U.S. at 634, 641-43

15                          **IV.**

16                        **CONCLUSION**

17      For the forgoing three independent reasons, defendant's
18  motion should be denied.

19
20
21
22
23
24
25
26
27
28

                          18

1              DECLARATION OF WILLIAM TORRENCE

2         I, William Torrence, do hereby declare:

3         1.   I am Special Agent (SA) for the Drug Enforcement

4    Administration (DEA), and have been so employed for over 9 years.

5    Since 2001, I have been assigned to the DEA's Ventura Resident

6    Office.  I offer the following declaration based on my personal

7    knowledge in support of the government's opposition to Charles C.

8    Lynch's motion to suppress evidence in the case of United States

9    v. Lynch.  This declaration is for that limited purpose and does

10   not purport to contain all the facts known to me about this case.

11        2.   On March 29, 2007, I was a member of a law enforcement

12   team consisting of DEA agents and members of the San Luis Obispo

13   County Sheriffs Department that executed a federal search warrant

14   at 589 Rosemary Lane, Arroyo Grande, California, the residence of

15   Charles Lynch ("the residence").  The warrant had been issued on

16   the previous day by the Hon. Fernando M. Olguin based upon the

17   affidavit of SA Rachel Burkdoll.

18        3.   At approximately 11:00 a.m., I entered the residence

19   soon after agents made their initial entry and were completing

20   their sweep of the location.  At that time, Mr. Lynch, who had

21   answered the door, was lying down on the floor near the front

22   door.  I stayed with Mr. Lynch for a few moments until other

23   agents announced that the location was clear.  While agents had

24   guns drawn upon entry into the residence, as is typical for

25   officer safety during execution of a warrant, upon the

26   announcement that the location was clear, agents holstered their

27   weapons.  I then asked agents to get Mr. Lynch some clothes, and

28   clothes were brought to him so he could get dressed.

4.    At this time I escorted Mr. Lynch to his kitchen, and sat down with him at his kitchen table.  I told him that we were here to execute a federal search warrant and offered to read it to him if he liked.  He said he didn't need me to read the warrant to him, and I provided him with a copy of the search warrant.  I then switched his handcuffs from his back to his front, so that he could look at and hold the search warrant, and be more comfortable.  He then began to read the warrant as I sat with him in the kitchen.  Mr. Lynch asked me a question about the warrant during this time though I do not recall what he asked.

5.    Once I saw Mr. Lynch was done reading the warrant, I read him his <u>Miranda</u> rights verbatim from a yellow card that I carried with me.  I asked him if he wanted to cooperate and he said that he would like to speak with his lawyer first.  I therefore did not ask him any further questions about the case.  As we waited while the search was being conducted we made small talk about issues not related to the investigation such as the view from his home and his interest in music.

6.    Approximately over an hour after Mr. Lynch finished reading his warrant, while other agents were searching the residence, I received a call from another law enforcement officer (I can't remember specifically which one, although I believe it may have been Detective Nick Fontecchio) who was in the process of executing another federal search warrant at Mr. Lynch's marijuana dispensary in Morro Bay, California.  The officer informed me that agents at the dispensary were going to break open a safe, and they wanted to know if Mr. Lynch would be

- 2 -

1 willing to provide the combination for the safe in lieu of a
2 forced entry into the safe.

3    7.   I passed this information onto Mr. Lynch who was still
4 sitting at the kitchen table with me, and he agreed to provide
5 the combination. At no point did I threaten or shout at Mr.
6 Lynch during this discussion about the combination (or at any
7 other time), nor were there any guns drawn. After Mr. Lynch gave
8 me the information, I relayed the numbers over the phone to the
9 officer at the dispensary.

10    8.   At the end of the search, I removed Mr. Lynch's
11 handcuffs, shook his hand, gave him my business card, and told
12 him that I would try to return to him as soon as possible some of
13 the personal property he was concerned about.

14    9.   In later preparing my report on the search warrant of
15 the residence, I did not include the details of my interaction
16 with Mr. Lynch at his kitchen table, including the discussion
17 about the combination for the safe, because it did not seem to me
18 either incriminating or relevant.

19    I declare that the foregoing is true and correct to the best
20 of my belief.

21 Executed in Ventura County, California on June 23, 2008.

22
23                        WILLIAM TORRENCE
24
25
26
27
28

- 3 -

DECLARATION OF NICK FONTECCHIO

I, Nick Fontecchio, do hereby declare:

1.    I offer the following declaration based on my personal knowledge in support of the government's opposition to Charles C. Lynch's motion to suppress evidence in the case of <u>United States</u> <u>v. Lynch</u>.  This declaration is for that limited purpose and does not purport to contain all the facts known to me about this case.

2.    I am a Detective for the San Luis Obispo (SLO) Sheriff's Department (the "Sheriff's Department"), and have had that position for 13 years.  I have worked for the Sheriff's Department since 1989.  I was also a police officer on the El Segundo Police Department for 10 years before transferring to the Sheriff's Department.  During my career I have participated in the execution of over 400 search warrants, including many during drug trafficking investigations.  From my training and experience I am familiar with the methods and procedures used by law enforcement, and especially the Sheriff's Department, in conducting search warrants.

3.    In the morning of March 29, 2007, I, other members of the Sheriff's Department, and federal agents from the DEA Ventura Resident Office executed a federal search warrant at 780 Monterey Avenue, Suite B, Morro Bay California, a marijuana store or dispensary known as the Central Coast Compassionate Caregivers (the "store" or the "location").  The warrant was issued by the Hon. Fernando M. Olguin.  A true copy of the warrant and affidavit in support of the warrant, which I reviewed prior to the search, is attached as exhibits A and B to this declaration.

4.    During the search of the location, I and other

1  officers found two black safes positioned on top of each other
2  ("the safes").  The safes were labeled with the numbers "1" and
3  "2" respectively, and were locked.  I believed they might contain
4  evidence responsive to the search warrant such as marijuana or
5  records of marijuana sales as we had found marijuana in other
6  safes at the location and because the safes were in a room set up
7  like an office with items like computers, fax machines, and
8  office supplies.  True and accurate photographs of the safes
9  taken during the search are attached as Exhibit C.
10      5.   I was unable to find a combination to the safes at the
11  store, and none of the marijuana store employees at the location
12  appeared to have, or were willing to provide, the combination.  I
13  was therefore prepared to have the safes opened by force, and had
14  at the location equipment for prying the safes open.
15  Specifically, we had on site a large metal ram that I can best
16  describe as a 40 pound hammer, and a large metal pick that can be
17  used with the ram to pry open a safe door.  In my experience,
18  these items would have been able to open the two safes at the
19  location.
20      6.   Before opening the safes by force, I sought to find out
21  whether Charles Lynch would be willing to provide law enforcement
22  with the combination since he was the owner.  I knew from my
23  personal participation in the investigation prior to the search
24  warrant that Lynch was the owner of the marijuana dispensary and
25  worked there much of the time it was open, that he was present
26  during marijuana sales, and was, I believed, in charge of, among
27  other things, bringing marijuana to and from the dispensary on a
28

- 2 -

1  daily basis.  (Please see for example paragraphs 15, 24, 38, 44-
2  50, and 52 of the affidavit in support of the search warrant for
3  the marijuana store which set forth the investigation by the
4  Sheriff's Department and other law enforcement into Lynch and the
5  dispensary prior to the execution of the warrant.  These and
6  other facts were all known to me at the time I helped execute the
7  warrant).  I also know that law enforcement was executing a
8  search of Lynch's home at the same time as our search at the
9  store.  In addition, it my standard practice during a search
10 warrant operation, and that of the Sheriff's Department, to ask a
11 property owner whether they will provide a combination or key
12 before breaking open a safe or similar container by force.  This
13 is done as a courtesy to prevent unnecessary destruction of
14 property.

15      7.   I caused a call to be made to law enforcement at
16 Lynch's residence to inquire about whether Lynch was willing to
17 provide the combination for the safes.  I do not remember
18 specifically whether I made the call or another person on my law
19 enforcement team made the call.  In any event, I received the
20 combination for the safes from the call, and we were able to open
21 them.  Again, had I not received the combination, I and other
22 officers and agents would have opened the safes by force to look
23 //
24
25 //
26
27 //
28

- 3 -

1   for evidence specified in the search warrant.

2       I declare that the foregoing is true and correct to the best

3   of my belief.  Executed in San Luis Obispo County, California on

4   June 23, 2008.

5

6                           _____  SLSO #578

7                           NICK FONTECCHIO

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -