EXHIBIT A

(Rev.√82)                              SEARCH WARRANT ON WRITTEN AFFIDAVIT

| UNITED STATES DISTRICT COURT | DISTRICT CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br><br>v.<br><br>THE PREMISES KNOWN AS:<br><br>CENTRAL COAST COMPASSIONATE CAREGIVERS<br>780 MONTEREY AVE., SUITE B<br>MORRO BAY, CALIFORNIA 93442-2128 | DOCKET NO.  MAGISTRATE'S CASE NO.<br>07-0420M<br><br>TO:<br><br>ANY SPECIAL AGENT(S) WITH THE DRUG ENFORCEMENT ADMINISTRATION OR ANY OTHER AUTHORIZED OFFICER |
|---|---|

Affidavit(s) having been made before me by the below-named affiant that he/she has reason to believe that on the premises known as

NOTE CHANGES MADE BY THE COURT.

**SEE ATTACHMENT A**

in the Central District of California

there is now being concealed certain property, namely:

**SEE ATTACHMENT B**

and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the person or premises above-described and the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit.

**YOU ARE HEREBY COMMANDED** to search on or before ____ten (10) days____ (not to exceed 10 days) the person or place named above for the property specified, serving this warrant and making the search (in the daytime--6:00 A.M. to 10:00 P.M.) and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to _____the duty U.S. Magistrate Judge_____ as required by law.

| NAME OF AFFIANT | SIGNATURE OF JUDICIAL OFFICER FERNANDO M. OLGUIN ·· | DATE/TIME ISSUED |
|---|---|---|
| Rachel Burkdoll | HONORABLE FERNANDO M. OLGUIN | 3/28/07  3:20 p |

*If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure Rule 41(c), show reasonable cause therefor.
**United States Judge or Judge of a State Court of Record.

MS

## Attachment "A"

### Premises to be Searched

The premises to be searched are described as follows:

(a)    **Central Coast Compassionate Caregivers, 780 Monterey Avenue, Morro Bay, California 93442-2128** (hereinafter referred to as "CCCC") is a commercial establishment located on the east side of Monterey Avenue and facing west. The building is mid-block between Morro Bay Boulevard (to the north) and Pacific Street (to the south.) 780 Monterey Avenue is a two-story tan colored stucco building with pink trim around the overhang. The numbers "780" run vertically down the face of the building. There are multiple reflective glass windows facing Monterey Avenue on the second story. There are two glass doors on the first floor of the building. The door to the south is the entrance to Fidelity National Title Company which occupies most of the ground floor of the building. The door to the north has the following markings on the front:

> ENTER HERE (displayed in large green lettering with a no smoking sign underneath)
> Central Coast Compassionate Caregivers
> 780 Monterey Ave Suite B
> Tus [sic] – Sun 11am – 6pm Closed on Monday
> 805-772-4879 (all of which is displayed in white lettering.)

North of this door is a large window which is almost the same size as the door with an "OPEN/CLOSED" sign affixed to the glass on the inside. Underneath the interchangeable "OPEN/CLOSED," sign is the following in white letters affixed to a black board:

> CENTRAL COAST CC
> 780 MONTEREY SUITE B
> HOURS 11AM TO 6PM
> CLOSED MONDAYS
> (805) 772-4879.

A white doorbell is located halfway down the window and is on the south side of the glass. The letter "B" is displayed on a reflective sticker to the south of the entryway to CCCC, and a security sticker is affixed to the bottom of the door listing HSM as the security company with phone number "877-HSM-4YOU." Another sticker "Pull to Open" is displayed just above the door handle to suite B. The door and the window to CCCC use reflective glass while the door to Fidelity National Title Company next door (suite A) is transparent. There is an alley way that runs parallel to the north of 780 Monterey Avenue. There is a parking lot directly behind 780 Monterey Avenue, but there is no back door access to the parking lot from the CCCC.

Attachment "B"

Items to be Seized

The items to be seized are evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 846, and 856(a)(1) (possession with intent to distribute, distribution of a controlled substance, namely, marijuana, a Schedule I controlled substance, conspiracy to manufacture or distribute a controlled substance, namely, marijuana; and maintaining drug-involved premises,) by Central Coast Compassionate Caregivers, and any owner(s) and/or employee(s) of this entity, as further described below:

(a)     Controlled substances, including marijuana and hash, derivatives thereof, and edible products containing marijuana;

(b)     Controlled substances paraphernalia, including but not limited to, equipment used for the cultivation of marijuana (including but not limited to rockwool, also known as Grodan (a fibrous material used as a growing medium and substituted for soil,) high intensity lights, nutrients, fertilizers, various types of fans such as those used for ventilation and drying, tables and trays that are specifically designed to facilitate the irrigation of marijuana plants, $CO_2$ enrichment systems, electrical timers, water filtration and reverse osmosis systems, and other items that allow for optimum growing conditions,) packaging materials and/or equipment, scales, and other instrumentalities of controlled substances activities;

(c)     Receipts, notes, ledgers, tally sheets, and other papers relating to the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or reflecting the proceeds of those activities;

(d)     Records, invoices, receipts, records of real estate transactions, bank statements, related bank records, passports, money drafts, money orders, bank drafts, wire transfers, cashier's checks, safe deposit box keys, credit card processing machines, records indicating credit card sales, and other items which demonstrate the obtaining, secreting, transfer, and/or concealment of narcotics proceeds, and any assets derived from narcotics proceeds;

(e)     Electronic equipment, to include but not limited to, telephones, cellular phones, pagers, computers, facsimile machines, currency counting machines, and telephone answering machines, containing any information regarding the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or the proceeds of such activities;

(f)     Photographs, including still photos, negatives, video tapes or other form of recording, films, undeveloped film, digital images and files, and the contents therein, depicting controlled substances or any entities or individuals involved in the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or acting as security for the manufacture, transportation, storage, or distribution of controlled substances or aiding and

1

abetting these activities in any way;

        (g)     Address and/or telephone books, telephones, pagers, answering machines, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of source(s) of supply or customer(s) of controlled substances;

        (h)     Indicia of occupancy, rental, and/or ownership of the Premises to be Searched, including but not limited to utility and telephone bills, canceled envelopes, rental, purchase, or lease agreements, letters, and keys;

        (i)     Documents and/or notes which purport to be recommendations and/or prescriptions for the use of marijuana; and

        (j)     Records, documents, programs, applications, or materials evidencing the cultivation, possession with intent to distribute, or distribution of marijuana.

        As used above, the terms "records, documents, programs, applications, or materials" include records, documents, programs, applications, or materials created, modified, or stored in any form. In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedures:

        (a)     Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

        (b)     If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

        (c)     If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the integrity of the data, then the computer personnel will determine whether it is practical to copy the data contained on the computer devices during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the computer devices cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a copy of the data contained on each computer device (a "data image") during the execution of this search and shall seize the data images rather than the computer devices themselves.

2

(d)     If the computer personnel determine it is not practical to perform an on-site search of the computer devices or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

(e)     In searching the computer devices or data images, the computer personnel may examine all of the data contained in the computer devices or data images to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

(f)     If the computer personnel seize the computer devices or make a data image pursuant to the provisions set forth above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such a search, the case agents determine that a computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device or data image; otherwise, the government will return the computer device or erase the data image. If the government needs additional time to determine whether the data on the computer devices or data images falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 60-day period from the date of execution of the warrant.

(g)     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i.      Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offenses listed above;

ii.     Any computer equipment used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii.    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.     Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

v.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

vi.     Any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

vii.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

4

EXHIBIT B

| UNITED STATES DISTRICT COURT | DISTRICT<br>CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>THE PREMISES KNOWN AS:<br><br>CENTRAL COAST COMPASSIONATE CAREGIVERS<br>780 MONTEREY AVE., SUITE B<br>MORRO BAY, CALIFORNIA 93442-2128 | DOCKET NO.          MAGISTRATE CASE NO.<br>07-0420M<br><br>NAME AND ADDRESS OF JUDGE OR U.S. MAGISTRATE JUDGE<br>HONORABLE FERNANDO M. OLGUIN<br>UNITED STATES MAGISTRATE JUDGE<br>LOS ANGELES, CALIFORNIA 90012 |

The undersigned being duly sworn deposes and says:          That there is reason to believe that

☐ on the person of       ☒ on the premises known as | DISTRICT
CENTRAL DISTRICT OF CALIFORNIA

SEE ATTACHMENT A

The following property (or person) is concealed:

SEE ATTACHMENT B

Affiant alleges the following grounds for search and seizure ₁

Evidence of violation(s) of Title 21, United States Code, Sections 841(a), 846, and 856(a)(1).

☐ See attached affidavit which is incorporated as part of this affidavit for search warrant

Affiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

(SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED AS PART OF THIS AFFIDAVIT FOR SEARCH WARRANT)

| SIGNATURE OF AFFIANT       /s/<br><br>Rachel Burkdoll | OFFICIAL TITLE, IF ANY<br><br>SPECIAL AGENT - DRUG ENFORCEMENT ADMINISTRATION |
|---|---|

Sworn to before me, and subscribed in my presence:

| DATE<br>3/28/07 | JUDGE₂ OR US MAGISTRATE JUDGE<br>FERNANDO M. OLGUIN<br>HONORABLE FERNANDO M. OLGUIN |
|---|---|

₁ If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefor

₂ United States Judge or Judge of a State Court of Record

MS

**Attachment "A"**

**Premises to be Searched**

The premises to be searched are described as follows:

      (a)    **Central Coast Compassionate Caregivers, 780 Monterey Avenue, Morro Bay, California 93442-2128** (hereinafter referred to as "CCCC") is a commercial establishment located on the east side of Monterey Avenue and facing west. The building is mid-block between Morro Bay Boulevard (to the north) and Pacific Street (to the south.) 780 Monterey Avenue is a two-story tan colored stucco building with pink trim around the overhang. The numbers "780" run vertically down the face of the building. There are multiple reflective glass windows facing Monterey Avenue on the second story. There are two glass doors on the first floor of the building. The door to the south is the entrance to Fidelity National Title Company which occupies most of the ground floor of the building. The door to the north has the following markings on the front:

                ENTER HERE (displayed in large green lettering with a no smoking sign underneath)
                Central Coast Compassionate Caregivers
                780 Monterey Ave Suite B
                Tus [sic] – Sun 11am – 6pm Closed on Monday
                805-772-4879 (all of which is displayed in white lettering.)

      North of this door is a large window which is almost the same size as the door with an "OPEN/CLOSED sign affixed to the glass on the inside. Underneath the interchangeable "OPEN/CLOSED," sign is the following in white letters affixed to a black board:

                CENTRAL COAST CC
                780 MONTEREY SUITE B
                HOURS 11AM TO 6PM
                CLOSED MONDAYS
                (805) 772-4879.

      A white doorbell is located halfway down the window and is on the south side of the glass. The letter "B" is displayed on a reflective sticker to the south of the entryway to CCCC, and a security sticker is affixed to the bottom of the door listing HSM as the security company with phone number "877-HSM-4YOU." Another sticker "Pull to Open" is displayed just above the door handle to suite B. The door and the window to CCCC use reflective glass while the door to Fidelity National Title Company next door (suite A) is transparent. There is an alley way that runs parallel to the north of 780 Monterey Avenue. There is a parking lot directly behind 780 Monterey Avenue, but there is no back door access to the parking lot from the CCCC.

**Attachment "B"**

**Items to be Seized**

The items to be seized are evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 846, and 856(a)(1) (possession with intent to distribute, distribution of a controlled substance, namely, marijuana, a Schedule 1 controlled substance, conspiracy to manufacture or distribute a controlled substance, namely, marijuana; and maintaining drug-involved premises,) by Central Coast Compassionate Caregivers, and any owner(s) and/or employee(s) of this entity, as further described below:

(a)     Controlled substances, including marijuana and hash, derivatives thereof, and edible products containing marijuana;

(b)     Controlled substances paraphernalia, including but not limited to, equipment used for the cultivation of marijuana (including but not limited to rockwool, also known as Grodan (a fibrous material used as a growing medium and substituted for soil,) high intensity lights, nutrients, fertilizers, various types of fans such as those used for ventilation and drying, tables and trays that are specifically designed to facilitate the irrigation of marijuana plants, $CO_2$ enrichment systems, electrical timers, water filtration and reverse osmosis systems, and other items that allow for optimum growing conditions,) packaging materials and/or equipment, scales, and other instrumentalities of controlled substances activities;

(c)     Receipts, notes, ledgers, tally sheets, and other papers relating to the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or reflecting the proceeds of those activities;

(d)     Records, invoices, receipts, records of real estate transactions, bank statements, related bank records, passports, money drafts, money orders, bank drafts, wire transfers, cashier's checks, safe deposit box keys, credit card processing machines, records indicating credit card sales,  and other items which demonstrate the obtaining, secreting, transfer, and/or concealment of narcotics proceeds, and any assets derived from narcotics proceeds;

(e)     Electronic equipment, to include but not limited to, telephones, cellular phones, pagers, computers, facsimile machines, currency counting machines, and telephone answering machines, containing any information regarding the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or the proceeds of such activities;

(f)     Photographs, including still photos, negatives, video tapes or other form of recording, films, undeveloped film, digital images and files, and the contents therein, depicting controlled substances or any entities or individuals involved in the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or acting as security for the manufacture, transportation, storage, or distribution of controlled substances or aiding and

abetting these activities in any way;

      (g)    Address and/or telephone books, telephones, pagers, answering machines, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of source(s) of supply or customer(s) of controlled substances;

      (h)    Indicia of occupancy, rental, and/or ownership of the Premises to be Searched, including but not limited to utility and telephone bills, canceled envelopes, rental, purchase, or lease agreements, letters, and keys;

      (i)    Documents and/or notes which purport to be recommendations and/or prescriptions for the use of marijuana; and

      (j)    Records, documents, programs, applications, or materials evidencing the cultivation, possession with intent to distribute, or distribution of marijuana.

      As used above, the terms "records, documents, programs, applications, or materials" include records, documents, programs, applications, or materials created, modified, or stored in any form.  In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedures:

      (a)    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

      (b)    If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

      (c)    If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the integrity of the data, then the computer personnel will determine whether it is practical to copy the data contained on the computer devices during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data.  If it is practical, and the computer devices cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a copy of the data contained on each computer device (a "data image") during the execution of this search and shall seize the data images rather than the computer devices themselves.

(d)     If the computer personnel determine it is not practical to perform an on-site search of the computer devices or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

(e)     In searching the computer devices or data images, the computer personnel may examine all of the data contained in the computer devices or data images to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

(f)     If the computer personnel seize the computer devices or make a data image pursuant to the provisions set forth above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such a search, the case agents determine that a computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device or data image; otherwise, the government will return the computer device or erase the data image. If the government needs additional time to determine whether the data on the computer devices or data images falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 60-day period from the date of execution of the warrant.

(g)     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i.     Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offenses listed above;

ii.     Any computer equipment used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii.     Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.     Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

v.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

vi.     Any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

vii.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Rachel Burkdoll, being duly sworn, declare and state:

## INTRODUCTION

1.       I am an investigative and law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510 (7), who is empowered to conduct

investigations of, and to make arrests for, the offenses enumerated in Title 18, United States

Code, Section 2516.

2.       I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA")

and have been so employed since September 2005. I am currently assigned to the Los Angeles

Field Division, Ventura Resident Office.  I have received 17 weeks of specialized training in

Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations,

surveillance tactics, interviewing, informant handling as well as tactical searches and arrests.  I

have been involved in several investigations regarding possession, manufacture, and distribution

of controlled substances as well as related money laundering statutes involving the proceeds of

specified unlawful activities and conspiracies associated with criminal narcotics, in violation of

Title 21, U.S.C. §§ 841 (a)(1), 843 (b), 846, 952(a), 963 and Title 18, U.S.C. §§ 2, 922, 924,

1952, 1956, 1957.

3.       In investigations relating to controlled substances, I have utilized a variety of

investigative techniques and resources, including physical and electronic surveillance, the

analysis of telephone records, and the use of various types of informants and confidential

sources.  I have participated and assisted in undercover operations and I have executed various

arrest and search warrants.  Through these investigations, my training and experience, and my

1

conversations with other law enforcement investigators, I have become familiar with the methods used by traffickers of controlled substances (interchangeably referred to as narcotics) to manufacture controlled substances, smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including the use of cellular telephone technology, pagers, counter surveillance techniques, false or fictitious identities and addresses, money laundering techniques, stash houses, storing records related to the criminal activities, and coded communications and conversations. Furthermore, I am also familiar with California "medical marijuana" laws and attempts to distribute marijuana through dispensaries.

### Training and Experience Regarding Medical Marijuana Dispensaries

4.     Based on my training and experience, I am aware that "medical marijuana" dispensaries are retail establishments selling marijuana to customers, purportedly for medical reasons. These dispensaries seek protection under California's medical marijuana laws -- Proposition 215 and Senate Bill 420 -- in order to sell marijuana for profit which is against the spirit and letter of the state laws. Based on my training and experience, I know the following regarding the operation of "medical marijuana" dispensaries:

      a. Proprietors of marijuana dispensaries often invest in several different dispensaries at once to maximize profits;

      b. Proprietors of marijuana dispensaries often buy their marijuana from several different vendors to obtain different varieties of marijuana and marijuana edibles;

      c. Proprietors of marijuana dispensaries will often limit the allowable purchases

2

for customers on each visit.  This allows the dispensaries to make more transactions at increased prices to maximize profits.

        d.  Marijuana dispensaries often sell several different varieties of marijuana products including marijuana plants, both mature and immature (clones); hash; hash oil; kief (concentrated cannabis); topical lotions and ointments; marijuana edibles, including baked goods, candies, drinks, ice cream, soups, and the like.

        e.  Marijuana dispensaries often use armed security guards to protect their marijuana and marijuana proceeds from robbery and theft.  They will also keep all doors locked to restrict free access to the dispensary, and often have video surveillance cameras installed inside and outside of the premises.

        f.  Marijuana dispensaries will purposely not display the name of their dispensary, so as to not draw attention by law enforcement officials and the general public.

        g.  Marijuana dispensaries conduct most of the marijuana transactions with cash and large amounts of cash are maintained at the dispensaries and at the place(s) of residence of the owner(s).

        h.  Proprietors of marijuana dispensaries often make purchases of high-value items with cash, in order to conceal their amassed wealth.

        i.  Marijuana dispensaries often have a pre-determined plan of what to do in the event of a raid by law enforcement officials.  This includes the following:

           1.  Plan a rally for during and after the raid -- preferably at a FedeBuilding;

           2.  Have less clones on hand and store cannabis, cash, proceeds, and other contraband at a separate location;

3. Haveof the marijuana and the customers who are buying the marijuana on computers encrypted or have a system for quickly erasingdrives;

4. Make sure everything is labeled "medical cannabis;"

5. Monitor the vicinity surrounding the dispensary for signs csurveillance;

6. Have an alternative site for re-opening;

7. Make sure there are no other drugs or unauthorized personnel on site;

8. Have a press release partially written and ready to submit to the media.

9. Prepare a "complaint list" of people to call to complain about the raid.

10. Use code words to notify others in the dispensary that thare present;

11. Step outside and lock the premises;

12. Have people with cameras and/or video recorders recording the police/agents' actions and take photographs of license plates;

### Other Training and Experience Regarding Drug Traffickers

5. I have had training, experience, and communications with law enforcement personnel who specialize in the area of documentation and detection of proceeds from drug trafficking. I also have experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have knowledge regarding the methods of transportation and distribution of the drugs and money in large scale controlled substance distribution operations.

6. Based on my training and experience, I know the following:

a. That drug traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location

where large quantities of narcotics, money, and/or other drug-related assets are stored. Therefore, one or more locations are often used to store lesser amounts of narcotics, money, and/or drug related assets, and additional locations are used to meet customers;

      b.     That persons involved in large scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, amounts of jewelry, automobiles, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics trafficking activities;

      c.     That drug traffickers have maintained at their locations, including the residences where they live, the types of things I have described above and other items like the following:  money, ledgers, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents notating the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed; that drug traffickers also maintain drug paraphernalia such as "cutting" materials, weighing devices, miscellaneous containers, and measuring devices which are used to facilitate the distribution of narcotics;

      d.     That when drug traffickers amass large quantities of cash from the sale of drugs, they often attempt to legitimize these profits through the use of banks, financial institutions, and their attendant services that include accounts, securities, traveler's checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes, the details of which they often keep in document form in their residences and places of business;

      e.     That drug traffickers often place assets in names of relatives and close

friends in order to avoid detection of those assets by law enforcement agencies and that even though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase of those assets while continuing to use those assets and exercise dominion and control over them, the details of which they often keep in document form in their residences and places of business;

f.      That it is common practice for large-scale narcotic traffickers to travel to their purchase and distribution areas to facilitate their trafficking and that after purchasing drugs, narcotic traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs.  The methods of transportation include commercial airlines, private airplanes, trains, vessels, rental and private automobiles, and government and contract mail carriers;

g.      That drug dealers use telephones, cellular telephones, pagers, and other communication devices, as well as maintain telephone and address books, telephone bills, and other records which reflect names, addresses, and/or telephone numbers of their associates in the narcotic trafficking organization and customers of narcotics;

h.      That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product; and that these traffickers usually maintain these photographs at their premises and if they have security cameras at a location that they are using as a marijuana dispencary they often maintain recordings of the drug transactions and the customers who are purchasing the drugs ;

i.      That drug dealers commonly have in their possession (meaning on their persons, at their residence, and/or at their stash houses) firearms including handguns, pistols,

6

revolvers, rifles, shotguns, machine guns, and other weapons that are used to protect and secure

the drug trafficker's property including narcotics, narcotic paraphernalia, currency, jewelry, and

records as described above. When the drug trafficking is ongoing in nature, like in the instant

case, these items are usually found at the location where the drugs are distributed from and the

residences of the drug traffickers and these items are there for a substantial long period of time.

This is so because the ongoing nature of the drug trafficking leads to an accumulation of

evidence in a way that is different than drug trafficking that occurs on an intermittent or isolated

basis. So, we often find evidence of the drug trafficking at the location of the distribution center

or the residence of the owner/manager/proprietor in these circumstances long after the last

undercover deal is conducted.

### Other Training and Experience Regarding Computer Evidence

      7.    Based upon my training and experience and information related to me by agents

and others involved in the forensic examination of computers, I know that computer data can be

stored on a variety of systems and storage devices including hard disk drives, floppy disks,

compact disks, magnetic tapes, thumb drives, and memory chips. I also know that during the

search of the premises, it is not always possible to search computer equipment and storage

devices for data for a number of reasons including the following:

      a.    Searching computer systems is a highly technical process which requires

specific expertise and specialized equipment. Due to the wide variety of computer hardware and

software in use today, it is impossible to bring to the search site all of the technical manuals and

specialized equipment necessary to conduct a thorough search. In addition, it may also be

necessary to consult with computer personnel who have specific expertise in the type of

7

computer, software application, or operating system that is being searched;

    b.  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

    c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data which if printed out would completely fill a 35' x 35' x 10' room to the ceiling;

    d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it

appear that the file contains text.  Computer users can also attempt to conceal data by using

encryption, which means that a password or device, such as a "dongle" or "keycard," is

necessary to decrypt the data into readable form.   In addition, computer users can conceal data

within another seemingly unrelated and innocuous file in a process called "steganography." For

example, by using steganography, a computer user can conceal text in an image file which

cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is

necessary to extract and sort through data that is concealed or encrypted to determine whether it

is evidence, contraband, or instrumentalities of a crime and it would not be practical or safe to do

this at the crime scene where the computer is found.  Also, it would serve to displace the

owner/renter of the property for long periods of time if we were to attempt to review the

computer material at the scene of the crime;

8.      This affidavit is submitted in support of search warrants for the following three

locations:

**Central Coast Compassionate Caregivers**
**780 Monterey Avenue, Suite B**
**Morro Bay, California 93442-2128**

**589 Rosemary Lane,**
**Arroyo Grande, California 93420**

**8419 Hannum Avenue**
**Culver City, California 90230**

These locations are  further described below in paragraph 11 and in Attachment A hereto,

and I would like to search for evidence, fruits, and instrumentalities of violations of Title 21,

U.S.C. §§ 841(a), 846, and 856(a)(1) (possession with intent to distribute, and distribution of a

controlled substance, namely, marijuana, a Schedule I controlled substance; conspiracy to

distribute a controlled substance, namely, marijuana; and maintaining drug-involved premises, as well as related conspiracy charges) as further described below in paragraph 11 and in Attachment B hereto.

9.      As set forth herein, there is probable cause to believe that one of the aforementioned locations is a dispensary that sells marijuana (Central Coast Compassionate Caregivers) and the other is an associated location (589 Rosemary Lane, Arroyo Grande, California) at which pertinent documents, marijuana, and/or marijuana proceeds are located.

9(a).    Marijuana is a Schedule I controlled substance and the manufacture or distribution of marijuana is a violation of federal law. This is true regardless of the fact that state law makes the distribution of marijuana legal under limited circumstances where a doctor determines that a patient has a medical need for the drug.   This is so because federal law cannot be preempted by a state law which legalizes what federal law makes illegal. Regardless, as set forth herein below, while Central Coast Compassionate Caregivers purports to operate as a dispensary which sells marijuana to individuals solely with a medical need, there is probable cause to believe that it sells marijuana to individuals who have no medical need at all. So, the sale of marijuana by Central Coast Compassionate Caregivers violates not only federal law but also violates state law.

10.     This affidavit is submitted solely to establish probable cause for the requested search warrants and does not purport to set forth all of my investigation or knowledge of this matter. The facts and information contained in this affidavit are based on my personal knowledge and expertise, as well as that of other law enforcement officers involved in this investigation.

**10**

## PREMISES TO BE SEARCHED

11.    The premises to be searched, also set forth in Attachment A hereto, are described as follows:

(a)    **Central Coast Compassionate Caregivers, 780 Monterey Avenue, Morro Bay, Suite B, California 93442-2128** (hereinafter "Central Coast Compassionate Caregivers" or "CCCC") is a commercial establishment located on the east side of Monterey Avenue and facing west. The building is mid-block between Morro Bay Boulevard (to the north) and Pacific Street (to the south.). This location, 780 Monterey Avenue, is a two-story tan colored stucco building with pink trim around the overhang. The numbers "780" run vertically down the face of the building. There are multiple reflective glass windows facing Monterey Avenue on the second story. There are two glass doors on the first floor of the building. The door to the south is the entrance to Fidelity National Title Company which occupies most of the ground floor of the building. The door to the north has the following markings on the front:

> ENTER HERE (displayed in large green lettering with a
> "no smoking" sign underneath)
> Central Coast Compassionate Caregivers
> 780 Monterey Ave Suite B
> Tus [sic] – Sun 11am – 6pm Closed on Monday
> 805-772-4879 (all of which are displayed in white lettering.)

North of this door is a large window which is almost the same size as the door with an "OPEN/CLOSED" sign affixed to the glass on the inside. Underneath the interchangeable "OPEN/CLOSED" sign is the following in white letters affixed to a black board:

> CENTRAL COAST CC
> 780 MONTEREY SUITE B

11

HOURS 11AM TO 6PM
CLOSED MONDAYS
(805) 772-4879.

A white doorbell is located halfway down the window and is on the south side of the glass. The letter "B" is displayed on a reflective sticker to the south of the entryway to CCCC, and a security sticker is affixed to the bottom of the door listing HSM as the security company with phone number "877-HSM-4YOU." Another sticker "Pull to Open" is displayed just above the door handle to suite B. The door and the window to CCCC are composed of reflective glass while the door to Fidelity National Title Company next door (suite A) is transparent. There is an alley way that runs parallel to the north of 780 Monterey Avenue. There is a parking lot directly behind 780 Monterey Avenue, but there is no back door access to the parking lot from the CCCC.

(b)    **589 Rosemary Lane, Arroyo Grande, California 93420** is located just south of the intersection of Rosemary Lane and Sombrillo. 589 Rosemary Lane is a ranch style residence with both two-car and one-car garage doors facing Rosemary Lane. It is a tan colored residence with a grey shingle roof. There are three windows and one door on the east side of the building. There is one window on the west side. Between the two-car and one-car garage doors is a pillar of river rock with the numbers "589" in black above the pillar. The front door is located to the west of the garage doors underneath an overhang, and the door has windows on either side of it. There is also large bay window that faces Rosemary Lane.

(c)    **8419 Hannum Avenue, Culver City, California 90230** is located just south-east of the intersection of Playa Street and Hannum Avenue. This location, 8419 Hannum Avenue, is

12

a located behind the gated entrance of "Playa Pacific Townhomes." This building, 8419

Hannum Avenue, is a three-story townhouse that has a two-car garage on the ground level. It is

a tan colored building with a grey shingle roof and teal trim railings and gutters. There are also

teal canopies above three windows on the south-west side of the building. The garage door is

located on the south-east side of the building and has a white door with four dark rectangles in

the corners. There is also a teal sign with "8419" in white letters above the door. In front of the

south-west side of the building is a sign that lists the following in teal lettering:

      ← 6301-7323

    7401-8507 →

The front entrance to the residence is located on the north-west side of the building at the top of

several staircases. It is a white door with a small window above the entrance. There is a large

patio area next to the front door with an approximately four foot wall surrounding it. A sign is

affixed to the patio wall which faces the north-west side that reads " 8419" in white lettering on a

teal background. There is also a large sliding glass door that provides entry from the patio to the

living room of the residence. There are multiple windows on three sides of the building and the

fourth side of the building on the north-east side is connected to another townhouse.

## ITEMS TO BE SEIZED

12.    I am requesting authorization to search for evidence, fruits, and instrumentalities

of violations of Title 21, U.S.C. §§ 841(a), 846, and 856(a)(1) (possession with intent to

distribute, distribution of a controlled substance, namely, marijuana, a Schedule I controlled

substance; conspiracy to manufacture or distribute a controlled substance, namely, marijuana;

and maintaining drug-involved premises.) by Central Coast Compassionate Caregivers, and any owner(s) and/or employee(s) of this entity as well as evidence of the same at the residence of Doctor TOLLETTE, as described in Attachment B. Specifically, I am requesting authority to search for the following:

(a)     Controlled substances, including marijuana, derivatives thereof, and edible products containing marijuana;

(b)     Controlled substances paraphernalia, including but not limited to, equipment used for the cultivation of marijuana (including but not limited to rockwool, also known as Grodan (a fibrous material used as a growing medium and substituted for soil,) high intensity lights, nutrients, fertilizers, various types of fans such as those used for ventilation and drying, tables and trays that are specifically designed to facilitate the irrigation of plants, $CO_2$ enrichment systems, electrical timers, water filtration and reverse osmosis systems, and other items that allow for optimum growing conditions,) packaging materials and/or equipment, scales, and other instrumentalities of narcotics activities;

(c)     Receipts, notes, ledgers, tally sheets, and other papers relating to the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or reflecting the proceeds of those activities;

(d)     Records, invoices, receipts, records of real estate transactions, bank statements, related bank records, passports, money drafts, money orders, bank drafts, wire transfers, cashier's checks, safe deposit box keys, credit card processing machines, records indicating credit card sales, and other items which demonstrate the obtaining, secreting, transfer,

14

and/or concealment of narcotics proceeds, and any assets derived from the proceeds of the manufacture, possession, or distribution of controlled substances;

(e)     Electronic equipment, to include but not limited to, telephones, cellular phones, pagers, computers, facsimile machines, currency counting machines, and telephone answering machines, containing any information regarding the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or the proceeds of such activities;

(f)     Photographs, including still photos, negatives, video tapes, films, undeveloped film, digital images and files, and the contents therein, depicting controlled substances or any entities or individuals involved in the cultivation, transportation, ordering, purchasing, and/or distribution of controlled substances or persons depicted with large sums of proceeds;

(g)     Address and/or telephone books, telephones, pagers, answering machines, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of source(s) of supply or customer(s) of controlled substances;

(h)     Indicia of occupancy, rental, and/or ownership of the Premises to be Searched, including but not limited to utility and telephone bills, canceled envelopes, letters addressed to the location searched, personal items that may be at the location search and connected to specific indivuals which would then reflect the presence of the individuals at that location, rental, purchase, or lease agreements, and keys;

15

(I)     Documents and/or notes which purport to be recommendations and/or prescriptions for the use of marijuana: and

(j)     Records. documents. programs. applications. or materials evidencing the cultivation. possession with intent to distribute. transportation. storage. or distribution of marijuana.

13.     As used above. the terms "records. documents. programs. applications. or materials" include records. documents. programs. applications. or materials created. modified. or stored in any form.  In searching for data capable of being read. stored. or interpreted by a computer. law enforcement personnel executing this search warrant will employ the following procedures:

(a)     Upon securing the premises. law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices and without jeopardizing the safety of the agents.1

(b)     If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a

---

[1] I know that when agents stay at a search location for a long period of time they run the risk of retaliation from the occupants of the location or other co-conspirators who may learn of the search and decide to go to the location.  This risk increases as more time is spent at the search location.

computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

(c)     If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the integrity of the data and the safety of the agents, then the computer personnel will determine whether it is practical to copy the data contained on the computer devices during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the computer devices cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a copy of the data contained on each computer device (a "data image") during the execution of this search and shall seize the data images rather than the computer devices themselves.

(d)     If the computer personnel determine it is not practical to perform an on-site search of the computer devices or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data and the safety of the agents, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

(e)     In searching the computer devices or data images, the computer personnel may examine all of the data contained in the computer devices or data images to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted,"

17

"hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

        (f)     If the computer personnel seize the computer devices or make a data image pursuant to the provisions set forth above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such a search, the case agents determine that a computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device or data image; otherwise, the government will return the computer device or erase the data image. If the government needs additional time to determine whether the data on the computer devices or data images falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 60-day period from the date of execution of the warrant.

        (g)     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

        i.     Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offenses listed above;

        ii.     Any computer equipment used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii.    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.    Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software and any documents that appear to be passwords or codes or descriptions of how to use the computer or located data on the computer.

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

vi.    Any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

vii.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

### BASIS OF INVESTIGATION

14.    On January 5, 2006, the narcotics detectives of the San Luis Obispo (SLO) Sheriff's Department received information that a marijuana dispensary had opened at 7425 El Camino Real in Atascadero, CA.  The owner was listed as Charles LYNCH and LYNCH was observed by detectives entering and exiting the dispensary several times throughout the day.

15.     On January 19, 2006, SLO detectives observed LYNCH exit the dispensary at 7425 El Camino Real at closing time with two unidentified males and one unidentified female who were carrying storage boxes. The group walked closely together to LYNCH's 2005 Nissan Murano with California license plate 5NWS347, and placed the boxes in the back of the vehicle. The group entered the vehicle and conducted counter surveillance maneuvers which appeared to the detectives who were attempting to follow the Nissan Murano as maneuvers intended to lose or identify any individuals following the Murano. This type of driving is typical of people involved in drug trafficking. LYNCH was observed driving his vehicle, with the boxes in it, to his residence at 589 Rosemary Lane (one of the subject premises). He drove his vehicle into the garage and closed the door behind him. This led me to concluded that it is LYNCH's pattern of behavior to take evidence, be it marijuana or documents, from his dispensaries to his house. This is consistent with my understanding how drug traffickers operate because they often want to keep the drugs or drug trafficking records close to them in order to maintain control over the drugs or records, thus reducing the likelihood that someone will steal the drugs or records or discover the identities of their drug purchasing customers.

16.     Shortly thereafter, business owners located near the El Camino dispensary began filing complaints that customers exiting the dispensary were observed giving marijuana to other people waiting outside. On other occasions, the local business owners reported that customers who exited the dispensary were smoking marijuana before driving away in their vehicles. Within a couple of weeks, the dispensary was closed by the City of Atascadero due to zoning regulations.

20

## Opening of the Central Coast Compassionate Caregivers

17.    In April of 2006, SLO detectives learned that another dispensary owned by LYNCH opened at 780 Monterey Avenue Suite B in Morro Bay, California.  The name of this facility was listed as "Central Coast Compassionate Caregivers" (CCCC.)  Charles C. LYNCH was listed as the sole proprietor on the license application.  LYNCH also provided that he resided at 589 Rosemary Lane in Arroyo Grande, California 93420 and listed his date of birth as 5/15/1962, California driver's license number as A4448929, and social security number as 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.  LYNCH also gave a home phone number as 805-489-4653 and cellular phone number as 805-801-0380.  In addition to the application, LYNCH also provided two floor plans for the first and second stories.

18.    On June 21, 2006, LYNCH submitted a conditional use permit to the City of Morro Bay requesting that LYNCH be able to grow marijuana plants at 780 Monterey Avenue Suite B for medicinal purposes.  The city granted the request.  LYNCH included a floor plan of the CCCC and a proposed set of guidelines for maintaining the indoor grow.  The guidelines were as follows:

> 1. Nursery Conditional Use Permit conditions will be displayed conspicuously in the nursery area.
>
> 2. No more than 12 immature plants per verified patient may be on the premises at one time.
>
> 3. No plant shall be taller that [sic] 1 foot from the base of the plant.
>
> 4. No mature budding plants are allowed.

21

5. Nursery area will be maintained free of mold, mildew and fungus.

6. Nursery area will be maintained free of bugs and mites.

7. Nursery dispensing will comply with all provisions of California Health and Safety code.

8. Nursery area not to exceed 60 square feet of total office space.

9. The nursery shall be maintained in compliance with regulations the City may issue regarding, but not limited to, the maximum number that may be dispensed in any single transaction. Such regulations may be modified from time to time, as the City deems appropriate.

### Undercover and Confidential Source Activities

19.     On June 1, 2006, the SLO Sheriff's Department was able to utilize a confidential source, hereinafter referred to as CS-1, to make several marijuana purchases from the CCCC. CS-1 is a person who approached the SLO Sheriff's Department and offered his/her assistance. CS-1 was working for the SLO CS-1 Sheriff's Department in exchange for money and is controlled by SLO detectives. CS-1 has provided reliable and truthful information in the past and has done other undercover work in which his assistance resulted in the seizure of controlled substances. CS-1 also has a criminal history that includes narcotic related offenses and posing as police officer.

20.     At the time of the undercover transaction in June of 2006, CS-1 entered the CCCC on the first floor and was contacted by two male subjects who began to search CS-1 with a radio frequency indicator. This is a device which is utilized to detect radio frequencies that

22

may be transmitting from a body wire and indicates to me that the workers/owner of the CCCC are very cautious about being detected by law enforcement. CS-1 inquired as to what the two males were doing, and he/she was told that the business did not want to have any undercover law enforcement personnel in the building without their knowledge. The two males also conducted a physical search of CS-1. Once this was completed, CS-1 was announced via a hand-held portable radio and the announcer indicated that CS-1 would be entering the CCCC. CS-1 was greeted by a female at the rear of the lobby on the first floor. CS-1 explained to the female employee that his/her medicinal use card had expired. The female employee handed CS-1 a list of physicians that she said would be able to reissue him a recommendation. I learned this information by it being recounted to me by detectives who were handling CS-1.

21.    On June 2, 2006, at the direction of SLO detectives, CS-1 was able to make an appointment with Doctor Armond Tennyson TOLLETTE II who was a doctor on the list provided to CS-1 by the CCCC employee. TOLLETTE was using a cellular phone number (310-505-0002) which is a Sprint Nextel phone subscribed to Veking B. Tollette of 3500 W. Manchester Blvd, Unit 289, Inglewood, CA 90305-4289. The phone account was established on April 26, 2002, but is listed as delinquent pending payment of $824.11. CS-1 called TOLLETTE and asked if he/she needed to bring his/her medical records to the appointment or a list of current medications that CS-1 was taking, and TOLLETTE stated that it would not be necessary. TOLLETTE directed CS-1 to meet with him at 8419 Hannum Avenue in Culver City, California. An inquiry through the Lexus Nexus database reveals that this is TOLLETTE's primary residence. This is one of the locations I seek to search.

23

22. When CS-1 arrived at 8419 Hannum Avenue, he/she was greeted by TOLLETTE. TOLLETTE briefly inquired about CS-1's physical health, and CS-1 stated only that he/she was suffering from Graves Disease. TOLLETTE did not physically conduct an examination of CS-1 but, without prompting from CS-1, advised CS-1 that he/she was also suffering from anorexia nervosa, sleeplessness, and anxiety. CS-1 stated that at no time during the appointment had he/she complained about any additional ailments aside from Graves Disease. TOLLETTE explained to CS-1 that he was simply documenting CS-1's need for medical marijuana. TOLLETTE then instructed and demonstrated to CS-1 how to inhale marijuana. CS-1 stated that they (CS-1 and TOLLETTE) smoked marijuana together for several minutes. TOLLETTE supplied the marijuana that the two smoked.

23. At the end of the appointment, TOLLETTE provided CS-1 with a physician's statement recommending his/her need to use marijuana. CS-1 provided TOLLETTE with $200 U.S. currency that had been given previously to CS-1 by detectives from SLO. TOLLETTE also told CS-1 that if he/she referred additional people to TOLLETTE, he would pay him/her $100.00. This appointment was relayed to SLO detectives by CS-1.

24. On June 5, 2006, at the direction of SLO detectives, CS-1 entered the CCCC dispensary. CS-1 was again searched by two males standing at the front door. One of these males stepped outside of the door during the search and looked up and down Monterey Avenue. This is consistent with someone who knows that he is violating the law and wants to ensure that no law enforcement officers are around. CS-1 was then asked to remove his/her cell phone and any pagers that he/she may be carrying and turn it over to the two males at the front door. CS-1

was told that his/her belongings would be returned to him/her at the end of his/her visit. CS-1 was sent upstairs where a photo identification card for CCCC was issued to him/her after the recommendation from TOLLETTE was confirmed. CS-1 was then allowed to purchase $40.00 worth of marijuana with funds given to him/her by SLO detectives. CS-1 was searched before entering the CCCC and it was confirmed that he/she did not have marijuana in his/her possession. After leaving the CCCC, CS-1 went directly to the SLO detectives and provided them with the marijuana that he obtained at the CCCC.

25.    On June 19, 2006, SLO detectives as well as Immigration and Customs Enforcement (ICE) Special Agent (SA) Carlos Ortiz were able to schedule another appointment with TOLLETTE utilizing another confidential source (CS-2) in order to corroborate the previous meeting which was not monitored by investigators between TOLLETTE and CS-1. CS-2 is a defendant who is controlled by SLO detectives and has provided reliable and truthful information in the past. CS-2 also has a criminal history that includes narcotic related offenses. CS-2 is working with law enforcement in an attempt to obtain a reduced sentence on a pending criminal case.

26.    CS-2 met with TOLLETTE at 8419 Hannum Avenue. TOLLETTE did not conduct a physical examination of CS-2. TOLLETTE did tell CS-2 what his/her blood pressure and heart rate were during the appointment even though he conducted no examination that would have allowed him to monitor blood pressure and heart rates. CS-2 stated that he/she was suffering from knee and back pain. CS-2 does not suffer from these ailments but was directed by investigators to claim that he/she was. TOLLETTE did ask CS-2 several questions, and then

25

stated that CS-2 needed medicinal marijuana. CS-2 paid TOLLETTE $150.00 U.S. currency which had previously been provided to CS-2 by SLO detectives in order to obtain the recommendation. TOLLETTE also smoked marijuana (supplied by TOLLETTE) with CS-2 during this visit as well. The recommendation states that CS-2 was under TOLLETTE's care and that TOLLETTE would continue to monitor CS-2's medical condition although no follow-up appointments were scheduled. The name of TOLLETTE's "practice" is R.O.O.T.S or the Revival Of Old Time Substances as listed on the recommendation. TOLLETTE also listed his DEA number which is BT3849152 and his California license number of G50837 on the recommendation as well as the 8419 Hannum Avenue address and his cell phone number of 310-505-0002. This appointment was monitored by the SLO Detectives and ICE SA Ortiz. An audio and video recording was also captured of the substance of the appointment with TOLLETTE and CS-2.

27.     On June 26, 2006, at the direction of SLO detectives, CS-1 contacted TOLLETTE at phone number 310-505-0002 and inquired about his/her referral fee for introducing TOLLETTE to CS-2. TOLLETTE told CS-1 to meet him at 8419 Hannum Avenue in order to discuss the referral fee further. CS-1 arrived at 8419 Hannum Avenue shortly thereafter. TOLLETTE stated that he did not have $100.00 in his possession but that he would give CS-1 $100.00 worth of marijuana as payment for the introduction of CS-2. CS-1 agreed and observed TOLLETTE reach into a five-gallon bucket from Home Depot and retrieve some marijuana. TOLLETTE placed the marijuana in a plastic bag with a zipper seal and give it to CS-1. CS-1

stated that the five-gallon bucket was almost completely full of marijuana.  CS-1 then left the residence of TOLLETTE.

28.    On July 11, 2006, at the direction of SLO detectives, CS-1 contacted Abraham BAXTER, a security guard who is employed by LYNCH at the CCCC.  (BAXTER had previously asked CS-1 if he/she was interested in purchasing marijuana outside of the confines of the CCCC.)  CS-1 was advised by SLO detectives to inform BAXTER that he/she had a friend (a SLO detective acting in an undercover capacity, hereinafter referred to as UC-1) who would be willing to buy eight ounces of marijuana in addition to the four ounces that CS-1 would buy.  Detectives also told CS-1 to request a particular strain of marijuana that had previously been bought from the CCCC called "Diesel."  BAXTER stated that twelve ounces would cost $3,200.00 U.S. currency and that he would be willing to drive to the northern part of San Luis Obispo County in order to conduct the transaction.

29.    On July 12, 2006, UC-1 and CS-1 met with BAXTER in the parking lot of Big 5 Sporting Goods Store on Madonna Road in San Luis Obispo, California.  BAXTER drove to the parking lot in a white Mitsubishi Eclipse with an unknown white male passenger who was using a cellular phone.  UC-1 stated to BAXTER that he/she did not have a medical marijuana card during the buy, and BAXTER stated that he would provide UC-1 with a card at the CCCC.  BAXTER also stated that the CCCC would be selling marijuana brownies in the near future and that he would give some to UC-1 and CS-1 for free.  BAXTER sold four ounces of marijuana in a clear plastic bag labeled "Diesel" to CS-1 for $1,100.00 U.S. currency, and then sold eight ounces of marijuana in a clear plastic bag labeled "Diesel" to UC-1 for $2,100.00 U.S. currency.

27

Upon an initial, cursory examination of the "Diesel" marijuana, detectives believe that this was the same strain sold within the confines of the CCCC. UC-1 was also able to make arrangements with BAXTER to have his/her own CCCC identification card issued to him/her using the CCCC's facilities without providing any physician's recommendation and without having a physical examination conducted by a physician.

30.     On July 14, 2006, at the direction of SLO detectives, CS-2 entered the CCCC with the recommendation from TOLLETTE in order to purchase marijuana. CS-2 was searched with the RF indicator on the first floor of 780 Monterey Avenue Suite B. CS-2 provided a male employee at the CCCC his/her recommendation, and the male subject issued CS-2 a CCCC identification card. CS-2 was then directed to another room where he/she purchased a total of 5.5 grams of marijuana and one gram of hash. CS-2 paid for this transaction with a credit card. Employees at the CCCC asked CS-2 if he/she knew of anyone who had high grade marijuana for sale and that the dispensary would be interested in purchasing it. CS-2 was also told that clone marijuana plants would also be available for sale in the near future at the CCCC before he/she exited the dispensary. At no time during the visit was CS-2 asked about his/her health, symptoms, or offered shelter by any employee of the CCCC which is required in order to be considered a caregiver under Proposition 215. CS-2 was searched before entering the CCCC and was found to have no drugs. CS-2 had marijuana and hash upon exiting the CCCC.

31.     On December 5, 2006, at the direction of SLO detectives, CS-1 contacted TOLLETTE via telephone (310-505-0002) and told TOLLETTE that he/she had a friend that needed a recommendation. TOLLETTE stated that he was extremely busy at that time but that

CS-1 could have his/her friend meet with TOLLETTE at 8419 Hannum Avenue on December 8, 2006, in the morning.

32. On December 8, 2006, a SLO detective working in an undercover capacity, hereinafter referred to as UC-2, met with TOLLETTE at his residence, 8419 Hannum Avenue, in Culver City, California. UC-2 was asked to fill out a form requesting his/her name, date of birth, and any symptoms that he/she was experiencing. UC-2 listed that he/she suffered from nausea and difficulty sleeping. UC-2 does not suffer from these medical problems, but included them as part of his/her undercover identity for the purpose of this investigation. TOLLETTE did not conduct a physical examination of UC-2 but told UC-2 that he/she looked sick and was probably having difficulty eating as well although UC-2 did not suggest this as a symptom and UC-2 did not have any difficulty eating. While UC-2 was inside of the residence, two Hispanic males entered the apartment also seeking a recommendation from TOLLETTE. Another unknown female called TOLLETTE during the appointment in order to acquire directions to 8419 Hannum Avenue. It was UC-2's opinion that the unknown female was also traveling there in order to acquire a recommendation. UC-2 also observed marijuana on a table between UC-2 and TOLLETTE. TOLLETTE provided UC-2 with a recommendation for marijuana for a fee of $150.00 U.S. currency. Also during this meeting, TOLLETTE received another phone call which he answered by speaker phone. Another unknown female was calling from a local marijuana dispensary to verify a recommendation letter that TOLLETTE had issued. TOLLETTE did not search through his records to locate the name of this patient but simply asked if there was a seal at the bottom of the recommendation and if the date the

29

recommendation was issued was less than a year ago. When the unknown female caller stated

that there was a seal and that the recommendation was from August 2006, this satisfied

TOLLETTE's verification process, and he stated that the person in question was a "good guy."

UC-2 also attempted to purchase some marijuana from TOLLETTE before he/she left

TOLLETTE's residence, but TOLLETTE instead directed UC-2 to a local marijuana dispensary.

Shortly thereafter, UC-2 left 8419 Hannum Avenue. An audio and video recording was made of

the appointment. No review of UC-2's medical records was required in order to receive the

recommendation, nor were any of his/her basic vital statistics taken such as blood pressure and

body temperature which is standard practice by legitimate physician's especially at an initial

appointment. TOLLETTE also did not attempt to portray himself as a legitimate doctor as he

invited his patients into his home which clearly appeared to be a residence and did not look like

a doctor's office which is typically clean and sterile. In fact, the video of the undercover

purchase of a marijuana prescription or "recommendation" by the undercover officer reveals that

there is bedding at this location, indicating that TOLLETTE lived at the location from which he

was distributing the marijuana "recommendations" and from which he provided marijuana to the

two CSs that they smoked with him. Also, at one point during the transaction with the

undercover officer, TOLLETTE stated that he was having brick work done, again confirming

that he lived at this location. There was also no medical equipment visible in the apartment for

TOLLETTE to use as part of his practice. He did not have a receptionist taking his calls or

scheduling appointments nor did he request any insurance information of his patients. He did

not appear to be equipped to treat any type of condition that his patients might present to him,

but only appeared to using his house as a way station to sell "recommendations" to people who wanted to use marijuana. TOLLETTE was also in frequent contact with the CCCC as he stated to UC-2 that CS-1 had been discovered by the CCCC to be working for the police. The CCCC faxed TOLLETTE a letter detailing CS-1's involvement with the police. Agents believe that TOLLETTE is simply using his medical license, which he obtained while working at a correctional facility in Oklahoma, to generate a substantial income by issuing recommendations and that there may be a compensation plan arranged between the CCCC and TOLLETTE for referring patients to them where the patients purchased marijuana from the CCCC.

33.     On February 27, 2007, UC-2 contacted TOLLETTE at telephone number 310-505-0002 and asked if UC-2 could send a "friend" to visit TOLLETTE on March 2, 2007, for a marijuana recommendation. TOLLETTE stated that he would be available and that it was all right for UC-2 to refer a person to TOLLETTE.

34.     On December 21, 2006, under the direction of SLO detectives, CS-2 was utilized to make another purchase of marijuana at the CCCC. CS-2 entered 780 Monterey Avenue Suite B and bought a six-inch marijuana plant in rockwool and 3.5 grams of marijuana. Again during this visit, no employee inquired about CS-2's health, symptoms, offered shelter, or expressed any concern or inquiry about the medical condition that allegedly resulted in a medical need for the marijuana.

35.     While CS-2 was inside 780 Monterey Avenue Suite B on December 21, 2006, detectives outside observed BAXTER exit the front door of the CCCC and approach a subject who was later identified as Gregory Randolph MCDOWELL. MCDOWELL opened the back of

a 1997 Ford Explorer with California license plate 4AAG180 (registered to Gregory McDowell of 322 Weymouth Street, Cambria, California 93428.) An inquiry with Lexus Nexus and the California DMV revealed that MCDOWELL actually resides at 1551 Kenneth Drive, Cambria, California 93428. MCDOWELL and BAXTER looked inside the back of the Ford Explorer and talked for a few minutes before BAXTER returned inside the CCCC. Based on previous surveillances at the CCCC, detectives believe that MCDOWELL was attempting to sell marijuana to the CCCC.

36.    On January 2, 2007, UC-2 was utilized to purchase marijuana from the CCCC. UC-2 stated that as he/she approached the front door of 780 Monterey Avenue Suite B, he/she heard it unlock and open. Once inside, UC-2 was searched by two male subjects. The first subject was a black male, approximately six-foot tall with a thin build. The second male was a white male, approximately 6'2" tall with a larger build and short dark hair. The white male shut and locked the door behind UC-2. The black male asked UC-2 for his/her physician's statement and his/her California driver's license. The black male then grabbed a hand-held portable radio and stated that UC-2 was in the lobby. The black male then asked if UC-2 had any metal objects in his/her pockets and searched UC-2 with a metal detector. UC-2 was also instructed to remove any cellular phones or pagers, turn them off, and place them in a basket near the front door for "security reasons." UC-2 was then told to proceed up the stairs to the second floor and meet with "Gina."

37.    A female was sitting behind a large desk with a computer on it and identified herself to UC-2 as "Gina." Detectives later identified her as Gina ARMSTRONG of 8520

32

Casanova Road in Atascadero, California. She requested UC-2's physician statement and his/her driver's license. ARMSTRONG then provided UC-2 with several forms to fill out regarding the rules and regulations of the club. ARMSTRONG entered the information that UC-2 had provided into the computer and shortly provided him/her with a CCCC membership/identification card. UC-2 was listed as member number #1851. UC-2 was then instructed to proceed through a beaded curtain to purchase his/her marijuana which he/she did.

      38.    UC-2 observed LYNCH and another unknown male employee of the CCCC cleaning the floor in the room that he/she was instructed to enter. There was also a white female with long curly hair standing behind a glass counter which contained marijuana. The female advised UC-2 that the blue tape on the ground meant that only one person at a time could stand in front of the tape to purchase marijuana. She invited UC-2 to step forward, and she also explained to UC-2 the prices and strains of marijuana that were displayed on a dry erase board behind her. The female at the counter also informed UC-2 that hash and marijuana plants were also available for sale. UC-2 purchased one-gram of marijuana and a marijuana plant in rockwool that the female selected for UC-2. Both items were purchased for a total of $35.00 ($20.00 for the gram of marijuana and $15.00 for the marijuana plant.) UC-2 paid for the items with cash which had been provided to him/her by the SLO sheriff's department prior to entering the CCCC. UC-2 proceeded downstairs upon receiving a receipt for the items that he/she purchased and retrieved his/her cellular phone from the basket. The discussion above and the marijuana purchase took place in the same room that LYNCH was located and he would have had to hear the conversation and observe the purchase.

33

39.     On March 16, 2007, UC-2 along with a juvenile acting under the direction of SLO detectives contacted TOLLETTE to confirm a previously scheduled appointment where UC-2 stated that he/she was bringing his/her child to TOLLETTE's in order to obtain a medical marijuana recommendation for the child.  When UC-2 and the juvenile arrived, TOLLETTE confirmed twice that the juvenile was seventeen years old.  The juvenile provided TOLLETTE with a high school identification card which TOLLETTE accepted.  TOLLETTE asked the juvenile what his/her condition was, and the juvenile stated that he/she was suffering from migraines.  The juvenile does not suffer from migraines but was directed by investigators to claim that he/she was for the purpose of the undercover activity.  TOLLETTE again did not conduct a physical examination of the juvenile but did issue the recommendation for a charge of $160.00 which was provided by the SLO Sheriff's Department.  During an earlier phone call between UC-2 and TOLLETTE to schedule the meeting on March 16, 2007, TOLLETTE stated that he had raised his rate to $200.00.  The juvenile was given $200.00 before the undercover activity, but during the meeting, TOLLETTE stated that he would accept $150.00.  TOLLETTE claimed that he did not have change, and so the juvenile and TOLLETTE agreed upon a cost of $160.00 for the medical marijuana recommendation.  Also during this meeting, TOLLETTE accepted a phone call on speaker phone from a male who identified himself as "Sammy." "Sammy" asked TOLLETTE if he (TOLLETTE) would be available at 4:00 P.M. that day (March 16, 2007) to meet with a friend of "Sammy's."  TOLLETTE agreed.

## Surveillance Activities

40.    On May 11, 2006, during a surveillance operation at 780 Monterey Avenue Suite B in Morro Bay, California, SLO detectives observed an older male park a 2005 white Toyota with California license plate 5NSM209 (registered to Jonathan Halas, 292 Olive Street, Morro Bay, California 93442.). The older male exited his vehicle and entered CCCC. Shortly thereafter, the older male subject exited the dispensary and waited on the sidewalk. Another male that the detectives recognized as John CANDELARIA, a security guard for the CCCC, exited the building and met with the older male subject. CANDELARIA looked around and handed a brown paper package which had been concealed underneath his coat to the older male. The package was consistent with the size of approximately a half pound of marijuana. They continued to speak for a few minutes, and then the older male entered his vehicle and drove away while CANDELARIA returned to the CCCC. At closing time, CANDELARIA exited 780 Monterey Avenue Suite B carrying a large brown paper bag that was consistent with the size of approximately two pounds of marijuana. CANDELARIA placed the bag in a 1981 yellow Mercedes Benz with California license plate 5CPY775 (registered to Toni Thompson of 14257 Torrey Pines in Auburn, California) and drove to 292 Olive Street in Morro Bay. CANDELARIA exited his vehicle, entered 292 Olive Street, and then returned to get the brown paper bag from the Mercedes Benz and went back inside of the residence. The white Toyota which had been driven by the older male subject who was at the CCCC earlier that day was also parked in the driveway. Detectives believe that during both instances, CANDELARIA was giving marijuana to people outside of the premises of the CCCC. This is consistent with

35

CANDELARIA keeping the bag underneath his coat until he passed it off to the older male subject. Hiding drugs under a coat or in clothing until it is distributed is one of the ways that drug traffickers reduce their likelihood of being caught by law enforcement officers.

41.     In October of 2006, the Morro Bay Police Department received a complaint from an anonymous citizen who stated that CANDELARIA had been bragging about capitalizing on the medical marijuana practice. CANDELARIA stated that he was making $3,000 in the sale of marijuana to people who did not have a physician's recommendation and that he was also not paying income tax on the sales. CANDELARIA also stated to the citizen that he rented multiple apartments in order to grow additional marijuana to sell.

42.     On December 5, 2006, SLO detectives established surveillance at the CCCC. During the surveillance, detectives observed a white male exit the dispensary and enter a white Nissan Maxima with California license plate 4YUH535 (registered owner is Heidi Nelson of 27 Bower Lane, Ladera Ranch, California 92694.) The vehicle pulled to the rear of Bank of America (which is located across Monterey Avenue from the CCCC) and waited until a Dodge pick-up truck with California license plate 6F87990 (registered owner is Martin Alan Mimmack of 842 ½ Marina City, Morro Bay, California 93443) pulled in behind the Nissan and then both vehicles left in tandem. Detectives followed the vehicles to the Lemus Ranch parking lot near Highway 1 in Morro Bay where the driver of the Nissan exited his vehicle, carrying a package in his hand, which he gave to the driver of the Dodge pick-up truck. The driver of the Nissan then

36

returned to his vehicle and drove back to the CCCC. This is classic behavior for people who are conducting a drug transaction.

43.   Shortly after closing time at the CCCC, detectives observed four subjects (one of which was the driver of the Nissan observed earlier) exit the CCCC and enter their respective vehicles. The driver of the Nissan was carrying several brown paper bags which he loaded into the Nissan Maxima before leaving the area. Surveillance units followed the Nissan, and a traffic stop was initiated when the Nissan failed to properly change lanes. The deputy who initiated the stop was able to identify the driver of vehicle as Ryan DOHERTY of 27 Bower Lane, Ladera Ranch, California 92694. Initially, DOHERTY told the deputy that he was a "bouncer" at the CCCC. DOHERTY also told the deputy that he didn't have a medical marijuana card and that there was no marijuana inside of the vehicle. DOHERTY then admitted to the deputy that there were three marijuana plants inside of the vehicle which DOHERTY was transporting to a vendor of the CCCC who could not drive. The officer observed the plants but did not seize them. DOHERTY was unable to remember the house number but stated that the vendor lived on Fredericks Street. The deputy issued DOHERTY a citation for the traffic violation, and DOHERTY was then surveilled to 1769 Fredericks Street in San Luis Obispo. Detectives observed DOHERTY exit the vehicle with the bag containing the marijuana plants and enter the residence. So, DOHERTY distributed marijuana that he took from the CCCC to someone outside the confines of the CCCC. An hour later, detectives observed DOHERTY exit the residence and retrieve clothing from the Nissan. Surveillance was terminated shortly after that. On December 6, 2006, Detective Giese from SLO sheriff's department drove by 1769 Fredericks

37

Street and confirmed that the Nissan was still parked there in the same place it had been the night before. Based on these events, investigators believe that DOHERTY had previously made arrangements with the driver of the Dodge pick-up truck to follow DOHERTY to a discrete location in which to sell him marijuana which came from the CCCC.

44.     On January 23, 2007, DEA agents and SLO detectives conducted surveillance on the CCCC. SLO detectives observed LYNCH leave his residence at 589 Rosemary Lane, Arroyo Grande, California carrying a weighted backpack which appeared to be stuffed and which he carried with both hands. LYNCH placed the backpack inside the rear of his Nissan Murano, entered the vehicle, and drove directly to the CCCC. LYNCH then carried the backpack into the CCCC. Shortly thereafter, LYNCH returned to his Nissan Murano with BAXTER, and they both walked to the rear of the vehicle. LYNCH opened the hatch, and BAXTER reached inside and retrieved a large cardboard box. BAXTER then carried the box inside of the residence. Investigators did not observe LYNCH place the cardboard box when he left his residence that morning. I believe that the box was already inside of the vehicle before the garage door opened that morning as LYNCH drove directly from his residence to the CCCC that day and that it contained either marijuana or marijuana plants. I believe that the backpack contained marijuana that LYNCH was carrying from his house into the CCCC, and I believe that he is bringing the marijuana from his house for fear of leaving it overnight at the CCCC because people know that the CCCC dispenses marijuana and that increases the likelihood that it would be burglarized if the drugs were left at the CCCC overnight.

38

45.    On January 23, 2007, agents and detectives observed approximately 80 customers enter the CCCC during this surveillance. Nearly all of the customers parked two or more blocks away from the CCCC and walked to 780 Monterey Avenue Suite B in spite of available parking in front of the dispensary. I believe that these people parked far away because these people were buying marijuana from the CCCC and did not want their license plates to be observed by any surveillance officers who may be in the area watching the CCCC. Also, during this surveillance, a Ford truck bearing California license plate 6U18824 (registered owner is Jeffry Long of 7500 Vernalis Avenue in Atascadero, California) pulled in front of the dispensary, and an unknown male wearing camouflage pants quickly exited the vehicle and entered the CCCC. Investigators believe that the CCCC was aware that the unknown male would be arriving shortly as the door to the CCCC opened immediately in contrast to the normal delay that occurs when customers go into the CCCC. The unknown male was carrying a bag believed to contain marijuana plants. The bag was a brown grocery bag which the person carried in a way to support the bottom of the bag which would be heaviest if the bag contained marijuana plants that had an amount of rockwool at its base that is used to keep the plants upright as they grow. Shortly thereafter, the Ford truck returned to the front of the dispensary, and the unknown male quickly exited carrying a brown paper bag. Based on this event, agents and detectives believe that the unknown male was selling clone plants to the dispensary as the CCCC had previously been inquiring about purchasing marijuana plants.

46.    Agents and detectives decided to send UC-2 into the dispensary during the established surveillance on January 23, 2007, in order to gain additional intelligence. UC-2

stated that he/she was searched at the entrance to the CCCC before being allowed to proceed

upstairs. UC-2 was able to purchase two half-grams containers of hash and a clone plant for a

total of $65.00 U.S. currency which was previously provided to UC-2 by SLO detectives. Each

half-gram of hash was $25.00 and the marijuana clone plant was $15.00. UC-2 observed

approximately 100-150 plants in the "nursery area" that LYNCH had previously requested in his

conditional use permit to the City of Morro Bay. UC-2 reported that there were three security

cameras that he/she was aware of while inside of the dispensary. UC-2 also stated that LYNCH

was having a meeting with his employees while UC-2 was purchasing marijuana although he/she

could not hear the nature of the meeting.

    47.    Surveillance resumed the following day on January 24, 2007. Throughout the

course of the day, approximately 99 customers were reported leaving the CCCC. There were

also several local businesses in the area that complained about the high foot traffic in and out of

the dispensary and the lack of available parking as a result. Due to these complaints and a recent

county ordinance that had been instituted, a city council woman participated in the surveillance.

In addition to the numerous customers frequenting the CCCC, the council woman also observed

one male exit the dispensary and give what she believed was marijuana to another individual

waiting in the parking lot. The council woman reported the incident to the Morro Bay Police

Department. The county ordinance mentioned above was established on December 15, 2006.

This ordinance declared that since state law dictated that caregivers are required to be

consistently responsible for the housing, health, and safety of the people that the caregivers

supply marijuana to, the county believed that the only way to provide adequate care would be to

limit the amount of people that a caregiver could be responsible for to ten people. It should also be noted that LYNCH appeared before the board of supervisors to object to this limit as his business operates under the guise of being a caregiver and would be negatively impacted by this ordinance. As noted above, substantially more than 10 people entered the CCCC on a single day while it was under surveillance and consequently I believe that LYNCH was distributing marijuana to substantially more than 10 people on a single day, in violation of the county law as well as in violation of federal law which prohibits the trafficking of marijuana under any circumstance.

48.     At the close of business, detectives observed LYNCH exit the dispensary carrying the same weighted backpack that had been seen previously as well as a white bag. The backpack appeared to be filled to its maximum capacity. Surveillance units observed LYNCH load the backpack and white bag into his Nissan Murano and drive directly to his residence. Based on these surveillances, investigators believe that LYNCH is removing the bulk of the marijuana that is kept in the dispensary at closing and storing it in his residence overnight. Investigators also believe that LYNCH is replenishing his stock of marijuana at the dispensary when the supply is runs low.

49.     On February 14, 2007, SLO detectives conducted surveillance at the CCCC during which there were 19 instances of people exiting the CCCC carrying brown paper bags and delivering them to other individuals parked in vehicles which led me to conclude that the CCCC is distributing marijuana to people who are then selling it to other people. Most of these

41

vehicles were parked away from the dispensary even though there was available parking in front of the CCCC. Several customers arrived on skateboards and appeared to be young, leading me to conclude that the CCCC is distributing marijuana to teenagers. One male wearing a black t-shirt with a large marijuana leaf on the back, parked in a space reserved for handicapped drivers, hung a placard in his windshield, and entered the CCCC. When this male exited the CCCC with a brown paper bag, he shifted his weight to his heels which activated a wheel in the shoes and rolled towards his vehicle (these types of shoes are referred to as "heelies" and are commonly worn by youth who participate in skateboarding.) The male entered his vehicle and left the area. Towards the end of the surveillance, detectives observed a known male employee of the CCCC carry a package out of the dispensary and walk towards a nearby post office. Surveillance observed the employee sniff the package several times. Investigators believe that the employee was shipping marijuana and trying to determine if the odor was able to be detected through the packaging material for fear of the package being intercepted by law enforcement officers.

50. On March 24, 2007, SLO detectives established surveillance at LYNCH's residence and observed LYNCH enter his garage with the backpack that had been seen during previous surveillances. As noted before, the backpack was filled to capacity and placed inside the back of LYNCH's Murano. LYNCH drove directly to the CCCC and retrieved the backpack from the rear of the Murano and entered the CCCC.

51. It should also be noted that during multiple surveillances at LYNCH's residence at 589 Rosemary Lane, Arroyo Grande, California, surveillance units observed that all of the

42

windows of the residence are consistently closed with coverings on all of them. LYNCH's house stands out because of this as most of the windows in neighboring homes are open and uncovered on a daily basis. Based on my training and experience, I know that narcotics traffickers often attempt to conceal their illicit goods from others who may report them to law enforcement. I believe that LYNCH is attempting to conceal his proceeds and marijuana from being discovered by his neighbors and keeps his windows carefully covered to avoid detection.

### Financial Gains

52.   Internal Revenue Service (IRS) SA Tim Nugent reviewed Bank of America records for the CCCC. IRS SA Nugent was able to estimate, based on these documents, that LYNCH was depositing $40,000 to $50,000 in sales per month. IRS SA Nugent also learned that nearly all of these deposited monies were due to credit card charges. Both IRS SA Nugent and myself believe that LYNCH is depositing all of the credit card charges due to the difficulty in concealing these transactions, and is not reporting the majority of the cash purchases that occur at the CCCC. Based on my experience and that of IRS SA Nugent, I know that individuals attempting to conceal proceeds of illegal money will often keep cash out of the banking system or structure transactions in order to avoid detection by law enforcement. This cash is often used to purchase assets and pay for expenses of the illicit operations which promote the illegal activity. Also, the CCCC limits the amount of marijuana that may be purchased in any one visit to an ounce. This causes the customers to pay more for marijuana than if they were permitted to buy the maximum amount allowed by state law which is eight ounces. Based on this, and the

large amount of customers frequenting the CCCC on a daily basis, agents conservatively estimate that the CCCC is averaging about $120,000 a month (over two times what is being reported.)

### Conclusion

53.    Based on this investigation, I believe that LYNCH, TOLLETTE, and the CCCC are distributing marijuana in violation federal law. I also believe that they are distributing marijuana in violation of state law and are attempting to disguise their criminal activity by claiming that the CCCC caters exclusively to persons suffering from medical illnesses, when in fact, persons without any medical condition can purchase marijuana (a Schedule I controlled substance) at this retail establishment. In addition, LYNCH and the CCCC are also attempting to claim that they are caregivers for their customers which under state law requires them to inquire about the health, safety, and provide shelter to these customers if necessary. Although several UC and CS buys were made during the course of this investigation, at no time did anyone at the CCCC inquire about the health of their customers or if their ailments were alleviated by the use of the marijuana. The CCCC also did not ask if the customers needed housing.

54.    TOLLETTE is violating federal law by aiding and abetting the distribution of marijuana by writing "recommendations" for marijuana to people. TOLLETTE is also violating state law by recommending marijuana be distributed to people who have no medical need for the drug under the standards set by state law. In fact, TOLLETTE is fraudulently manufacturing documents that assert symptoms that people do not have in order to cover his illegal activity in

44

making recommendations for marijuana to be distributed to people without a medical need for the drug. TOLLETTE did not perform good faith medical examinations on any of the people who were sent to him as part of this investigation. Also, he scheduled appointments at his own residence which lacks the customary medical equipment of a standard doctor's office. There is no valid physician-patient relationship between TOLLETTE and his "patients," and even when visited by the same person twice (CS-1 and UC-2,) TOLLETTE failed to conduct any type of follow-up examination or inquire as to whether marijuana was alleviating CS-1's or UC-2's symptoms. TOLLETTE also provided a medical marijuana recommendation to a juvenile without any state identification or valid documentation of a date of birth. TOLLETTE was told twice during this meeting that the juvenile was 17 years of age, and although it is not documented in state law regarding a minor acquiring a recommendation for the use of marijuana, TOLLETTE is facilitating the ability of a minor to acquire a Schedule I controlled substance. Based on this investigation, it does not appear that TOLLETTE operates in the best interests of his patients or even has a doctor / patient relationship with the people to whom he provides a marijuana recommendation. Instead, TOLLETTE uses his medical license as a way to protect himself from being held accountable for his illegal, and quite profitable, drug trafficking.

55.    Based on the foregoing, and my training and experience, I submit that there is probable cause to believe that the locations identified herein above as the Premises to be Searched will contain evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 846, and 856(a)(1) (manufacture, possession with intent to distribute, and distribution of a controlled substance, namely, marijuana, a Schedule I controlled

45

substance; conspiracy to manufacture and distribute a controlled substance, namely, marijuana;

and maintaining drug-involved premises,) as described herein above and in Attachment B hereto,

and I therefore request that search warrants be issued on that basis.

_____/s/_____

Rachel Burkdoll

Special Agent

U.S. Drug Enforcement Administration

Subscribed and sworn to before me

this _____ of March, 2007.

**FERNANDO M. OLGUIN**

_____

United States Magistrate Judge

46



EXHIBIT C





