THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
DAVID P. KOWAL (Cal. Bar No. 188651)
RASHA GERGES (Cal. Bar No. 218248)
Assistant United States Attorneys
OCEDTF Section
        1400 United States Courthouse
        312 North Spring Street
        Los Angeles, California   90012
        Telephone:   (213) 894-5136/6530
        Facsimile:   (213) 894-0142
        E-mail:   david.kowal@usdoj.gov
        E-mail:   rasha.gerges@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>CHARLES C. LYNCH, and<br>ARMOND TENNYSON TOLLETTE, JR.,<br><br>                    Defendants. | CR No. 07-689-GW<br><br>GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS INDICTMENT FOR DESTRUCTION OF EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF RACHEL BURKDOLL AND DAVID KOWAL IN SUPPORT THEREOF<br><br>Hearing Date: July 7, 2008<br>Hearing Time: 8:00 a.m. |

        Plaintiff, United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California, hereby files this Opposition to

//
//
//
//

1  the motion of defendant Charles Lynch ("defendant") to Dismiss
2  Indictment For Destruction of Exculpatory Evidence, and the
3  exhibits thereto.   The motion is based on the attached memorandum
4  of points and authorities, all the files and records of this
5  case, and such other oral and written argument that is permitted
6  by the Court.

7

8  Dated: June 22, 2008              Respectfully submitted,
                                     THOMAS P. O'BRIEN
9                                    United States Attorney

10                                   CHRISTINE C. EWELL
                                     Assistant United States Attorney
11                                   Chief, Criminal Division

12                                   _____/S/_____

13
                                     DAVID P. KOWAL
14                                   RASHA GERGES
                                     Assistant United States Attorneys
15                                   OCEDTF Section

16                                   Attorneys for Plaintiff
                                     United States of America

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . ii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . 2

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 6

     A.   DEFENDANT HAS NOT MET HIS BURDEN OF SHOWING A DUE
          PROCESS VIOLATION UNDER THE TROMBETTA/YOUNGBLOOD
          TEST . . . . . . . . . . . . . . . . . . . . . . 9

          1.   The Bulk Marijuana and Marijuana Plants Had
               No Apparent Exculpatory Value At the Time of
               Their Destruction and Contamination . . . . . . 9

          2.   Comparable Evidence Is Available . . . . . . . 12

          3.   Defendant Has Not Made The Requisite Showing
               Of Bad Faith . . . . . . . . . . . . . . . . . 16

     B.   EVEN ASSUMING THERE WAS A VIOLATION OF DUE PROCESS,
          WHICH THERE WAS NOT, DISMISSAL IS NOT THE CORRECT
          REMEDY . . . . . . . . . . . . . . . . . . . . . . 20

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 20

i

1

TABLE OF AUTHORITIES

2

**FEDERAL CASES**                                                    PAGE(S)

3

Arizona v. Youngblood,
       488 U.S. 51 (1988)  . . . . . . . . . . . . . . . .  passim

4

California v. Trombetta,
       467 U.S. 479 (1984)  . . . . . . . . . . . . . . . .  passim

5

6

Featherstone v. Estelle,
       948 F.2d 1497 (9th Cir. 1989) . . . . . . . . . . . . .  17

7

8

Mitchell v. Goldsmith,
       878 F.2d 319 (9th Cir. 1989) . . . . . . . . . . . . .  16

9

Paradis v. Arave,
       954 F.2d 1483 (9th Cir. 1992),
       vacated and remanded on other grounds,

10

       507 U.S. 1026 (1993)  . . . . . . . . . . . . . . . .  10

11

12

Phillips v. Woodford,
       267 F.3d 966 (9th Cir. 2001)  . . . . . . . . . .  16, 17

13

United States v. Andreas,
       216 F.3d 645 (7th Cir. 2000)  . . . . . . . . . . . . .  9

14

15

United States v. Belden,
       957 F.2d 671 (9th Cir. 1992)  . . . . . . . . . .  7, 14, 17

16

United States v. Cooper,
       983 F.2d 928 (9th Cir. 1992)  . . . . . . . . . .  15, 20

17

18

United States v. Deaner,
       1 F.3d 192 (3d Cir. 1993) . . . . . . . . . .  12, 18, 19

19

20

United States v. Galvan-Garcia,
       872 F.2d 638 (1st Cir. 1989)  . . . . . . . . . . . . .  7

21

United States v. Heffington,
       952 F.2d 275 (9th Cir. 1991)  . . . . . . .  7, 10, 11, 19

22

23

United States v. Hernandez,
       109 F.3d 1450 (9th Cir. 1997) . . . . . . . . . . . . .  8

24

United States v. Kearns,
       5 F.3d 1251 (9th Cir.1993)  . . . . . . . . . . . . .  20

25

26

United States v. Lord,
       711 F.2d 887 (9th Cir. 1983)  . . . . . . . . . . . . .  9

27

28

ii

TABLE OF AUTHORITIES (cont'd)

**FEDERAL CASES**                                                      PAGE(S)

United States v. Morrison,
    449 U.S. 361 (1981) . . . . . . . . . . . . . . . . . .   20

United States v. Parker,
    72 F.3d 1444 (10th Cir. 1995) . . . . . . . . . . . . .   12

United States v. Richard,
    969 F.2d 849 (10th Cir. 1992) . . . . . . . . . . . . .   13

United States v. Sepulveda,
    15 F.3d 1161 (1st Cir. 1993) . . . . . . . . . . . . . .   6

United States v. Sherrod,
    964 F.2d 1501 (5th Cir. 1992) . . . . . . . . . . . . .   14

United States v. Stevens,
    935 F.2d 1380 (3d Cir. 1991) . . . . . . . . . . . . . .   8

United States v. Traylor,
    656 F.2d 1326 (9th Cir. 1981) . . . . . . . . . . .  7, 14

United States v. Valenzuela-Bernal,
    458 U.S. 858 (1982) . . . . . . . . . . . . . . . . . .   9

United States v. Westerdahl,
    945 F.2d 1083 (9th Cir. 1991) . . . . . . . . . . . . .   8

Youngblood. Grisby v. Blodgett,
    130 F.3d 365 (9th Cir. 1997) . . . . . . . . . . . . . .   9

**FEDERAL STATUTES**

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . .   1

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . .   1

21 U.S.C. § 856(a)(1) . . . . . . . . . . . . . . . . . . .   1

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . .   1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Defendant Lynch ("defendant") is charged with owning and operating a marijuana store in San Luis Obispo County, specifically, Morro Bay, California.  He is charged in each count of a six count indictment, specifically with participation in a narcotics conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1), 856, and 859 (Count One); aiding and abetting in the sale of marijuana to minors, in violation of 21 U.S.C. §§ 841(a)(1), 859(a), and 18 U.S.C. § 2 (Counts Two and Three); possession of marijuana with intent to distribute, in violation of 21 U.S.C. 841(a)(1) (Count Four); operation and use of a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count Five); and criminal forfeiture (Count Six).  In the present motion, defendant seeks to dismiss the indictment against him due to the government's destruction of allegedly exculpatory evidence.  Defendant argues that the government's destruction prior to trial of 104 marijuana plants and approximately 20 kilograms of bulk marijuana seized from his marijuana store violated his due process rights and warrants the strong sanction of dismissal.

Defendant's motion should be denied.  Defendant bears the heavy burden of demonstrating that (1) the government destroyed evidence with readily apparent exculpatory value, (2) the evidence cannot be replaced, even imperfectly, by comparable evidence through any reasonable means, and (3) the government destroyed the evidence in bad faith.  Defendant can meet none of

1

these three requirements.  Among other things, defendant was allowed to inspect the bulk marijuana before it was destroyed, and samples were retained.  Numerous photographs and video were taken of the marijuana plants before they became rotten and too contaminated by mold and insects to permit further lab analysis, and the agent who counted them is available for cross-examination.  And at all times, the government acted with respect to this evidence in accordance with federal laws and regulations rather then any intent to harm defendant's case.

## II.

### FACTUAL BACKGROUND

On Thursday, March 29, 2007, Special Agents (SAs) from the DEA Ventura office and detectives from the San Luis Obispo Sheriff's Department executed a federal search warrant at 780 Monterey Avenue, Suite B, Morro Bay, California, a marijuana store owned and operated by defendant.[1]  During the search of the marijuana store, DEA SA Rachel Burkdoll seized, among other things: (1) multiple bags containing a total of approximately 21 kilograms of marijuana that had been stored in four large safes in the rear office area of the store, and (2) 104 marijuana plants being grown in cups and rockwool in the marijuana sales section of the store.  From the same room as the plants, agents seized additional bulk quantities of marijuana, jars of lip balm containing marijuana, containers of hashish powder, containers of

---

[1]   Unless otherwise stated all facts are from the declaration of the case agent, SA Rachel Burkdoll, and the declaration of AUSA David P. Kowal which are filled concurrently herewith.

1  hashish oil, books on the subject of marijuana, information on
2  characteristics of marijuana, price lists for marijuana, and a
3  marijuana "policy report."

4      Prior to seizing these and other items from the marijuana
5  store pursuant to the warrant, agents took photographs of the
6  evidence in the locations where they were found.  These include
7  seven photographs of the marijuana plants from different angles
8  in the nursery, and 11 photographs of the 21 kilograms bags taken
9  from the office safes.  Agents also made a video tape recording
10 of all the items in the marijuana store in the location where
11 they were found.

12     During execution of the warrant, after the photographs and
13 video documentation were complete, SA Burkdoll seized these
14 items, counted the plants, and put both the plants and the 21
15 kilograms of marijuana in evidence containers.  Her count of the
16 plants was based on looking at their root balls, for looking
17 merely at the number of containers or number of stems would not
18 give the specific number of plants.  SA Burkdoll then transferred
19 the items to the DEA Ventura office drug evidence vault pending
20 further processing.

21     On Monday, April 2, 2008, at the DEA Ventura Resident
22 Office, SA Burkdoll, weighed and took samples from the 21
23 kilograms, and took photographs of both exhibits.  All the
24 photographs and video recordings taken of the exhibits have been
25 turned over to defense counsel in this case as part of the
26 government's discovery production.  At this time, SA Burkdoll and
27 another agent attempted to conduct another count of the plants,
28 but they had already begun to deteriorate, so another count was

1   not possible.   The 21 kilograms of bulk marijuana was designated
2   as DEA drug Exhibit 2, while the 104 plants were designated as
3   Exhibit 5.   They were placed in DEA evidence containers and
4   stored in the Ventura Office drug evidence vault, prior to
5   transfer for forensic analysis at the DEA Southwest Regional
6   Laboratory in Vista California near San Diego.

7        Exhibits 2 and 5 were stored in an evidence vault at DEA
8   Ventura until April 11, 2007, at which time SA Burkdoll and
9   another agent transferred the samples from Exhibit 2 and all of
10   Exhibit 5 to the DEA laboratory in Vista, California.   The
11   laboratory later conducted analysis on the samples taken of
12   Exhibit 2 and concluded that they were marijuana.   The agents
13   took the remainder of Exhibit 2, the bulk marijuana, to a DEA
14   storage vault in Los Angeles.   The samples were retained by the
15   lab.

16        With respect to Exhibit 5, the plants, on April 30, 2008, a
17   DEA chemist informed SA Burkdoll that as a likely result of
18   wetness on the plants, the Exhibit had become infested with mold
19   and insects and requested that no testing be done for health and
20   safety reasons.   The chemist also said the exhibit should be
21   destroyed.   SA Burkdoll agreed to request that Exhibit 5 not be
22   tested and assumed that the laboratory had destroyed the Exhibit.
23   The agent documented her interaction with the lab and the
24   destruction of the plants in a written report.   Recently,
25   however, in preparation for this Opposition, SA Burkdoll spoke to
26   the lab and learned that it had not destroyed the plants, but
27   repackaged them.   Nonetheless, the laboratory will not conduct
28   testing on the plants because it considers Exhibit 5 to be a bio

4

1   hazard.

2       Defendant was indicted on July 13, 2008 and arrested on July

3   17, 2008.  On August 8, 2008, government counsel produced to

4   defendant, among other things, reports regarding the DEA's

5   seizure and analysis of, among other things, Exhibit 2.  In its

6   cover letter with this production, the government stated that

7   "[t]he government will make available for your inspection any

8   item of evidence referred to in the enclosed documents, as well

9   as any other evidence seized from your client and/or which the

10  government intends to offer in its case-in-chief.  Please contact

11  me to arrange a mutually convenient time for your inspection of

12  any such items."  On or about December 5, 2008, government

13  counsel informed counsel for defendant that, pursuant to its

14  standard evidence destruction procedures, DEA was preparing to

15  destroy Exhibit 2, and asked to know whether defense counsel

16  would like to inspect the marijuana or objected to the

17  destruction.  (See Def.'s Mot, Cohen Decl. at Ex B).  Defendant's

18  counsel replied on December 17, 2008, stating that due to other

19  pending commitments he would not be able to inspect Exhibit 2,

20  and thus requested that Exhibit 2 not be destroyed.  Over a month

21  later, on January 25, 2008, government counsel wrote again to

22  defense counsel, noting the prior request of defendant's counsel

23  for more time, but informing counsel that "unfortunately, DEA

24  simply does not have the space to store this material for much

25  longer.  Thus, if you, or your investigators, would like to

26  examine this evidence or have it independently tested it will

27  have to be soon."

28      After a series of phone calls, two defense counsel and an

5

1  defense assistant inspected Exhibit 2 on March 6, 2008.  Later,
2  government counsel informed defendant's counsel that Exhibit 2
3  would likely be destroyed, and defendant's counsel stated his
4  desire that the evidence be preserved for trial.  Government
5  counsel requested that DEA retain the evidence to obviate any
6  potential dispute.  However, on April 15, 2008, after defense
7  counsel had been given a chance to inspect it, acting pursuant to
8  Title 21, United States Code, Section 881(f)(2) and 28 C.F.R. §
9  50.21, DEA destroyed Exhibit 2.  The samples taken from Exhibit 2
10 and previously submitted to the DEA laboratory were not
11 destroyed, and remain in DEA custody.

## III.

### ARGUMENT

14 "[U]nless a criminal defendant can show bad faith on the
15 part of the police, failure to preserve potentially useful
16 evidence does not constitute a denial of due process of law."
17 Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  As a consequence,
18 the Supreme Court has held that law enforcement officers have no
19 obligation to retain evidence that does not appear to be
20 exculpatory.  California v. Trombetta, 467 U.S. 479 (1984);
21 United States v. Sepulveda, 15 F.3d 1161, 1195 (1st Cir. 1993)
22 ("Government destruction of potentially exculpatory evidence only
23 violates the rule in Brady if the evidence possesses apparent
24 exculpatory value that cannot fully be replicated through other
25 sources, and if the government acts willfully or in bad faith in
26 failing to preserve it").  Courts have therefore repeatedly found
27 that the DEA may properly dispose of bulk quantities of
28 controlled substances seized from defendants pursuant to DEA

6

1  policy without violating due process.  E.g., United States v.
2  Belden, 957 F.2d 671, 674 n.1 (9th Cir. 1992) (no apparent
3  exculpatory value to bulk quantities of marijuana plants); United
4  States v. Galvan-Garcia, 872 F.2d 638, 641 (1st Cir. 1989)
5  (marijuana); United States v. Heffington, 952 F.2d 275, 280-81
6  (9th Cir. 1991) (methamphetamine); United States v. Traylor, 656
7  F.2d 1326, 1334-35 (9th Cir. 1981) (cocaine).

8      In Trombetta, the Supreme Court first addressed the extent
9  to which the Due Process Clause requires the government to
10 preserve evidence.  The defendants in that case were convicted of
11 driving under the influence of alcohol on the results of a
12 "breathalyzer"-like test.  467 U.S. at 482.  The police failed to
13 preserve the defendants' breath samples, and the defendants moved
14 to suppress the breathalyzer results, stating that destruction of
15 the samples eliminated their ability to impeach the test results,
16 and thereby deprived them of due process of law.  Id. at 482-83.

17     The Court found that the failure of the police to preserve
18 the breath samples did not violate the Due Process Clause for
19 several reasons.  First, the record contained no allegation of
20 "official animus" towards the defendants or of "a conscious
21 effort to suppress exculpatory evidence."  Id. at 488.  More
22 importantly, the Court found that the evidence in question did
23 not meet the standard of constitutional materiality, which
24 required that the evidence (1) "possess an exculpatory value that
25 was apparent before [it] was destroyed"; and (2) "be of such a
26 nature that the defendant would be unable to obtain comparable
27 evidence by other reasonably available means."  Id. at 489.

28     The Supreme Court further refined its analysis in

7

1  Youngblood.  The defendant in Youngblood had been convicted of
2  kidnaping and molesting a child.  The police in that case failed
3  to preserve semen samples found on the victim's clothing, which,
4  if analyzed, might have exculpated the defendant.  Youngblood,
5  488 U.S. at 52-54.  In addition to affirming the Trombetta
6  materiality standards, see id. at 56 n.*, the Court held that
7  "unless a criminal defendant can show bad faith on the part of
8  the police, failure to preserve potentially useful evidence does
9  not constitute a denial of due process of law," id. at 58.  With
10 respect to bad faith, the Court stated that for Due Process
11 purposes, the presence or absence of bad faith "must necessarily
12 turn on the police's knowledge of the exculpatory value of the
13 evidence at the time it was lost or destroyed."  Id. at 56 n.*.

14      Thus, for the government's loss or destruction of evidence
15 to rise to the level of a due process violation, Trombetta and
16 Youngblood require a defendant to establish: (1) that the
17 exculpatory value of the evidence was apparent before the
18 evidence was lost or destroyed; (2) that the nature of the
19 evidence was such that the defendant would be unable to obtain
20 comparable evidence by other reasonably available means; and (3)
21 the government agents acted in bad faith in losing or destroying
22 the evidence.  See, e.g., United States v. Hernandez, 109 F.3d
23 1450, 1455 (9th Cir. 1997); United States v. Westerdahl, 945 F.2d
24 1083, 1087 (9th Cir. 1991).

25      Courts have applied the Trombetta/Youngblood test in
26 circumstances where the allegedly exculpatory evidence is
27 destroyed after charges are brought, as well as before
28 indictment.  See, e.g., United States v. Stevens, 935 F.2d 1380,

1  1387-88 (3d Cir. 1991) (applying <u>Trombetta</u> where FBI allegedly
2  destroyed evidence after defendant was charged); <u>see also</u> <u>United</u>
3  <u>States v. Valenzuela-Bernal</u>, 458 U.S. 858 (1982) (government
4  deported two witnesses); <u>United States v. Andreas</u>, 216 F.3d 645,
5  661 (7th Cir. 2000) (applying <u>Trombetta</u> where FBI allegedly
6  instructed witness to destroy evidence after target learned he
7  was to be indicted).  Such a result is not surprising where
8  neither <u>Trombetta</u> nor <u>Youngblood</u> limited their holdings to pre-
9  charging destruction of evidence.  <u>See, e.g.,</u> <u>Youngblood</u>, 488
10 U.S. at 57-58.

11 **A.    DEFENDANT HAS NOT MET HIS BURDEN OF SHOWING A DUE PROCESS**
12        **VIOLATION UNDER THE TROMBETTA/YOUNGBLOOD TEST**

13       The burden is on the defendant to prove a due process
14 violation by meeting each of the three elements required to find
15 a due process violation under <u>Trombetta</u> and <u>Youngblood</u>.  <u>Grisby</u>
16 <u>v. Blodgett</u>, 130 F.3d 365, 371 (9th Cir. 1997) (defendant could
17 not show prejudice, and failed to show bad faith); <u>United States</u>
18 <u>v. Lord</u>, 711 F.2d 887, 891 n.3 (9th Cir. 1983) (burden of proof
19 for constitutional or due process violation is on the defendant,
20 by a preponderance of the evidence).  Defendant has not met his
21 burden of proving any one of the <u>Trombetta/Youngblood</u> elements,
22 let alone all of them, as he must.  Accordingly, his motion
23 should be denied.

24       1.    <u>The Bulk Marijuana and Marijuana Plants Had No Apparent</u>
              <u>Exculpatory Value At the Time of Their Destruction and</u>
25            <u>Contamination</u>

26       The "duty to preserve evidence is limited to material
27 evidence, i.e., evidence whose exculpatory value was apparent
28 before its destruction . . ."  <u>Grisby</u>, 130 F.3d at 371; <u>see</u>

1  <u>Trombetta</u>, 467 U.S. at 489-90 (original breath samples in DUI
2  cases might have conceivably contributed to defense, but chances
3  were low that preserved samples would have been exculpatory).
4  Defendant makes the conclusory claim that the exculpatory value
5  of the evidence destroyed is "apparent on its face" because the
6  "physical evidence itself was the best measure of the volume of
7  marijuana for which" defendant "can be held responsible."  (Def.
8  Mot. at 6).  Yet defendant sets forth no facts showing that the
9  destroyed marijuana was in fact exculpatory, or even appeared to
10 be exculpatory.  Mere speculation that destroyed evidence would
11 have proven exculpatory if retained is insufficient under
12 <u>Youngblood</u>.  <u>See</u> <u>Paradis v. Arave</u>, 954 F.2d 1483, 1488 (9th Cir.
13 1992), <u>vacated and remanded on other grounds</u>, 507 U.S. 1026
14 (1993) ("[t]he mere failure to preserve evidence which could have
15 been subjected to tests which might have exonerated the defendant
16 does not constitute a due process violation"); <u>see</u> <u>also</u>
17 <u>Heffington</u>, 952 F.2d at 80-81 (destruction of laboratory
18 equipment in methamphetamine manufacturing case where the
19 defendant alleged that the equipment, if retained, could have
20 been tested to show that it did not bear any trace elements
21 associated with drug production and did not bear the defendant's
22 fingerprints insufficient).  Here, the bulk marijuana in Exhibit
23 2 had already been weighed and tested and proven by analysis to
24 be marijuana.  Samples from those tests still remain.  Moreover,
25 defendant had been given full access to inspect it prior to its
26 destruction in order to find even some hypothetical exculpatory
27 value in the material before destruction.  Unsurprisingly, even
28 after that inspection, defendant can point to nothing exculpatory

10

1  in the exhibit.

2      Nor was there any apparent exculpatory value in the
3  marijuana plants.  SA Burkdoll had counted and recorded the
4  number of plants seized, and agents had taken numerous
5  photographs and videotape of the plants.  (Burkdoll Decl. ¶ 4,
6  6).  At best, fault can be found for not taking photographs of
7  the root balls, however, there was never any intent or reasonable
8  expectation that such a count would not be done a second time.
9  It was only through the plant's natural deterioration, not
10 through any planned destruction, that agents were unable to
11 perform a second count few days after they had been seized.  (Id.
12 ¶¶ 5-6).  There is no evidence that this deterioration was
13 apparent at the time the plants were first counted and stored.
14 (Id.).  Moreover, defendant has not shown how the plants could
15 have been even tested once it became clear that they were
16 contaminated.  Nor does the government have any duty to test the
17 evidence it seizes.  Heffington, 952 F.2d at 280 (no due process
18 violation merely because government does not perform analysis on
19 evidence before destroyed "because a law enforcement agency has
20 no constitutional duty to perform any particular test").

21     In addition, defendant has not articulated any basis, or
22 pointed to any facts, sufficient to meet his burden of
23 demonstrating that it was apparent to SA Burkdoll, or anyone
24 else, that lab testing of the 104 plants seized from the store
25 could be anything other than marijuana.  Defendant does not even
26 make such a claim in his motion.  This makes sense given that the
27 plants were taken from a store manifestly dedicated to selling
28 marijuana plants and other marijuana products, from which other

11

1   marijuana products were seized and confirmed by lab testing to be
2   marijuana, and from a room which was pervaded by marijuana
3   information and literature.  (Burkdoll Decl. ¶ 3).  Given these
4   circumstances, defendant has not shown that any of the marijuana
5   evidence was material in a way that would have exonerated him.
6   See Trombetta, 467 U.S. at 489; United States v. Deaner, 1 F.3d
7   192, 199 (3d Cir. 1993) ("We think the destruction of drugs whose
8   weight is material to sentencing is analogous to the
9   prosecution's failure 'to preserve evidentiary material of which
10  no more can be said than that it could have been subjected to
11  test, the results of which might have exonerated the defendant'")
12  (citing Trombetta and Youngblood); United States v. Parker, 72
13  F.3d 1444, 1451-52 (10th Cir. 1995) (destruction of videotape not
14  due process violation because there was no showing it was
15  material where, among other things, defendant neglected to show
16  that videotape would have exculpated defendant and court found
17  government witness credible).

18      2.   Comparable Evidence Is Available

19      Defendant also must show that he is "unable to obtain
20  comparable evidence by other reasonably available means."
21  Trombetta, 467 U.S. at 489.  Trombetta, however, does not require
22  that the alternative evidence be an exact substitute for that
23  which is lost.  Indeed, if exact replicas of lost or destroyed
24  evidence existed, there would be little reason for a defendant to
25  make a claim.  Trombetta only requires that the substitute
26  evidence be "comparable."  Trombetta, 467 U.S. at 489.
27  Comparable or substitute evidence may be of poorer quality than
28  the lost or destroyed evidence without violating due process.

12

1  The <u>Trombetta</u> Court itself set forth numerous methods by which
2  the defendants in that case could have challenged the
3  breathalyzer results at issue, including: (1) inspecting the
4  breathalyzer machines at issue to determine if they had been
5  calibrated correctly; (2) introducing evidence that the
6  defendants had been dieting at the time, or that the breathalyzer
7  tests had been conducted near sources of radio waves (both of
8  which would have interfered with tests); and (3) cross-examining
9  the arresting officer to determine whether he had administered
10 the test properly. <u>See</u> <u>Trombetta</u>, 476 U.S. at 490.  Obviously,
11 none of these methods would have produced the same results as if
12 the defendants had been able to analyze the actual breath samples
13 taken from them, but the Supreme Court nonetheless found the
14 alternate methods comparable, stating:  "Even if one were to
15 assume . . . that breath samples might therefore have been
16 exculpatory, it does not follow that [defendants] were without
17 alternative means of demonstrating their innocence." <u>Id.</u> at 490.

18     Comparable evidence to the physical presence of Exhibits 2
19 and 5 is available in this case.  Samples, photographs, and video
20 recordings of Exhibit 2 still exist, and, in fact, defendant was
21 given unfettered access to Exhibit 2 before it was destroyed.
22 <u>See</u> <u>United States v. Richard</u>, 969 F.2d 849 (10th Cir. 1992) (no
23 due process where law enforcement officers destroyed marijuana
24 and containers in which marijuana found because there was no
25 showing of bad faith, evidence was photographed, and samples were
26 taken).

27     There is also comparable evidence available with respect to
28 the marijuana plants, for there are photographs and video

13

1  available of the plants to confirm their appearance and quantity.
2  The exact details of SA Burkdoll's rootball count has not been
3  preserved by photographs or video.  However, in addition to the
4  photographs and videotape, and the numerous records of plant
5  sales at the marijuana store seized, defense counsel can cross-
6  examine SA Burkdoll regarding her counting of the number of
7  plants.  United States v. Sherrod, 964 F.2d 1501, 1507 (5th Cir.
8  1992) (no due process violation when narcotics were destroyed
9  because defendant has an opportunity to cross-examine chemist);
10  see Traylor, 656 F.2d at 1335 (defense ability to cross examine
11  chemist mitigates against due process violation for destruction
12  of bulk cocaine).

13      That this comparable evidence is sufficient for due process
14  purposes is confirmed by the Ninth Circuit opinion in Belden.
15  There, government agents had negligently stored marijuana plants
16  seized from the defendant, allowing them to rot.  Before storing
17  the plants, the officers had counted the plants twice, coming up
18  with a different total each time.  Defendant claimed that the
19  destruction of the plants prevented him from making his own
20  independent count, and therefore prejudiced him.  The Ninth
21  Circuit declined to find a Trombetta/Youngblood violation, in
22  part because the defendant had access to comparable evidence.
23  The court stated that the defendant could still make his own
24  count, "albeit an imperfect one," because defendant (1) had
25  access to a videotape of officers walking through the plants
26  before they were destroyed, and (2) could cross-examine the
27  officers who made the count.  Belden, 957 F.2d at 674.  This same
28  substitute evidence is available in this case, and there have not

14

1  been inconsistent counts of the plants.  (Indeed the actual

2  plants are also available hereto, albeit in a much deteriorated

3  state.).  In this case, defendant has not even claimed that the

4  marijuana plants were not in fact marijuana, an understandable

5  position given the myriad of records, books, and marijuana

6  paraphernalia taken from the same room of the store as the

7  plants.  Defendant has not demonstrated that comparable evidence

8  is not available.

9       This conclusion is not altered by United States v. Cooper,

10 983 F.2d 928 (9th Cir. 1992), the one Ninth Circuit case where a

11 due process violation was found.  There, defendants claimed that

12 an alleged methamphetamine laboratory was in fact a legitimate

13 business producing chemicals for the treatment of AIDS, and

14 laboratory equipment seized by law enforcement was not physically

15 capable of producing methamphetamine.  Despite knowing of these

16 claims at all relevant times, the government intentionally

17 destroyed the pertinent laboratory equipment soon after it was

18 seized, and on appeal the government conceded both bad faith and

19 the readily apparent exculpatory nature of the evidence.  As to

20 comparable evidence, remaining photographs of the lab equipment

21 and oral testimony about the design of the equipment twenty-five

22 years before the seizure were insufficient for an expert to

23 determine whether the laboratory equipment could be used for

24 legitimate or illegitimate means.  Id. at 930, 31.  Thus,

25 defendants claimed that there was not an adequate substitute for

26 the equipment itself, and the court agreed.  Id. at 932.  The

27 instant case is readily distinguishable from Cooper.  Here, the

28 photographs, videotape, samples, and seized records are the

15

nearest possible substitute to the marijuana itself.  Nor has defendant pointed to any material factual issue which cannot be made due to the absence of the bulk marijuana.

   3.   Defendant Has Not Made The Requisite Showing Of Bad
        Faith

The showing of bad faith required to turn a mere loss of evidence into a due process violation is extremely demanding. Case law from the Supreme Court and the Ninth Circuit indicate that a defendant must make a showing closely approaching intentional misconduct on the government's part.  The Trombetta Court faulted the defendants for failing to show evidence of "official animus towards [the defendants]" or "a conscious effort to suppress exculpatory evidence."  467 U.S. at 479.  The Youngblood Court indicated that bad faith due process violations would be limited to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  488 U.S. at 58.

In interpreting Trombetta and Youngblood, the Ninth Circuit has set a similarly high standard.  In Mitchell v. Goldsmith, 878 F.2d 319 (9th Cir. 1989), a defendant charged with sexual assault claimed that the police's failure to properly refrigerate sperm samples violated his due process rights.  The Ninth Circuit stated that "the police did not know the semen samples would have exculpated [defendant] when they failed to perform certain tests or refrigerate [the samples], hence there was no bad faith on the part of the police."  Id. at 322 (internal quotations omitted).

In Phillips v. Woodford, 267 F.3d 966 (9th Cir. 2001), the defendant, charged with murder, claimed that the police

16

1  improperly destroyed the vehicle in which the victims were shot.
2  The Ninth Circuit found no bad faith on the part of the police,
3  in part because the defendant made "no colorable showing, or
4  indeed any showing at all that the State destroyed the [vehicle]
5  to prevent disclosure of evidence favorable to the defense." Id.
6  at 987.  Similarly, in Featherstone v. Estelle, 948 F.2d 1497
7  (9th Cir. 1989), the police destroyed a photograph of the
8  defendant that one of the defendant's victims had picked out of a
9  photo line-up.  The Ninth Circuit found no evidence of bad faith
10 on the part of the police because "it is clear that [the
11 destruction of the photo] was not deliberately done to deprive
12 petitioner of access to relevant evidence." Id. at 1505.  Thus,
13 to make a showing of bad faith that will satisfy the
14 Youngblood/Trombetta test, a defendant essentially must show that
15 the government acted with the intent of depriving the defendant
16 of access to exculpatory evidence.

17     Here, defendant has not brought forward any evidence, as it
18 must, to show bad faith on the government's part.  Defendant's
19 motion may be denied on that basis alone, for it is defendant's
20 burden to establish bad faith, not merely to make an unsupported
21 allegation in the hope the Court will then allow a lengthy
22 fishing expedition into government procedures.  See Belden 957
23 F.2d at 1147 ("When potentially exculpatory evidence has not been
24 preserved, the defendant must show bad faith on the part of the
25 police to establish infringement of the right to access")
26 (internal quotation marks omitted, emphasis added).

27     In any event, the government acted in good faith here.  With
28 respect to Exhibit 2, the bulk marijuana, the destruction was

17

performed pursuant to the government's standard evidence
destruction policies set forth in Title 21, United States Code,
Section 881(f)(2) and its accompanying Department of Justice
regulations, 28 C.F.R. § 50.21.  (See Kowal Decl. ¶¶ 3, 6, 8).
These provision reflect government policy:

> [i]ntended to prevent the warehousing of large
> quantities of seized contraband drugs which are
> necessary for due process in criminal cases.  Such
> stockpiling of contraband drugs presents inordinate
> security and storage problems which create additional
> economic burdens on limited law enforcement resources
> of the United States.

28 C.F.R. § 50.21(c).  The regulation permit DEA to destroy bulk
contraband sixty days after notification to the government's
AUSA.  See 28 C.F.R. § 50.21(g)(1).

Although there is no requirement in these regulations for
notification to defense counsel, in this case, the government
notified defendants of the potential destruction and retained the
evidence for over four months until defense counsel had an
opportunity to inspect it.  (Kowal Decl. ¶¶ 3-7).  The government
also retained a sample of the exhibit.  (Burkdoll Decl. ¶ 8).
Courts have consistently found that government destruction of
evidence pursuant to regulations such as those here demonstrate a
lack of bad faith by the government, even where the government
did not provide notice and opportunity to inspect, or failed to
retain a sample of the narcotics, as the government did in this
case.  See Deaner, 1 F.3d at 200-01 (no bad faith were bulk
marijuana destroyed pursuant to 28 C.F.R. § 50.21 even though

18

government did not retain a sample as required by regulation and also did not first inform defense counsel of destruction); Heffington, 952 F.2d at 280-81 (no bad faith where methamphetamine lab equipment destroyed by surveillance team in accord with DEA procedures for disposal of hazardous waste) (law enforcement's compliance with "departmental procedure should be regarded as an indication that disposal of evidence was not performed in bad faith") (internal quotation marks omitted).

As to Exhibit 5, the evidence shows no bad faith by the government.  SA Burkdoll learned from the DEA laboratory that the drug exhibit had become infested by mold and insects and thus any analysis laboratory would pose health and safety concerns. (Burkdoll Decl. ¶ 9-10).  There was no intent to harm the defense case.  SA Burkdoll agreed with the laboratory's determination, believed the exhibit to have been destroyed, and wrote a report on that basis.  (Id.).  Again, there is no general requirement that the government test its evidence,  Heffington, 952 F.2d at 280, and here there was a legitimate affirmative reason to not conduct testing.  At most, the government could be found to have been negligent in not transferring Exhibit 5 to the laboratory more quickly before the marijuana plants decomposed.  However, even if there was negligence (a point which the government does not concede), negligence is not sufficient to show bad faith. Deaner, 1 F.3d at 201 (government's negligent failure to retain sample of bulk marijuana not sufficient to show bad faith) (citing Youngblood, 488 U.S. at 58 (failure of police to refrigerate clothing and perform tests on semen sample was at worst negligent)).  In sum, on this element, like the two other

1  required elements of the <u>Trombetta</u>/<u>Youngblood</u> test, defendant has
2  failed to meet his burden.

3  **B.**   **EVEN ASSUMING THERE WAS A VIOLATION OF DUE PROCESS, WHICH**
4       **THERE WAS NOT, DISMISSAL IS NOT THE CORRECT REMEDY**

5       Defendant has failed to meet any of the elements required to
6  prove a due process violation, and his motion to dismiss should
7  therefore be denied.  In order to preserve the issue, however,
8  the government notes that, in the alternative, dismissing an
9  indictment based on government misconduct is a disfavored remedy,
10  and should be used only where less drastic alternatives are not
11  available.  <u>United States v. Kearns</u>, 5 F.3d 1251, 1254 (9th
12  Cir.1993); <u>see also</u> <u>United States v. Morrison</u>, 449 U.S. 361, 364-
13  365 (1981) (sanctions should be tailored to remedy constitutional
14  violation without unnecessarily infringing on competing
15  interests); <u>but see</u> <u>Cooper</u>, 983 F.2d at 933 (affirming dismissal
16  of indictment where no other sanction sufficient).  Especially
17  where, as here, the motion is meritless, such a remedy should not
18  be granted.

19                              **IV.**

20                           **CONCLUSION**

21       For the forgoing reasons, defendant's motion should be
22  denied in its entirely.

23

24

25

26

27

28

                              20

<u>DECLARATION OF DAVID P. KOWAL</u>

I, David P. Kowal, declare:

1.    I am an Assistant United States Attorney in the Central District of California and represent the government in the case encaptioned <u>United States v. Charles Lynch et. al</u>, No. CR 07-689-GW.  This declaration is made in support of the government's Opposition to Defendant's Motion to Dismiss Indictment For Destruction of Exculpatory Evidence (the "motion").

2.    On November 4, 2005, I produced discovery to defense counsel including defendant Lynch's counsel, Rueven Cohen, Esq. That discovery specifically refers to the DEA drug Exhibit 2, the approximately more than 21 kilograms of marijuana that is one of the subjects of the motion.  In the cover letter, I specifically offered to make available for defense inspection any item of evidence referred to in the enclosed documents, as well as any other evidence seized from defendant which the government intended to offer in its case in chief.  I asked defense counsel to contact me to arrange a mutually convenient time for his inspection of those items.  A true and correct copy of that letter is attached hereto as Exhibit A.

3.    On or about December 5, 2008, I wrote to defense counsel in this case informing them that DEA was intending to destroy the bulk marijuana, Exhibit 2, from this case.  (That letter is attached to defendant's motion as Exhibit B to Mr. Cohen's declaration).  This destruction was being done, as it is frequently done in my experience in narcotics cases, pursuant to

1

1  DEA's authority under Title 21, United States Code, Section
2  881(f)(2) and its accompanying Department of Justice regulations,
3  28 C.F.R. § 50.21.  It is my understanding that the decision to
4  destroy the exhibit was based on standard evidence destruction
5  procedures rather than anything specific about the case.

6       4.   In response, Mr. Cohen sent me his letter of December
7  17, 2007, which is attached to defendant's motion as Exhibit C to
8  Mr. Cohen's declaration.

9       5.   On or about January 25, 2008, I wrote to both counsel
10 for defendant.  I have not retained a hard copy of this letter,
11 but have preserved an electronic version of the letter.  In the
12 letter I stated:

13          "I wrote to you in early December about DEA's desire to
14      destroy the DEA is preparing to destroy drug exhibit number
15      2 from the above case - miscellaneous bags of marijuana
16      seized on 3/29/07 from Central Coast Compassionate
17      Caregivers at 780 Monterey Ave. Ste B, Morro Bay,
18      California.  See Bates numbers 0292, 0557-0558 for a
19      description of this exhibit.

20          At that time Mr. Cohen wrote me to request that the
21      government retain the evidence at that time due to his need
22      to focus on other matters at that time.  Unfortunately, DEA
23      simply does not have the space to store this material for
24      much longer.  Thus, if you, or your investigators, would
25      like to examine this evidence or have it independently
26      tested it will have to be soon.  Please contact me next
27      week, so we can discuss this matter further."

28

                                2

6.    At the time I wrote this letter, I had requested that DEA not destroy the evidence (though I understood they had authority to do so) until after defense counsel had inspected it. Also, although I did not believe that the evidence had any exculpatory value, and had limited probative value to the government's case, I also asked that it not be destroyed until trial in order to avoid unnecessary litigation (like the present motion) or to present the defendant with an argument to make to the jury.

7.    After this letter to defendant's counsel, I had a series of discussions with Mr. Cohen, Mr. Littrell, and the case agent, finally leading to the defense team's inspection of Exhibit 2 on or about March 6, 2008. After that inspection, as Mr. Cohen states in his declaration, I told him that DEA would likely destroy the evidence now that it had been inspected, and, as he states, he expressed his desire that the Exhibit be retained until trial.

8.    I later learned that on April 15, 2008, DEA had destroyed Exhibit 2. However, it is my understanding now, as it has been throughout this process, that the destruction was standard procedure in accord with DEA policies under Title 21, United States Code, Section 881(f)(2), 28 C.F.R. § 50.21, and the space and safety issues relating to storing large quantities of

//

//

//

3

1 | narcotics, rather than any improper motive.

2 |     I declare under penalty of perjury that the foregoing is

3 | true and correct.

4 |

5 | DATED: January 23, 2008

6 |                         DAVID P. KOWAL

4

EXHIBIT A



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

---

David P. Kowal
Assistant United States Attorney
(213) 894-5136

312 North Spring Street
Los Angeles, CA  90012

August 8, 2007

**Via Interoffice Mail**
Reuven Cohen, Esq.
Deputy Federal Public Defender
312 East Second Street
Los Angeles, CA  90012

**Via US Mail**
William S. Kroger, Jr., Esq.
8888 Olympic Blvd., 1st Flor
Beverly Hills, CA 90211

Re:     United States v. Lynch and Tollette,
        No. CR 07-689-GW

Dear Counsel:

**A.     Documents Enclosed and/or Now Available for Inspection and Copying**

Pursuant to Mr. Kroeger's request for discovery on August 6, 2007, and Mr. Cohen's request for discovery on August 8, 2007, please find the following documents, Bates Numbered 0001 to 0607, for the above-referenced case.  These materials include the following:

| **Bates** | **Description** |
|---|---|
| 0001-0013 | Indictment |
| 0014-0270 | Search warrants and related materials |
| 0271-0354 | DEA Reports |
| 0355-0507 | San Luis Obispo County Reports |
| 0508-0553 | DEA Reports re non-drug exhibits |
| 0554 | DMV Report |
| 0555-0598 | DEA Reports re drug exhibits |
| 0599-0607 | Criminal history reports re defendants |

The government will make available for your inspection any item of evidence referred to in the enclosed documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief.  Please contact me to arrange a mutually convenient time for your inspection of any such items.  In this regard, please note specifically that I currently have at my office copies of the documents seized during the search warrants including those seized at the residence of Dr. Tollette and at the marijuana store.  These documents are described in the DEA reports regarding the searches and also in the DEA reports regarding non-drug exhibits.  The categories of documents are typically identified by the letter "N" followed by a number.  (See, e.g., Bates No. 0295 describing N-2 to N-5 recovered during search of the marijuana store, and Bates Nos 300-305 describing N-101 to N-113 recovered during the search of Dr. Tollette's residence).  The documents are voluminous, representing approximately a dozen boxes of materials.  If you wish to inspect and/or copy any of these documents please let me know as I can make them available on short notice.

In the coming days I expect to produce additional materials including: photographs from the search warrants, video and audio recordings of surveillance and undercover operations described in the reports, and files retrieved from some of the computers seized during the searches.  If you need to see any of these items immediately, please let me know so that I can make them available to you quickly.  In the meantime, it may take me some time to copy and transfer all of these materials to compact discs for production to you.  Please note that forensic examination is continuing on the majority of the computers seized during the search warrants.  I will not be able to produce discovery from those sources until the forensic examination succeeds in gaining access to the files.  I also expect to provide additional discovery regarding the confidential sources referenced in the search warrants.

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute or relevant case law are provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

**B.     Discovery Meeting and Government's Objection to Court's Discovery Order**

The Court's discovery order requires us to meet and confer sufficiently prior to the August 16, 2007 status conference to file a status report prior to that date.  (See discovery order Paragraph 4).  I am available to do so as soon as you are ready, and will draft our report for your review after talking with you.

**Please take note** that the government objects to, and will decline to provide, early disclosure of witness statements, as set forth in the Court's discovery order at page 2, paragraph 1 (j).  It is the government's view that this portion on the order violates the Jencks Act and binding Ninth Circuit case law.  Should you disagree with this position I will be glad to discuss it with you in the hope of avoiding unnecessary motion practice.  Notwithstanding this objection, the

-2-

government will produce to you any additional <u>Jencks</u> material, including any relevant grand jury transcripts (assuming a Rule 6(e) order has been issued) one week before trial if you agree to the production of reciprocal <u>Jencks</u> material at that time or affirmatively represent that you have no <u>Jencks</u> material to produce.  Please inform me whether such an arrangement is acceptable to you.

**C.      Request for reciprocal discovery and notices of defenses**

With this letter the government requests all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure.  The government also requests notice of any intention of your client to rely on an entrapment defense, a public authority defense, or a defense involving mental condition, duress, or alibi.  Please note that the Court's discovery order also requires prompt notification of your intent to present any of these defenses.

Please do not hesitate to call me about any of the foregoing.

Very truly yours,

GEORGE S. CARDONA
United States Attorney

DAVID P. KOWAL
Assistant United States Attorney

Enclosures (Bates Nos. 001 to 607)

<b><u>DECLARATION OF RACHEL BURKDOLL</u></b>

I, Rachel Burkdoll, do hereby declare:

1.    I am Special Agent (SA) for the Drug Enforcement Administration (DEA), and have been so employed since September of 2005.  Since 2006, I have been assigned to the DEA's Ventura Resident Office.  I offer the following declaration based on my personal knowledge in support of the government's opposition to Charles C. Lynch's motion to suppress evidence in the case of <u>United States v. Lynch</u>.  This declaration is for that limited purpose and does not purport to contain all the facts known to me about this case.

2.    On Wednesday, March 28, 2007, the Hon. Fernando M. Olguin issued a search warrant for 780 Monterey Avenue, Suite B, Morro Bay, California, a marijuana store owned and operated by defendant Lynch, based on my affidavit (the marijuana store).  On Thursday, March 29, 2007, I was a member of a law enforcement team consisting of DEA Special Agents (SAs) and members of the San Luis Obispo County Sheriff's Department that executed a federal search warrant.

3.    During the search of the marijuana store, I seized, among other things:  (1) multiple bags containing a total of approximately 21 kilograms of marijuana that had been stored in four large safes in the rear office area of the store, and (2) 104 marijuana plants being grown in plastic cups and in individual containers of rockwool in the marijuana sales section of the store.  From the same room as the plants, I also seized additional bulk quantities of marijuana, jars of lip balm containing marijuana, containers of hashish powder, containers of

1

1  hashish oil, books on the subject of marijuana, information on
2  characteristics of marijuana, price lists for marijuana, and a
3  marijuana "policy report."

4      4.    Prior to seizing these and other items from the
5  marijuana store pursuant to the warrant, detectives and I took
6  photographs of the evidence in the locations where they were
7  found, including seven photographs of the marijuana plants from
8  different angles in the nursery, and 11 photographs of the 21
9  kilograms of marijuana taken from the office safes.  True copies
10 of examples of these photographs are attached hereto as Exhibit
11 A.  Detectives also made a video tape recording of all the items
12 in the marijuana store in the location where they were found.
13 This tape includes clear views of both the marijuana plants and
14 the 21 kilograms in their original state.

15     5.    During execution of the warrant, after the photographs
16 and video documentation were complete, I removed all of the
17 marijuana plants that were growing in this area, counted them
18 based on the root ball, and placed them in a large evidence bag
19 so that they could be transported back to the Ventura Resident
20 Office later that day for processing.  Based on each root ball, I
21 counted that there were 104 marijuana plants total.  Sometimes
22 there was more than one root ball in a container, and sometimes
23 there were multiple stems leading to only one root ball. I also
24 seized the 21 kilograms of marijuana, and other items which were
25 then transported to the DEA Ventura Resident Office evidence
26 vault pending further processing.

27     6.    On Monday, April 2, 2007, I retrieved all of the drug
28 exhibits from the evidence vault and began to photograph and

2

1  process the exhibits in accordance with DEA policy.  During the
2  processing of the 104 marijuana plants, I and SA Suzanne Hauck
3  attempted to conduct another count of the marijuana plants;
4  however, the plants had already begun to deteriorate and were
5  falling apart.  Because of this a second count was unable to be
6  completed.

7       7.   I also processed the bulk marijuana, placed them in
8  evidence packages, weighed, and took samples from the 21
9  kilograms, and took photographs of all exhibits.  The 21
10 kilograms of bulk marijuana was designated as DEA drug Exhibit 2,
11 while the 104 plants were designated as Exhibit 5.  The exhibits
12 were placed back in the Ventura Office evidence vault, prior to
13 transfer for forensic analysis at the DEA Southwest Regional
14 Laboratory in Vista, California near San Diego.  It is my
15 understanding that all the photographs and video recordings taken
16 of these Exhibits have been turned over to defense counsel in
17 this case as part of the government's discovery production.

18      8.   Exhibits 2 and 5 were stored in an evidence vault at
19 DEA Ventura.  I was on vacation from April 3 through April 5,
20 2007.  On April 6, 2007, I conducted the search warrant return in
21 Los Angeles, California.  I was further unable to transport the
22 Exhibits to the laboratory until April 11, 2007, as under DEA
23 policy, two agents are required to transfer all drug exhibits and
24 I was not able to obtain an available agent to travel with me
25 until that day.  On April 11, 2007, I and SA Apel brought
26 Exhibit 5 and the samples from Exhibit 2 to the laboratory in
27 Vista, California (approximately a 3-4 hour drive from my
28 office).  Prior to arriving at the DEA laboratory, I and SA Apel

1  transferred the bulk portion of Exhibit 2 (that is, every thing
2  except the samples)  to the DEA bulk evidence vault in Los
3  Angeles, California.  The samples were retained at the lab.  The
4  laboratory would later conduct analysis on the samples taken from
5  Exhibit 2 and concluded that they were marijuana.

6      9.  With respect to Exhibit 5, on April 30, 2007, I was
7  contacted by a DEA chemist who informed me that as a likely
8  result of wetness on the plants, the exhibit had become infested
9  with mold and insects and the lab requested that testing not be
10  done on the exhibit for health and safety reasons.  The chemist
11  later told me that the exhibit should be destroyed as it was
12  considered a biohazard.  I agreed to the request for no testing,
13  and assumed that the laboratory had destroyed Exhibit 5.  I
14  documented my interaction with the lab and the destruction of the
15  plants in a written report.

16      10.  In fact, recently, in preparation for this Opposition,
17  I spoke to the lab and learned that they had not destroyed the
18  plants, but had repackaged them.  However, the laboratory will
19  not conduct testing on the plants since it considers Exhibit 5 to
20  be a biohazard.

21      11.  On March 6, 2008, I was present when two defense
22  counsel, Mr. Cohen and Mr. Littrell, along with an assistant who
23  they said was there to take pictures, inspected Exhibit 2 at the
24  DEA Office in Los Angeles.

25      I declare that the foregoing is true and correct to the best
26  of my belief.  Executed in Ventura County, California on June 23,
27  2008.

28

RACHEL BURKDOLL

4











