*United States v. Charles C. Lynch, <u>et. al.</u>,*

CR 07-689-GW

EXHIBIT A

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 05-813 JSL |
| Plaintiff, | ) | SENTENCING OPINION |
| v. | ) | |
| SANCO GRANT III and LAMONT DINKINS, | ) | |
| Defendants. | ) | |

## INTRODUCTION

Defendants Sanco Grant III ("Grant") and Lamont Dinkins ("Dinkins") pled guilty to both counts of an indictment charging them with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846, and distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii). The government argues that the charges require the court to apply a ten-year mandatory minimum sentence. Dinkins, by virtue of a government motion under U.S.S.G. § 5K1.1, is relieved of the ten-year sentence. Grant, on the other hand, is not relieved of such a sentence and moves to strike the ten-year mandatory minimum sentence as applied to him.

For the reasons discussed herein, the court hereby grants defendant Grant's Motion and holds that the ten-year mandatory minimum sentence urged by the government cannot be applied in this case. For the reasons set forth below, Grant is sentenced to a term of imprisonment of sixty (60) months, and Dinkins is sentenced to a term of imprisonment of forty (40) months.

## DEFINED STATUTORY TERMS

For convenience of reference, the following terms are defined at the outset, as follows. When used herein, the term:

(A)   "Section 841" or "§ 841" refers to 21 U.S.C. § 841;

(B)   "Ten Year Minimum" refers to the sentence urged by the government as being mandated by 21 U.S.C. § 841(b)(1)(A) as the minimum sentence that can be legally imposed in this case;

(C)   "Five Year Minimum" refers to the lowest minimum sentence prescribed by 21 U.S.C. § 841(b)(1)(B);

(D)   "Section 841 Minimums" or "§ 841 Minimums" refers to the Ten Year Minimum, the Five Year Minimum, and the other minimum sentences prescribed by 21 U.S.C. § 841(b) related to prior convictions for a felony drug offense, upon the filing of an information by the government pursuant to 21 U.S.C. § 851;

(E)   "Section 3553" or "§ 3553" refers to 18 U.S.C. § 3553 in its entirety;

(F)   "Section 3553(a)" or "§ 3553(a)" refers to the first subsection of 18 U.S.C. § 3553; and

(G)   "Sentencing Guidelines" or "Guidelines" refer to the federal Sentencing Guidelines promulgated by the United States Sentencing Commission.

## PROCEDURAL HISTORY

On January 11, 2006, Dinkins pled guilty to both counts of an indictment, charging him with conspiracy to distribute cocaine base and distribution of cocaine base. Five months later, Grant also pled guilty to both counts of the indictment.

On November 22, 2006, Grant filed a sentencing memorandum styled as a Motion to Strike Mandatory Minimums (the "Motion"). The Motion asked the court to rule that the Ten Year Minimum could not be constitutionally applied in this case. Dinkins did not join in the Motion because, pursuant to a government motion under U.S.S.G. § 5K1.1 (the "5K Motion"), he was relieved of the Ten Year Minimum by virtue of his "substantial assistance."

On January 24, 2007, the court granted defendant Grant's Motion and sentenced Grant to sixty

1 | (60) months of imprisonment and Dinkins to forty (40) months of imprisonment.

2 | ## NATURE OF OFFENSE

3 | Grant and Dinkins entered their guilty pleas pursuant to plea agreements that contained identical

4 | factual bases, which described the offense conduct as follows:

> Beginning on September 15, 2004, Dinkins conspired with Grant to distribute 4½ ounces of cocaine base, which is also known as crack cocaine, to a government confidential witness ("CW") and did, in fact, knowingly distribute this cocaine base to the CW on September 16, 2004. Specifically, on September 15, 2004, the CW, who was a former acquaintance of Dinkins, called Dinkins and confirmed that Dinkins could supply the CW with cocaine base. During this conversation, Dinkins advised the CW that he had a source of supply who could provide up to nine ounces of cocaine base. Dinkins and the CW ultimately negotiated a deal that would take place the following day – September 16, 2004 – in which Dinkins would provide the CW with 4½ ounces of cocaine base for $1,800. Following the completion of this call, Dinkins called his source of supply, Grant, and ordered 4½ ounces of cocaine base for delivery the following day.

> On the morning of September 16, 2004, Dinkins contacted the CW on multiple occasions: (1) to confirm that the CW was ready to complete the negotiated drug deal; (2) to notify the CW as to the time that the transaction would take place; (3) to provide the CW with directions to his residence; and (4) to advise the CW that the price for the 4½ ounces of cocaine base would be $2,000 and not $1,800 as previously negotiated.

> Later that day, the CW drove to Dinkins' residence to complete the transaction. After briefly entering Dinkins' residence to make payment for the cocaine base, the CW returned to his car, which was wired with audio and visual equipment, to await the arrival of the cocaine base. Approximately ten minutes later, Dinkins joined the CW in waiting for the arrival of the drugs. Shortly thereafter, Grant parked his gold Honda Accord[1] behind the CW's car. Dinkins then left the CW's car and met up with Grant, at which time Dinkins provided Grant with the $2,000 payment and, in return, received 4½ ounces of cocaine base. Dinkins subsequently returned to the CW's car and provided the CW with the 4½ ounces of cocaine base.

> The substance that Dinkins and Grant sold to the CW was subjected to chemical analysis at the Drug Enforcement Administration's Southwest Laboratory and was found to consist of 123.5 grams of cocaine base.

The government contends that the foregoing admissions are not only sufficient to establish the elements of the crime, but also to require the court, as a matter of law, to impose at least a ten-year sentence upon Grant.

The following additional relevant information was revealed to the court in the defendants' Pre-Sentence Reports ("PSR") and the government's brief in support of its 5K Motion on behalf of Dinkins. Neither Dinkins nor Grant was arrested at the scene of the drug transaction. A pursuit team followed the

---

[1]The car, with license plate 5BIT595, was registered to Grant.

1   car that had arrived to supply the drugs – a car registered in Grant's name – from the scene to a

2   restaurant. Although the pursuit team managed to obtain a distant photograph of the car's driver as he

3   entered the restaurant, they were not able to make an identification of Grant. For reasons unknown to

4   the court, Grant and Dinkins were not arrested until approximately a year after the drug transaction took

5   place.

6         According to the government, at the time of the arrests, it possessed limited circumstantial

7   evidence that Grant had supplied the cocaine base ("crack cocaine"). Specifically, its evidence

8   consisted of the following: 1) the fact that a car registered in Grant's name appeared at the transaction

9   site; 2) Dinkins met with the driver of the car – who was not captured on audio or video – immediately

10   prior to providing the CW with the drugs; and 3) the pursuit team obtained a distant photograph of the

11   driver as he left the car to enter the restaurant, which matched the general description of Grant ("tall,

12   husky, bald, black male"). The government contends that it was not until after Dinkins participated in a

13   proffer session, almost immediately after his arrest, in which Dinkins provided a detailed overview of

14   the drug transaction, that it had conclusive evidence against Grant, even though they had already

15   indicted Grant. This so-called "critical information" by Dinkins became the primary basis for the

16   government's 5K Motion on behalf of Dinkins. Moreover, the government states that Grant was

17   "exceedingly opposed" to pleading guilty throughout the course of this case, and it was not until he

18   received a copy of the report of Dinkins' proffer session a week before trial, that he decided to plead

19   guilty. The government also threatened Grant with the filing of an information that would subject him

20   to a ten-year enhancement pursuant to 21 U.S.C. § 851, under which Grant would face a minimum of

21   twenty years in prison if he did not plead guilty.

22                     **DISCUSSION**

23                        I.

24         This case involves the government's unconstitutional claim of sentencing power over defendants

25   convicted of participating in a crime instigated, orchestrated and implemented by the government itself

26   for its own undisclosed purposes. The government contends that the criminal convictions of these

27   defendants place the power to decide their resulting sentence within a range of zero to twenty years in

28

1   the hands of an individual Assistant United States Attorney ("AUSA"), based entirely on that AUSA's

2   personal evaluation of the totality of circumstances with which only he is acquainted.  This degree of

3   sentencing power, if exercised as the government contends, violates the defendants' rights guaranteed

4   by the Due Process Clause of the Fifth Amendment (the "Due Process Clause").  For the reasons

5   described herein, the court holds that the Ten Year Minimum cannot be constitutionally applied to Grant

6   and Dinkins, or any other similarly situated defendants.

7          Nothing in the Sentencing Guidelines, Section 841, or the relevant case law is fairly understood

8   as mandating or authorizing that individual AUSAs will assume sentencing powers in this way, or that

9   other government agents may arrange the facts of crimes in which the government itself participates so

10  as to produce mandatory sentences that are within the discretion of an AUSA to enforce or alter without

11  any outside review.  The issue before the court, therefore, is whether Congress, by enacting the

12  Sentencing Guidelines and Section 841, intended to, or could constitutionally, delegate sentencing

13  power to the government in cases like this one, or whether the government unilaterally created the

14  appearance of such sentencing power by its own unconstitutional acts.

15         The crime to which Grant and Dinkins pled guilty was not an ordinary crime.  On the contrary,

16  the offense for which the government insists that the court must apply the Ten Year Minimum was a

17  crime planned, orchestrated and choreographed by the government for its own purposes -- in essence, a

18  sting.[2]  Sting crimes are unlike the ordinary crimes that the government tries to prevent.  Rather, they are

19  crimes in which the government itself is an unindicted co-conspirator and participant, and in fact the

20  instigator -- a role usually held by the most culpable participant in a conspiracy.  As the instigator, the

21  government is able to control and manipulate the terms of the sting.  In a drug sting, these terms

22  generally include which individuals are targeted, the type and amount of drugs involved, as well as the

23  time and place where the crime will be committed so that the transaction can be videotaped, wiretapped,

24  and/or observed by law enforcement.  By planning and executing the sting in this way, the government

25  makes it virtually certain that when sting targets are arrested, indicted and prosecuted, they will have no

26

27         [2]The court recognizes that the precise parameters of what is meant by the term "sting" are not
    well-established.  For the purposes of this case, however, the court uses the term to refer to an
28  operation which the government instigates, directs and controls.

1 | credible defense.

2 |       While it might come as a surprise even to some lawyers who are not versed in criminal law

3 | practice to learn that law enforcement can obtain criminal convictions based upon crimes which they

4 | instigate as co-conspirators, and into which they defraud others into participating, the use of stings to

5 | obtain convictions is not unlawful. In fact, it is supported by a wealth of controlling authority. The

6 | court has followed these precedents in many cases without serious misgivings, and it has followed them

7 | in this case. The record in this case, however, does not show facts that demonstrate the rationale by

8 | which stings are thought to be justified, *i.e.*, that an individual who is otherwise predisposed to

9 | committing the acts constituting the elements of the crime is no less guilty because the government

10 | provided him with the opportunity to do so. *See Jacobson v. United States*, 503 U.S. 540, 548-50

11 | (1992). As discussed below, the record in this case provides no legitimate reason to believe that either

12 | Grant or Dinkins was predisposed in any way to commit or participate in an unlawful drug transaction

13 | before being contacted by the government. Nevertheless, the court considers the factual bases of the

14 | plea agreements to be sufficient to support the criminal convictions in this case. The court concludes,

15 | however, that the convictions do not warrant the application of the Ten Year Minimum.

16 |       The court's conclusion is not based on the fact that the government instigated and participated in

17 | the criminal conspiracy that produced the defendants' convictions, but rather that it claimed unilateral

18 | control over the punishment of those persons. The government argues that Congress, through its

19 | enactment of Section 841, has directed the court to apply the Ten Year Minimum in the sentences of

20 | Grant and Dinkins, and that the government has done no more than urge the court to follow this

21 | congressional mandate. The court disagrees. The government ignores the role that it has played in

22 | arranging the facts to make this mandate facially applicable. Stings are the creation of law enforcement.

23 | They are not supported by any legislation. They have been expressly sanctioned by courts only for the

24 | purpose of obtaining criminal convictions.

25 |       It is true that courts have routinely applied the Ten Year Minimum in sting cases. As discussed

26 | further herein, however, the lesson of *United States v. Booker*, 543 U.S. 220 (2005), is that no matter

27 | how routinely sentences were imposed on the basis of assumptions about issues that had not been

28 |

1  specifically presented, those sentences have no precedential effect when the issue is specifically raised.

2  Although the Ten Year Minimum has been applied to sentences in many sting cases, those cases appear

3  to suffer from the same absence of facts and argument of relevant law with which the court was first

4  presented in this case. No case has been decided before now in which the issues in this case were

5  presented to the sentencing judge or to any circuit court, either through the development of facts or legal

6  arguments based thereon.

7      According to the government's sentencing position in this case, an individual AUSA has the

8  power to determine or alter an offender's sentence based solely upon whatever sentencing

9  considerations he deems to be relevant. These decisions are entirely at the discretion of this AUSA,

10  subject only to whatever supervision he might receive from within his own office. No Article III judge

11  or court, including the Supreme Court, has ever possessed or claimed such plenary power over a

12  citizen's right to liberty, and so far as the court is aware, no one government official has ever possessed

13  or claimed such power either.

14      In the instant case, the government maintained unilateral control from beginning to end over

15  both of the defendants' sentences. The government instigated the sting by tricking Dinkins and Grant

16  into participating in what would appear to be a bona fide drug sale. The government could have

17  obtained criminal convictions by arranging to have Grant and Dinkins participate in the sale of <u>any</u>

18  controlled substance in <u>any</u> distributable amount. Notwithstanding that, the government as the instigator

19  of the transaction, predetermined that the drug to be bought and sold would be crack cocaine and that

20  the amount would be sufficient to trigger the Ten Year Minimum. Once the government set the sting in

21  motion, therefore, it guaranteed that if it was successful, Grant and Dinkins would be pre-sentenced by

22  the government to a prison term of at least ten years, absent any circumstances that qualified them for

23  the two narrow statutory exceptions, one of which was not applicable and the other of which was within

24  the AUSA's control.

25      Not only did the government build the Ten Year Minimum into the transaction, it then

26  manipulated the outcome through concessions and threats, based solely on its opinion of what was

27

28

1  appropriate.[3] Dinkins' chance of acquittal was essentially nil from the beginning. He had worked with

2  the government's confidential witness and had been observed at close range while actually involved in

3  the drug transaction. Thus, his only chance of avoiding the Ten Year Minimum was to persuade the

4  government that he had provided it with "substantial assistance." As the government concedes, it

5  possessed only limited circumstantial evidence against Grant without Dinkins' testimony. Aside from

6  the government's proof that the car driven by the person who carried the drugs to the transaction was

7  registered in Grant's name, the evidence against Grant was very weak. The government neither had any

8  evidence (in the form of listening devices, recordings, telephone records, etc.) to support Dinkins' claim

9  that Grant was the person with whom he negotiated the transaction over the telephone, nor did it have

10  any independent positive identification of Grant as the driver. After pursuing the car that supplied the

11  drugs to a restaurant, the government failed to arrest or positively identify the driver. By reason of this,

12  according to Dinkins' 5K Motion, without Dinkins' testimony, the government had only the

13  identification of Grant's car as the one that carried the drugs to the scene and a distant photograph to

14  link Grant to the drug transaction. Further, Grant had already been indicted by the time Dinkins made

15  his proffer, and the government had no other suspect. The authenticity of Dinkins' identification of

16  Grant as his co-conspirator is severely lessened, therefore, by the fact that Dinkins, in order to receive

17  5K credit, had no option but to name Grant as his co-conspirator. In return for choosing this option, the

18  government submitted a 5K motion on Dinkins' behalf and recommended a sentence below the Ten

19  Year Minimum.[4]

20          For whatever undisclosed reason, the government opted to use all of the coercive power

21  available to it to force Grant to accept the Ten Year Minimum. Armed with proof of a decade-old

22  felony marijuana conviction, the government advised Grant that if he did not change his plea to guilty

23  pursuant to the already-proffered plea agreement, it would file an information pursuant to 21 U.S.C. §

24

25

26          [3]The court does not assert or know of any intentional misconduct by the government.

27          [4]In its 5K Motion, the government stated that Dinkins also provided information in an
28  unrelated counterfeiting case.

851.[5] The government would then have only to prove what would be the undisputed existence of the marijuana conviction to bind the court, under Section 841(b), as a matter of law, to sentence Grant to at least twenty years in prison if he was convicted of the instant offense. Of course, this was an appalling threat. Although the government argued in Dinkins' 5K Motion that Grant changed his plea as a result of his reading a copy of Dinkins' proffer session, the court is not persuaded. The government conceded that even after Grant was told that Dinkins had identified him as his co-conspirator, he steadfastly maintained his innocence until a week before the trial was to begin. In these circumstances, the court finds it more credible to believe that Grant's plea change was precipitated by the looming trial deadline and the government's assertion that it was about to file an information pursuant to Section 841(b) and proceed to trial.

The government contends that the AUSA has the power to make the kinds of decisions made in this case entirely on his own, and further, that he may do so without having to disclose any information about the circumstances upon which his decisions are based, or reveal anything about his decisionmaking process. In effect, the government argues that these decisions may be made behind closed doors without any outside scrutiny or review, by someone who may have little experience of any kind and certainly no experience with sentencing. By contrast, an Article III judge, if given the same power, would be required to make his determinations in open court, in the defendant's presence, and having considered the PSR and the applicable law, as argued by the parties. This information then becomes part of the record of the case, and the judge's decision is subject to appellate review. Given these circumstances, it makes much difference, in the reality and the perception of justice, both in the courtroom and the community, who decides the sentence.

In this case, the AUSA maintains that the Ten Year Minimum for Grant is warranted, based on relevant sentencing considerations. But he does not disclose them.[6] The court therefore is not aware of

---

[5]*See infra* text accompanying notes 8 & 9.

[6]Although the court sought additional information from the government for sentencing purposes, the government contended that it was not required to provide such information to the court and that the record before the court was sufficient to proceed with sentencing. Reporter's Transcript, Jan. 23, 2007, at 15:12-21, 20:13-18, 23:8-24:10, 28:20-23, 40:12-13, 41:18-42:1,

1   any information which might justify the imposition of a ten-year term of imprisonment on Grant. Based

2   on this total vacuum of information, the court is unable to determine whether a reasoned consideration

3   of the totality of the circumstances would justify a ten-year sentence for Grant. However, based on the

4   totality of the record before the court, the court concludes that it does not.

5        It seems that neither Grant nor Dinkins was regarded by law enforcement as a significant drug

6   trafficker or a serious danger to the community. As of September 15, 2004, the date of the sting, Grant

7   does not appear to have been involved with dealing drugs. Moreover, both defendants were allowed to

8   leave the scene of the drug transaction, Grant taking with him the fruits of the crime and not having been

9   identified by law enforcement. Notwithstanding that the sting subjected both defendants to the Ten

10  Year Minimum, Grant and Dinkins were allowed to remain at large for more than a year before being

11  arrested. The court is not aware of any additional evidence gathered against either defendant during that

12  year. Rather, the record appears to indicate that the government believed that it had all of the evidence

13  it needed at the time of the sting to arrest, indict and convict both Grant and Dinkins for the crimes for

14  which they were eventually charged. Even after Grant was convicted and sentenced, the government

15  indicated how little a threat it regarded Grant to be by stipulating to a thirty-day extension of time to

16  surrender so that Grant could settle his financial affairs.

17       Similarly, Grant appears to have been a very unlikely target of a government sting. According to

18  the PSR, Grant's father is retired, while Grant's mother works as an insurance adjuster for Allstate

19  Insurance located in Torrance, California.[7] Grant is one of three children. Both of Grant's siblings are

20  employed in conventional occupations and appear to be leading conventional lives. Grant, himself, is a

21  college graduate, with a bachelor of arts degree in criminal justice from California State University,

22  Long Beach. In the period immediately following graduation, Grant pursued several entrepreneurial

23  ventures, one of which appears to have enjoyed some temporary success, but all of which ultimately

24  failed. In late 2003, nearly a year before the sting, Grant commenced working as a loan processor at a

25  _____

26  47:18-24, 49:1-50:17, 65:20-67:5.

27       [7]According to a letter attached to Grant's Motion, Grant's father was a pile driver before

28  retiring, and his mother has worked for Allstate Insurance for thirty-five years.

1    company located in Carson, California, where he earned approximately $3,000 per month. Grant

2    continued to work with that same employer until nearly a year after the sting. While on pre-trial bond,

3    Grant completed a real estate appraisal program at Allied Real Estate School in Orange, California, and

4    was earning close to $4,000 per month as a real estate appraiser of residential properties.

5         The only blemishes shown by the PSR on Grant's otherwise commendable personal history are a

6    1994 conviction for misdemeanor theft of property and a 1997 conviction for possession of marijuana

7    for sale. Grant was sentenced to three years of summary probation on the misdemeanor conviction,

8    pursuant to which he served one day in county jail. Grant's 1997 conviction occurred while he was still

9    in college. It was for one count of felony possession of marijuana for sale, to which he pled *nolo*

10   *contendere*.[8] He received three years of formal probation, pursuant to which he again served only one

11   day in county jail.[9] Since that time, according to the PSR, Grant has had no contact of any kind with

12   law enforcement or the criminal process, except in connection with this case. Based upon the record

13   before the court, therefore, one would not have expected the AUSA to be substantially less sympathetic

14   for plea bargaining purposes to Grant than to Dinkins.

15        Over the years, the court has seen countless cases in which individual AUSAs have been highly

16   creative in avoiding the Ten Year Minimum when they found it desirable to do so. The court has

17   compiled a short sample list from the many cases on its own docket in which the government took

18   highly creative steps to avoid subjecting defendants to an unjust application of Section 841(b).[10] A

19   number of these cases have been ones in which the interests of justice demanded that someone not be

20   imprisoned for ten years for being a peripheral participant in a drug transaction. In one case for

21

22   [8]Grant's papers indicate that the amount of marijuana at issue was less than 2½ ounces. The
23   court finds no reason to question this statement, and it appears to be consistent with his sentence.

24   [9]Although the PSR indicates that Grant was sentenced to 180 days in county jail for the
     marijuana offense, Grant's papers state that he spent only one day in county jail. The court has
25   no reason to question this statement. This outcome is consistent with the court's independent
26   understanding of the state system and county jail practices in general.

27   [10]This is by no means an exhaustive list of such cases but merely examples in the court's
     recent memory. A brief summary of each of the cases appears in the Appendix attached to the
28   end of this opinion.

1  example, the government substituted an information charging the use of a telecommunication device in

2  connection with a drug trafficking offense for an indictment originally charging a drug offense that

3  would have triggered the Ten Year Minimum, so as to make possible a plea agreement pursuant to

4  which the defendant would be sentenced to a statutory maximum of four years.  The court singles out

5  this case because, according to the plea agreements, both Grant and Dinkins used telecommunication

6  devices in the course of the sting.  The AUSA in this case could have used this charging device or any

7  number of other charging devices to avoid the Ten Year Minimum, had he chosen to do so.  But, for

8  whatever reason, he did not.

9        In summary, the government contends in this case that through its own planned behavior, it

10  acquired the unilateral power to have both Grant and Dinkins sentenced to at least ten years of

11  imprisonment, in a manner which foreclosed any action by the court, either by way of imposing a lower

12  sentence or acquiring for the record additional information about how the government made the relevant

13  decisions.  In the court's view, if the court were to accept this contention, it would amount to turning the

14  prosecutor fox loose in the chicken coop while handcuffing the guard outside.  The executive is

15  empowered to enforce the laws, but it is not entitled to do so in a way that makes it the last, and only,

16  word on whether, and for how long, an individual is to be deprived of his right to liberty.  A process that

17  produces that result cannot properly be considered "due process," as guaranteed by the Due Process

18  Clause.

19                          II.

20        One of the most fundamental rights protected by the Bill of Rights is the individual right to

21  liberty protected by the Due Process Clause.  The Due Process Clause provides heightened protection

22  against arbitrary and unreasonable infringements of liberty by the government.  *See Washington v.*

23  *Glucksberg*, 521 U.S. 702, 719-20 (1997).  The Due Process Clause draws no distinctions among

24  governmental acts done by Congress or combinations of acts done by Congress and the executive.  It

25  does not matter if the government believes it has, or even if it has, acted lawfully and in good faith.  Due

26  process violations can occur without any individual having a conscious intent to achieve that purpose.

27  Thus, it makes no difference in the court's analysis whether any of the acts that contributed to an

28

1    unconstitutional result were lawful, or even whether any, or all, of them might be considered to be an

2    appropriate discharge of the government's responsibilities.

3          In the criminal context, the Due Process Clause is often invoked as a procedural right in terms of

4    a fair trial.  The Due Process Clause, however, guarantees more than fair process.  The right to

5    substantive due process "protects individual liberty against 'certain government actions regardless of the

6    fairness of the procedures used to implement them.'" *Collins v. Harker Heights*, 503 U.S. 115, 125

7    (1992) (quoting *Daniel v. Williams*, 474 U.S. 327, 331 (1986)).  Although the right to a fair process at

8    trial is important, in actuality, trials do not result in the deprivation of liberty.  Trials do no more than set

9    the procedural stage for a sentence, which ultimately may or may not call for any kind of deprivation of

10   liberty.  The substantive step of actually depriving an individual of liberty following from a criminal

11   conviction can only be taken at the time of sentencing, by a judge through a judgment and commitment

12   order.  Thus, it is imperative that all sentences satisfy the guarantees of the Due Process Clause.

13         The government maintains that the Ten Year Minimum does not violate the Due Process Clause.

14   The court has reviewed the specific cases cited by the government to support its contention, and the

15   court is also aware of other authority that would appear to be controlling.  To the issues involved in this

16   instance, many of these cases are inapt.  Of those cases that are relevant, it is important to consider the

17   landmark case of *Booker*.  Prior to *Booker*, courts sentenced under the assumption that the Guidelines

18   were free from constitutional flaws.  It was not until two decades later, after millions of people had

19   served the full terms of their sentences, that courts were informed that their assumption had been wrong.

20   The lesson of *Booker*, thus, is that reliance on precedents, and on extensions of those precedents,

21   without fresh reasoning is not only imprudent, but reckless.

22         The government contends that "*Booker* does not bear on mandatory minimums" and cites *United*

23   *States v. Cardenas* for that proposition.  405 F.3d 1046, 1048 (9th Cir. 2005).  The court, however, reads

24   *Cardenas* much more narrowly than the government.  *Booker* effectively ended the era in which

25   sentences were determined as a matter of law (the "Guideline Era").  Although it is true that *Booker*

26   itself does not address the constitutionality of mandatory minimums, it is inescapable that *Booker* has

27   significantly affected the legal framework within which, as yet undecided questions about the scope,

28

1 | breadth, and preemptive effect of the Section 841 Minimums must be addressed.

2 |      Over the two decades since their enactment, the Section 841 Minimums, and particularly the Ten

3 | Year Minimum, have been criticized severely by authoritative bodies whose opinions are entitled to

4 | great weight. As early as 1991, the Sentencing Commission reported that mandatory minimums create

5 | unwarranted disparity and undermine truth in sentencing.[11] Three years later, the Federal Judicial

6 | Center conducted its own study and similarly concluded that mandatory minimums compromise the

7 | basic fairness and integrity of the criminal justice system and called upon Congress to repeal them.[12]

8 | Even several of the original architects of the Sentencing Guidelines agreed that mandatory minimums

9 | are fundamentally inconsistent with the goals of sentencing reform,[13] and the American Bar Association

10 | also called on Congress to repeal the mandatory minimums.[14] Despite the continuing criticism, no

11 | branch of government has done anything to address the complaints leveled by these and other critics.

12 |      For purposes hereof, the following propositions are deemed to be axiomatic. The basic structure

13 | of the Constitution provides for the federal government to be divided into three branches. Two of these

14 | branches, Congress and the executive, are elected by the people and therefore represent the majority.

15 | These branches are duty-bound not to subordinate the interests of the majority to those of minorities or

16 | individuals. Members of the third branch of government, the judiciary, are not elected by the people.

17 | Federal judges are nominated by the President and confirmed with the advice and consent of the Senate.

18 | They are appointed to life tenure to establish their independence and to render them as immune as

19 |

20 | [11]UNITED STATES SENTENCING COMMISSION, MANDATORY MINIMUM REPORT (1991).

21 | [12]BARBARA S. VINCENT & PAUL J. HOFER, THE FEDERAL JUDICIAL CENTER, THE
22 | CONSEQUENCES OF MANDATORY MINIMUM PRISON TERMS: A SUMMARY OF RECENT FINDINGS
    (1994).

23 | [13]*See, e.g.*, Orrin G. Hatch, *The Role of Congress in Sentencing: The United States Sentencing*
24 | *Commission, Mandatory Minimum Sentences, and the Search for a Certain and Effective*
    *Sentencing System*, 28 WAKE FOREST L. REV. 185, 194-95 (1993); *Harris v. United States*, 536
25 | U.S. 545, 570 (2002) (Justice Breyer, concurring in part, stated that "[m]andatory minimum
    statutes are fundamentally inconsistent with Congress' simultaneous effort to create a fair,
26 | honest, and rational sentencing system through the use of Sentencing Guidelines.").

27 | [14]AMERICAN BAR ASSOCIATION JUSTICE KENNEDY COMMISSION, REPORTS WITH
28 | RECOMMENDATIONS TO THE HOUSE OF DELEGATES (2004).

possible within the constitutional structure from political influences and pressures. The Bill of Rights was made a part of the Constitution to protect individuals from violations of certain fundamental rights by the government, even when the government acts in a good faith pursuit of the interests of the majority. By reason of its position in the constitutional structure, the judiciary must have the final word on whether or not governmental acts violate any article of the Bill of Rights.

Despite the criticism surrounding the Ten Year Minimum, Congress has failed to act. It must be understood, however, that Congress has behaved as would be expected in accordance with its position within the constitutional structure. It has simply responded to what appears to be the will of the majority of voters. The Section 841 Minimums have produced no groundswell of protests or other reason to believe that they are not approved by a majority of voters. From Congress' perspective, it may well be said that if the application of the Section 841 Minimums violates individual rights protected by the Due Process Clause, it is up to the courts to say so.

The executive branch can advance essentially the same defense for the manner in which it has enforced the Section 841 Minimums. Absent any showing that a majority of the electorate opposes the way in which the laws are enforced, law enforcement agencies must rely on their own judgment in this regard. Law enforcement agencies must be expected to enforce the laws passed by Congress by using all of the legal means available to them, and in pursuing their objectives, they are entitled to rely upon good faith interpretations of relevant laws made within the executive branch. If these interpretations are erroneous, it is up to the courts to say so.

The claim that the judiciary has responded properly to its own responsibilities under the Due Process Clause is much harder to defend. With regard to issues arising under the Due Process Clause, the judiciary owes no duty to respond to the will of the majority of voters. On the contrary, the duty of the judiciary is to ensure that the rights granted to individuals by the Due Process Clause are not violated by the government in its efforts to represent majority interests. This duty does not require any finding of fault on the part of the other branches of government.

The judiciary can no longer validly claim that it is meeting its obligations under the Due Process Clause merely by pointing out that judicial decisions on issues arising under the Sentencing Guidelines

1 | and Section 841(b) are dictated by prior precedents and reasonable extensions thereof. Reliance on

2 | precedents established prior to and during the Guideline Era, and on extensions of those precedents,

3 | without fresh reasoning to account for the vastly changed sentencing circumstances produced by

4 | *Booker*, is no longer defensible.

5 |      To date, the precedents established in cases involving issues arising under Section 841(b) appear

6 | to approach the point of saying that a sentencing process by which the law itself produces manifestly

7 | unjust sentences, both in individual cases and across a broad cross-section of cases, is still "due process"

8 | if it bears the imprimatur of Congress. This reasoning misses the mark. Courts should not defer to

9 | Congress when the laws it passes mandate gross miscarriages of sentencing justice, as seen by everyone

10 | present in the courtroom, or when the government itself must go to extreme lengths to avoid the unjust

11 | effects of having the judiciary render itself powerless. By deferring to Congress in such a manner,

12 | hundreds of thousands of people have been unjustly imprisoned for terms established solely by Congress

13 | before the crime was even committed, without any consideration of their circumstances and absent any

14 | explanation or justification for their sentence. In light of these gross miscarriages of justice, it is not

15 | enough simply to decide that Congress has the constitutional power to mandate changes in the

16 | sentencing process and leave it at that. The courts must also look at whether Congress has exercised

17 | that power in a constitutional manner.

18 |      In assessing the constitutionality of the Ten Year Minimum, courts must consider whether the

19 | term of imprisonment represents some form of "justice," as guaranteed by the Due Process Clause.

20 | Admittedly, the precise bounds of what constitutes "justice" are not always clear and tend to differ

21 | depending upon one's perspective. Nevertheless, although justice may be a difficult concept to define, it

22 | is not a difficult concept to grasp when juxtaposed against "manifest injustice." The courts' inaction to

23 | date appears to indicate that justice is not their concern. However, when courts routinely continue to

24 | apply legislation knowing that it has systematically resulted in "manifest injustice," proper deference to

25 | Congress becomes improper and becomes instead an abdication of judicial responsibility.

26 |      The Due Process Clause demands more of courts than this. Congress has no responsibility for

27 | assuring that its laws do not produce individual injustices. Neither does the executive. No matter how

28 |

1  well-intentioned or how lawful the acts of the other branches of government may be within their own

2  proper ambits, when the combined effects of their actions produce sentencing results that are as

3  systematically arbitrary, capricious, unjust, inequitable, and sometimes unconscionable, as the above-

4  referenced studies have shown them to be, courts are not only obligated to intervene under the Due

5  Process Clause, but to do so in a timely manner. It is already too late for the courts to intervene in a

6  timely manner to cure past injustices, but it is not too late to begin intervening to prevent future

7  injustices.

8                                               III.

9          According to legislative history, the purpose of the Ten Year Minimum was to target people who

10  are directly and personally responsible for the manufacturing and/or distribution of certain types and

11  quantities of controlled substances ("Principal Drug Traffickers"). *See* 132 CONG. REC. H6519-01

12  (Sept. 10, 1986), 132 CONG. REC. S14270-01 (Sept. 30, 1986). Violations of Section 841(a) that will

13  trigger the Ten Year Minimum, however, typically involve a number of other participants. These may

14  include aiders and abettors, co-conspirators, accessories, and others who may have done <u>none</u> of the acts

15  which constitute the elements of the underlying crime, and whose actions may contribute little or

16  nothing to the actual offense ("Peripheral Offenders"). Peripheral Offenders may also include lookouts,

17  couriers, government sting targets as discussed in Part I, and others who do contribute to the actual

18  offense, but whose roles and levels of culpability cannot be meaningfully compared with the role and

19  culpability of a Principal Drug Trafficker.

20          Despite the differences in role, responsibility and culpability between Principal Drug Traffickers

21  and Peripheral Offenders, the government contends that they are convicted by operation of law of the

22  same crime and thus exposed to the same sentence. According to the government, Congress has ordered

23  sentencing judges to sentence anyone who is convicted of a violation of Section 841(b)(1)(A) for any

24  reason to a prison term of at least ten years. This congressional mandate extends to <u>all</u> individuals

25  convicted in connection with the same crime, no matter how or why the conviction came about. It

26  applies regardless of the legal theory upon which the conviction was based, differences in the facts

27  required to support a conviction on that legal theory, the circumstances in which the crime was

28

                                               17

1   committed, or the reasons and manner in which the prosecution was pursued.

2          The Sentencing Guidelines recognize that just sentencing needs to account for such differences,

3   especially in crimes with numerous participants who operate in vastly different roles, and they do so,

4   such as in major fraud cases (*e.g.*, Medicare, insurance, telemarketing, etc.). For example, the

5   Guidelines provide for adjustments in the base offense level contingent on the roles played in the

6   offense by the various participants. These range from adjustments of two to four levels upward for

7   "aggravating roles" and two to four levels downward for "mitigating roles." U.S.S.G. §§ 3B1.1, 3B1.2.

8   For example, at level 32, the above-mentioned adjustments would increase the minimum Guideline

9   sentence from 121 to 188 months, or decrease it from 121 months to 78 months. In addition, if a

10  defendant agreed to plead guilty in a timely manner, he would receive an additional reduction from his

11  base offense level for "acceptance of responsibility" which would further reduce the minimum

12  Guideline sentence to 57 months. Conversely, a defendant who received an upward adjustment of four

13  levels for "aggravating role," thereby raising the minimum Guideline sentence to 188 months, would

14  return to 135 months, merely by pleading guilty and "accepting responsibility."

15         Pursuant to the government's contention, however, any downward adjustments below the Ten

16  Year Minimum are not applicable in Section 841(b)(1)(A) cases, even though the nature of drug crimes,

17  like major fraud crimes, appear to particularly warrant such adjustments. Thus, in a Ten Year Minimum

18  case, based on the analysis above, a Peripheral Offender in a drug transaction would receive a sentence

19  of 120 months, while a Principal Drug Trafficker in the transaction would receive a sentence of 135

20  months.[15] At the outset, a mere fifteen-month difference between a Principal Drug Trafficker and a

21  Peripheral Offender in a drug transaction is indefensible.[16] Moreover, it is arbitrary and capricious to

22  _____

23  [15]It is possible that the Principal Drug Trafficker would receive other enhancements, which would accordingly increase the sentence, but for purposes of this example, the court has assumed

24  that no other enhancements apply.

25  [16]This example is based on the November 1, 2005, Sentencing Guidelines used by the Probation Office for the sentences of Grant and Dinkins. If the court were to apply the 2007

26  Guidelines, which incorporated the Sentencing Commission's amendment to adjust downward by two levels the base offense level assigned to stated quantities of crack cocaine, the result

27  would be even more unreasonable. Under the 2007 Guidelines, a Principal Drug Trafficker and

28  a Peripheral Offender in a drug transaction could receive the same sentence of 120 months.

1   permit a Principal Drug Trafficker to take advantage of downward adjustments, while not permitting a

2   Peripheral Offender to take similar advantage of any downward adjustments, no matter how warranted.

3        The Ten Year Minimum as applied provides that there be little sentencing differential between

4   the sentences imposed upon Principal Drug Traffickers and those imposed upon the least involved and

5   least culpable Peripheral Offender, who is convicted in connection with the same offense.[17]  Any law

6   that requires courts to sentence every person involved in a multi-party criminal offense to a statutorily

7   mandated minimum, regardless of any differences in role, responsibility and culpability, cannot be

8   constitutional under the Due Process Clause.  Thus, the Ten Year Minimum is not constitutional as

9   applied to Peripheral Offenders.[18]

10                                    IV.

11        The Supreme Court's decision in *Booker* provides a basis for arriving at a construction of

12   Section 841(b) that avoids the constitutional issues otherwise decided hereby.  Summarized briefly, the

13   Supreme Court held in *Booker* that there was a conflict between the right to jury trial protected by the

14   Sixth Amendment and the mandatory Sentencing Guidelines, which required imprisonment based on

15   facts that had not been proven beyond a reasonable doubt.  To resolve this conflict in a way that would

16   best preserve the intent of Congress, the Court excised 18 U.S.C. § 3553(b)(1) and left the remainder of

17   Section 3553 and the Sentencing Guidelines intact.  *Booker*, 543 U.S. at 245-49.  According to the

18   Court, the effect of this change was to render the Guidelines "advisory" and to leave Section 3553(a) to

19   be considered as an independent statutory mandate.  *Id.*

20        Section 3553(a) directs sentencing judges to consider matters that are not susceptible to the

21

22   Post-*Booker*, it is clear that the Guidelines are advisory, and judges thus have the discretion to
23   correct these kinds of inequities.  This example, however, demonstrates the mandated disparity
    that existed for almost two decades prior to *Booker* and also illustrates the unjust outcomes that
24   result in the application of the Ten Year Minimum.

25      [17]This is not to say that sentences above the Ten Year Minimum could never be justified for
    Peripheral Offenders, or that sentences of exactly ten years could never be justified for Principal
26   Drug Traffickers.

27      [18]In this opinion, the court does not address the question of whether the Ten Year Minimum
    can be properly applied to a Principal Drug Trafficker, as that question is not at issue in this
28   case.  Similarly, the court does not address the constitutionality of the Five Year Minimum.

1   normal processes of judicial decisionmaking, *i.e.*, the application of law to judicially determined facts.

2   Instead, they require the use of judgement in the weighing and balancing of sentencing considerations

3   that go beyond facts that can be gleaned from the record, *i.e.*, the exercise of judicial discretion.  The

4   court finds that there is a conflict between the duties imposed by Section 3553(a) and those imposed by

5   the government's interpretation of Section 841(b) in this case and that it cannot comply with both.  In

6   the event of a conflict between two statutes, it is the duty of the court to interpret and apply the statutes

7   in a way that gives effect to both, while preserving their sense and purpose.  *See Watt v. Alaska*, 451

8   U.S. 259, 267 (1981) (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)); *see also United States v.*

9   *Borden Co.*, 308 U.S. 188, 198 (1939).

10      In the instant case, in order to resolve the conflict in a way that best preserves the sense and

11  purpose of the two statutes, the court rejects the government's construction that the Ten Year Minimum

12  applies to Peripheral Offenders, and it excises Section 5G1.1 from the Sentencing Guidelines for the

13  purposes of this case.  The court's interpretation of Section 841(b), namely that the Ten Year Minimum

14  does not apply to Peripheral Offenders, allows it to comply fully with its obligations under Section

15  3553(a).  The excision of U.S.S.G. Section 5G1.1 in this case allows the court to give weight to the

16  applicable Guideline adjustments that might be called for below the base offense level established by the

17  Ten Year Minimum and to consider appropriate Guideline departures.

18                              **IMPOSITION OF SENTENCE**

19      For the reasons described herein, the Ten Year Minimum cannot be applied to Grant and

20  Dinkins.  As such, the court considers both the advisory Sentencing Guidelines and the Section 3553(a)

21  factors.  In so doing, the court determines that the applicable range under the Guidelines for Grant is 79

22  to 97 months and for Dinkins is 57 to 71 months.[19]  Pursuant to Section 3553(a), the court takes into

23  _____

24      [19]Pursuant to the November 1, 2005, Guidelines used by the Probation Office for the
    sentences of Grant and Dinkins, the base offense level based on the quantity of the cocaine base
25  exchanged in the sting is 32.  U.S.S.G. § 2D1.1.  A decrease of two levels based on mitigating
    role and a decrease of three levels for acceptance of responsibility are warranted in this case.
26  U.S.S.G. §§ 3B1.2, 3E11.1(b).  Thus, the total offense level is 27.  Dinkins, based on his 5K
    Motion, receives an additional reduction of six levels, resulting in a total offense level of 21 for
27  Dinkins.  The PSR indicates that Grant and Dinkins fall into criminal history category II and IV,
    respectively, thus resulting in a range of 78 to 97 months for Grant and 57 to 71 months for
28

                                    20

1  consideration the following facts: the drug transaction at issue was instigated by the government as a

2  sting; the government predetermined the type and amount of the drug, which in turn triggered the Ten

3  Year Minimum; Grant and Dinkins appear to have been Peripheral Offenders, as described herein; Grant

4  and Dinkins were not regarded by law enforcement as significant drug traffickers or serious dangers to

5  the community; the government had only limited circumstantial evidence to connect Grant to the drug

6  transaction; the totality of the record suggests that Grant was otherwise leading a conventional life, with

7  no evidence of any predisposition to become involved in a wholesale drug transaction; Grant's criminal

8  history is old and overstated; and the threat by the government to make use of Grant's decade-old

9  marijuana conviction to add another ten years to his sentence compelled Grant to forego any chance of

10  acquittal at a jury trial.

11      Having considered the advisory Sentencing Guidelines and Section 3553(a), the court finds a

12  sentence of sixty (60) months for Grant and a sentence of forty (40) months for Dinkins to be

13  appropriate.  Accordingly, the court sentences Grant to sixty (60) months and Dinkins to forty (40)

14  months of imprisonment.

15

16  IT IS SO ORDERED.

17

18  DATED:  November 30, 2007

19                                          J. Spencer Letts
                                          United States District Judge

20

21

22

23

24

25

26

27  _____

28  Dinkins.

**APPENDIX**
**GOVERNMENT-CREATED ALTERNATIVES TO TEN-YEAR MINIMUM**

United States v. Ibe
United States v. Sawyers
CR 02-717 JSL
Defendants were charged in an indictment with conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 846, 841(a)(1) and possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). These charges triggered a ten-year mandatory minimum sentence.

In the plea agreement, the government and Defendant Sawyers agreed that Defendant would plead guilty to count one of an information charging her with misprision of felony in violation of 18 U.S.C. § 4, thereby avoiding the ten-year mandatory minimum sentence and exposing her to a statutory maximum sentence of three years.

United States v. Mutuc
United States v. Navarro
United States v. Perez
CR 04-1504 JSL
Defendants were charged in an indictment with conspiracy to distribute more than 50 grams of actual methamphetamine in violation of 21 U.S.C. § 846 and distribution of less than one gram of actual methamphetamine in violation of 21 U.S.C. § 841 (a)(1). The first count triggered a ten-year mandatory minimum sentence.

In the plea agreement, the government and Defendant Mutuc agreed that Defendant Mutuc would plead guilty only to count two of the indictment, thereby avoiding the ten-year mandatory minimum sentence.

United States v. Sanchez
United States v. Sanchez Lopez
United States v. Williams
CR 05-742 JSL
Defendants were charged in an indictment with possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 941(a)(1), 841(b)(1)(A). The charge against Defendant Sanchez triggered a five-year mandatory minimum sentence, while the charges against Defendants Sanchez Lopez and Williams triggered a ten-year mandatory minimum sentence.

In the plea agreement, the government and Defendant Sanchez Lopez agreed that Defendant would plead guilty to a one-count information charging him with use of a communication facility to facilitate a felony narcotics offense in violation of 21 U.S.C. § 843(b), thereby avoiding the ten-year mandatory minimum sentence and exposing him to a statutory maximum sentence of four years.

United States v. Brooks
United States v. Chandler
CR 07-187 JSL
Defendants were charged in an indictment with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846, and possession with intent to distribute and distribution of cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1). The charges triggered a ten-year mandatory minimum sentence.

In the plea agreement, the government and Defendants agreed that Defendants would plead guilty to a lesser included offense, namely conspiracy to distribute in excess of five grams of cocaine base, thereby triggering only a five-year mandatory minimum sentence.

United States v. Suarez
CR 07-195 JSL

Defendant was charged in an indictment with possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii), carrying a firearm during and in relation to and possession of that firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and felon in possession of a firearm/ammunition in violation of 18 U.S.C. § 922(g)(1).  The first count triggered a five-year mandatory minimum sentence, and the second count triggered an additional five-year mandatory minimum sentence, to be served consecutively.

In the plea agreement, the government and Defendant agreed that Defendant would plead guilty only to count two but not to the underlying drug charge, thereby subjecting Defendant only to a single five-year mandatory minimum sentence.