1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4             THE HON. GEORGE H. WU, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,        )
                                      )
7                         Plaintiff,  )
                                      )
8              vs.                    ) NO. CR 07-689-GW
                                      )
9    CHARLES C. LYNCH, et al.,        )
                                      )
10                        Defendants. )
     _____)

11

12

13

14              REPORTER'S TRANSCRIPT ON APPEAL

15                   Los Angeles, California

16              Monday, August 4, 2008; 1:24 P.M.

17          Day 9 of Jury Trial, Afternoon Session

18

19

20

21                           Wil S. Wilcox, CSR 9178
                             Official Federal Reporter
22                           312 North Spring Street
                             Suite 430
23                           Los Angeles, California 90012
                             Phone:(213) 290-2849
24                           Fax:  (818) 286-3910
                             Email: wswilcox@pobox.com
25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:    THOMAS P. O'BRIEN
                            UNITED STATES ATTORNEY
 4                          By:  DAVID P. KOWAL
                            And: RASHA GERGES
 5                          ASSISTANT UNITED STATES ATTORNEYS
                            1400 United States Courthouse
 6                          312 N. Spring Street
                            Los Angeles, California 90012
 7                          (213) 894-5136
                            Email: David.Kowal@usdoj.gov
 8

 9    FOR THE DEFENDANT:    SEAN KENNEDY
                            FEDERAL PUBLIC DEFENDER
10                          By:  REUVEN L. COHEN
                            And: JOHN L. LITTRELL
11                          321 East Second Street
                            Los Angeles, California 90012
12                          (213)894-4454
                            Email: Reuven_Cohen@fd.org
13                                 John_Littrell@fd.org

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    <u>I N D E X</u>

2              August 4, 2008; VOLUME 9

3

4                                        Page  Volume

5   Closing Argument by Ms. Gerges ............10      9

6   Closing Argument by Mr. Littrell ..........42      9

7   Rebuttal Argument by Mr. Kowal ............85      9

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CA.;  MONDAY, AUGUST 4, 2008; 1:24 PM

 2                              -oOo-

 3

 4          THE COURT:  Let me ask counsel.  Can I get a

 5   waiver of the court's reporting of the jury instructions as

 6   read since the court is going to be reading from the jury

 7   instructions and the jury has already been given or will be

 8   given copies of the instructions themselves?

 9          MR. COHEN:  Of course, Your Honor.

10          MR. KOWAL:  No objection.

11          THE COURT:  All right.  Let's do this.  Let me

12   have -- Javier, can you bring in the jury.

13              (The jurors entered the courtroom.)

14          THE COURT:  Let me ask Javier.  Why don't you give

15   the jurors copies of the jury instructions.

16          THE CLERK:  Yes, judge.

17          THE COURT:  While my clerk is handing you copies

18   of the jury instructions, what I'm going to be doing is

19   reading to you this set of jury instructions.  If while I'm

20   reading them you have a question, please feel free to raise

21   your hand or tell me to stop and I will give you a further

22   explanation if what is stated in the jury instructions is

23   not clear to you.

24          Also, if at any point in time during your

25   deliberations in the jury room if you have a disagreement as
```

1  to what the instructions mean, again, feel free to give a

2  note to either the bailiff or to the clerk and, again, I

3  will endeavor to give you clarifying instructions or explain

4  the meaning of the instructions that I'm about to give to

5  you.  All right.  Are we set?

6          Okay.

7                  *(Jury instructions read,*

8                  not reported per stipulation.)

9                  *(Discussion held at sidebar.)*

10         THE COURT:  Let me ask.  As to that last sentence

11  I just read:  You need not find the defendant knew the type

12  or amount of the controlled substance.  I don't understand

13  how they might not know the amount.  They may not need to

14  know perhaps the precise amount, but they would have to know

15  an amount.

16         MR. KOWAL:  Yes.  He doesn't have to know the

17  amount.  The conspiracy just has to involve the amount.

18         THE COURT:  Well, should that sentence be modified

19  at all then?

20         MR. KOWAL:  That's right out of the jury

21  instruction.

22         THE COURT:  Let me ask the defense.  Do you agree?

23  It is out of the Ninth Circuit instruction, and again, that

24  just struck me as being strange.

25         MR. KOWAL:  He doesn't have to know what the

1    co-conspiracy amount was as long as he's in the conspiracy

2    for example.

3              THE COURT:  Okay.  Let me ask the defense.  What's

4    your position?

5              MR. COHEN:  Give me a moment.

6              THE COURT:  I've given you a moment.

7              MR. LITTRELL:  We'd prefer that the jury be

8    instructed that he does have to know the amount.  That's our

9    position.

10             THE COURT:  Well, that one is wrong.  You have to

11   know the specific amount; that's wrong.  But the question

12   really is -- let me put it this way, since that sentence

13   really revolves around the situation of a conspiracy --

14             MR. KOWAL:  It doesn't, Your Honor.

15             THE COURT:  It doesn't?

16             MR. KOWAL:  It would also be the substantive

17   counts as long as he knows that he possessed marijuana

18   plants at the store.  He doesn't have to know the quantity.

19   It meets the elements.  The jury can determine what the

20   quantity involved was.  He doesn't have to know the

21   quantity.  It's for all counts, Your Honor.

22             THE COURT:  All right.  What's the response for

23   the defense attorneys?

24             MR. LITTRELL:  The only problem would be is if the

25   jury found that the conspiracy was not the same one.

| | |
|---|---|
| 1 | THE COURT:  Well, you've already argued that one |
| 2 | and I've rejected that.  All right.  I will leave the |
| 3 | instruction as it is. |
| 4 | Let me just ask real quickly.  I presume that I |
| 5 | didn't give you guys a limitation on the closing arguments. |
| 6 | I'm giving you a limitation now of an hour each. |
| 7 | MR. KOWAL:  Okay. |
| 8 | THE COURT:  I think that should be enough. |
| 9 | MR. LITTRELL:  That's total with rebuttal? |
| 10 | THE COURT:  Total with rebuttal.  So let me ask |
| 11 | the government.  Do you want me to inform you if you've gone |
| 12 | past a certain time limit? |
| 13 | MR. KOWAL:  Just tell me how much the opening -- |
| 14 | THE COURT:  Well, when you've reached 55 |
| 15 | minutes -- |
| 16 | MR. KOWAL:  Oh, yes.  Okay.  Just let me know. |
| 17 | Stop me at 10 minutes. |
| 18 | THE COURT:  All right.  I will tell you what.  I |
| 19 | will give you 15 minutes. |
| 20 | MR. KOWAL:  Okay. |
| 21 | THE COURT:  All right.  Thank you. |
| 22 | *(End of discussion at the sidebar.)* |
| 23 | THE COURT:  Ladies and gentlemen, continuing on |
| 24 | from page 10. |
| 25 | *(Jury instructions read,* |

1                    not reported per stipulation.)

2              THE COURT:  Ladies and gentlemen of the jury, any

3     questions on those instructions?  No.  All right.  At this

4     point in time we will start with the closing arguments of

5     counsel.  And as I've indicated in the jury instructions,

6     closing arguments are not evidence.  A closing argument is

7     an attempt to persuade you how you should view the evidence

8     that you saw or heard during the course of the trial.  So

9     merely because an attorney represents that the evidence was

10    one way or the other should not be taken by you as evidence

11    or proof that the evidence in fact was that way.

12              But conversely, during the course of a closing

13    argument an attorney may make a representation as to what

14    the evidence was which conflicts with your memory or

15    recollection of what in fact that evidence was.  If that

16    occurs during the course of the closing arguments, do not

17    presume that that attorney is trying intentionally to

18    mislead you about what the evidence was.

19              The attorneys during the course of the trial are

20    doing a number of things while they are asking questions

21    insofar as witnesses are concerned.  They are trying to hear

22    what the answer was.  They are thinking of their next

23    question.  They are considering the overall strategy in the

24    case.  They are doing many things in that regard.  So,

25    therefore, what they hear from the witness may differ from

1   what you in fact heard.  So, therefore, don't presume that

2   if an attorney has mischaracterized the evidence that that

3   mischaracterization is in any way intentional on their part.

4            Also, during the course of a closing argument one

5   side or the other may raise an objection to a

6   characterization by the attorney on the other side as to

7   what the evidence was.  If that occurs during the course of

8   the closing arguments, I will not sustain or reject the

9   objection itself, because if I were to do that, that would

10  seemingly indicate how I viewed the evidence which is not my

11  function.

12           In other words, you are the triers of fact.  It is

13  up to you to decide what the evidence was.  All I will

14  simply do in response to such an objection is to state that

15  the jurors have heard the evidence and it is up to them to

16  decide what the evidence in fact actually was.  And so,

17  therefore, an attorney's characterization of the evidence

18  will not bind the jury, so I won't rule on the objection.

19           However, if an attorney does make a

20  mischaracterization of what the law is in this case and the

21  attorney on the other side raises an objection in that

22  regard, I will make a ruling on what the law is since it's

23  up to me to inform you, the jury, as to what the law is.

24           Do you all understand that?

25           THE JURY:   (Nods head.)

1              THE COURT:  Okay.  At this point in time let me

2     ask.  Is the government ready to give -- one other thing.

3     Sorry.  The government in this situation gives an

4     opening-closing argument and a closing-closing argument.  In

5     other words, the first opportunity to make a closing

6     argument is with the government, then the defendant is given

7     the opportunity to make a closing argument and then the

8     government is given a chance to respond to the defendant's

9     closing argument.

10             In other words, the government gets two bites at

11    the apple so to speak.  The reason for that is that the

12    government always bears the proof in regards to all of the

13    essential elements to be established as to each crime that

14    they have charged against the defendant and that burden of

15    proof doesn't shift.  And also, that burden of proof is an

16    extremely high standard of proof.  And so in that situation,

17    the government is given two chances to make a closing

18    argument.

19             Okay.  At this point in time let's begin with the

20    closing argument -- beginning closing argument of the

21    government.

22

23                     CLOSING ARGUMENT

24    BY MS. GERGES:

25             Thank you, Your Honor.  Good afternoon, ladies and

1    gentlemen.  Over the last few days you've had to sit there

2    and listen to a lot of evidence.  You've heard it from a

3    number of witnesses and you also saw a lot of exhibits.  And

4    my job now is to try to organize the evidence that you've

5    seen based on the instructions that were just given to you

6    by the judge.

7              At the beginning of this trial, government's

8    counsel told you that the evidence in this case would prove

9    beyond a reasonable doubt that the defendant owned and

10   operated a marijuana store in Morro Bay, California, and

11   that he conspired with his vendors, his suppliers, his

12   employees and his customers to distribute large quantities

13   of marijuana and THC, and that's the hash products that

14   we've been talking about.  They also conspired to grow

15   marijuana plants and to distribute marijuana to minors,

16   people under the age of 21.  And that's exactly what the

17   evidence in this case has proven beyond a reasonable doubt.

18             At this point I want to walk you through each of

19   the five counts that is charged against the defendant and I

20   will explain to you what the elements of those counts are,

21   as the judge has already read to you the elements, and

22   explain to you the evidence that you've seen throughout this

23   trial, how that proves beyond a reasonable doubt that each

24   of those counts have been satisfied.

25             So these are the charges that are against the

1    defendant.  The first count is conspiracy, and I will

2    explain to you what a conspiracy is.  It's just an

3    agreement, and it's an agreement to commit certain crimes,

4    and we will go over those crimes.

5            Counts two and three is the distribution of

6    marijuana to a minor and it's to a specific minor, one of

7    the defendant's employees and his customer Justin St. John.

8            Count four is the possession and the

9    distribution -- the possession with intent to distribute

10   marijuana and marijuana plants that were seized from the

11   defendant's home and business on March 29th, 2007, the day

12   the DEA executed the federal search warrants.

13           And count five is maintaining a drug premises,

14   namely his marijuana store.

15           Let's go and talk about the first count,

16   conspiracy.  Conspiracy has two elements.  The first element

17   is that there is an agreement to commit certain crimes.  And

18   the thing that's important to know about this, it's the

19   agreement itself that is the crime.  The government doesn't

20   have to actually establish that any of the crimes that were

21   agreed on were actually committed.  The agreement itself is

22   the crime.  And you also don't need any type of formal or

23   written agreement.  It could be a verbal understanding or

24   it's just how they operate.  You don't need anything in

25   writing, but, of course, in this case you actually did see

1    agreements in writing, specifically agreements regarding the

2    growing of marijuana plants.

3           The second element is that the defendant joined

4    the conspiracy knowing of at least one of the objects of the

5    conspiracy, the crime that was agreed upon.  And we will

6    talk about each of these.

7           First, what evidence is there that an agreement

8    existed?  In this case it's very easy.  It's the operation

9    of the marijuana store alone.  In order -- the whole point

10   of the marijuana store was to distribute marijuana and other

11   marijuana products and to also grow marijuana.  That was the

12   entire purpose of the store.  And in order for the store to

13   run, there had to be agreements.  The defendant had to hire

14   people to help him distribute.  He had to talk with vendors

15   in order to get his supply, and he had customers who came

16   and purchased the marijuana.  These are all agreements.  The

17   entire store was not a one-man operation.  The defendant was

18   the leader, but he didn't act alone and that's the

19   agreement.

20          We also saw -- in addition to just the running of

21   the store, we also saw records from the store that

22   memorialized this agreement.  We saw vendor sheets.  You saw

23   these over and over again, a little too much sometimes, but

24   the vendor breakdown sheets.  Those are agreements between

25   the store and their supplier to purchase marijuana.

1            You also saw receipts and sales records.  Those

2      are the agreements the store had, the defendant, with their

3      customers.  And you also saw again these written agreements

4      to grow marijuana.  The evidence that an agreement existed

5      is overwhelming and really not in dispute.

6            Now, did he knowingly join the conspiracy?  Not

7      only did he join the conspiracy, he was the leader of the

8      conspiracy.  He's the one who opened up the store.  He owns

9      the store and he's the one that hired employees.  He

10     obtained sources of supply of marijuana and he himself on at

11     least one occasion supplied marijuana to the store.

12            You also saw some video footage of him behind the

13     cash register helping sell marijuana.  And, of course, he

14     controlled the money.  Not only the money that was stuffed

15     in his backpack, the almost $30,000 worth of money in his

16     backpack that was found at his house, he also controlled the

17     bank account and you saw him even writing checks to himself

18     from that bank account.  So the second element of a

19     conspiracy also met and really not in dispute.

20            So what were the objects of the conspiracy?  These

21     are the crimes that the defendant agreed to commit with

22     others.  And I will go through these quickly now and then we

23     will go in more depth.  There are five different crimes that

24     the defendant agreed to commit.  And in order for you to

25     find the defendant guilty of count one, you need to find

1    only that he agreed to commit one of these crimes.  You

2    don't have to find that there was an agreement on all five

3    counts or all five crimes.

4            We will go into this now, the first one,

5    possession with intent to distribute and the distribution of

6    marijuana.  Was there an agreement?  Of course there was.

7    The defendant admitted he opened up the store, the store's

8    purpose was to distribute marijuana.  There is no issue on

9    that point.

10           Did he agree to manufacture marijuana plants?

11   Again, this one he also admitted when he was on the stand,

12   eventually.  It took him a little while to say, yes, at his

13   store marijuana plants were growing and that's all that is

14   required for manufacturing marijuana plants.  Manufacture

15   just means growing.

16           And, of course, you also saw images at the nursery

17   of the store.  This is where the plants were growing.  So,

18   of course, there was an agreement to manufacture marijuana

19   plants.  You saw the nursery area.  There were pesticides on

20   top of the area.  There were also spray cans.  That's what

21   the point of the nursery was, was to grow marijuana plants.

22   And you also saw some evidence of books relating to growing

23   marijuana plants and also directions as to how much water to

24   add and other things like that.  So again, did he agree to

25   manufacture marijuana plants, to grow marijuana plants?

1    Yes.  That's really not in dispute.

2         The next one, did he possess with intent to -- did

3    he agree to possess with intent to distribute or to

4    distribute THC?  That's tetrahydrocannabinol.  And is this

5    really in dispute?  No.  We know that the store did sell

6    hash, and you heard from the chemist who explained what hash

7    was.  It's just the extract of marijuana.  And the chemist

8    said that some of the items that she tested from this case

9    was hash.  It was THC.  So we know the store sold hash.  You

10   also heard from Detective Blank.  He was the undercover

11   officer who told you that he purchased hash.  And again,

12   that was tested by the chemist and sure enough it was THC.

13        Maintain a drug premises, did he agree to do this?

14   Again, this one also, it's not in dispute.  He was the owner

15   and operator of the CCCC.  That was his store.  That was his

16   marijuana store.  He's the one that signed the lease for

17   that store.  And that store's purpose, again, was to

18   distribute and manufacture marijuana.  That's all that is

19   required for you to find that there was an agreement to

20   maintain a drug premises.

21        And finally, the last object of the conspiracy is

22   did he agree to distribute marijuana to individuals under

23   21.  Here again, he admitted he did.  He did have customers

24   under the age of 21.  But, of course, that's something he

25   really could not deny.  Remember back to Exhibit 116.  This

1    is a chart that Special Agent Burkdoll created going through

2    all of the customer files and she picked out all of the

3    customers that were under the age of 21.  Page after page

4    after page, and finally 277 customers were under the age of

5    21.  Was there an agreement to sell to minors under the age

6    of 21?  Of course.  And again, these customers, they were

7    actually very loyal customers.  They came back day after

8    day.  And if you look at just one of these customers,

9    customer Dein who you saw video footage of purchasing

10   marijuana and you have still images of him purchasing

11   marijuana.  This is just for the month of March.  He came in

12   ten times; March 4th, 6th, 7th, 8th and on and on.  Day in,

13   day out.  And he's not alone.  There were many other

14   customers like him.

15        That is count one.  Every object of the conspiracy

16   either has been admitted or not in dispute.  There was an

17   agreement and he conspired to commit each of those crimes.

18        Let's go to counts two and three.  This is

19   distribution of marijuana to a minor.  This is a little

20   different from the conspiracy count because I know we just

21   talked about minors.  This is a sale of marijuana to a

22   specific individual, Justin St. John.  Count two deals with

23   the sale of marijuana to Justin St. John on June 10th, 2006,

24   and count three deals with the sale on August 27th, 2006.

25        And one thing to keep in mind here.  In order to

1    find the defendant guilty of these two counts, you don't

2    have to find that the defendant is the one who actually rang

3    him up at the cash register.  It doesn't matter whether the

4    defendant actually sold it to him personally or whether one

5    of his employees sold it to him.  That's the whole concept

6    the judge was reading about aiding and abetting, any type of

7    thing where you are helping someone commit a crime.  Of

8    course the defendant helped these sales occur.  This was his

9    store.  These were his employees.  Without his store these

10   sales would not have occurred.  So he's already helped with

11   these sales and that's all you have to find.  You don't have

12   to find who in particular sold him that marijuana in order

13   to find him guilty.

14          And if you remember who Justin St. John is, the

15   defendant was shown this specific sheet and this is a

16   printout from his database of Justin St. John, customer

17   No. 701.  And the defendant confirmed yes, based on this

18   sheet I know Justin St. John is customer No. 701.  And we

19   also saw, if you remember, who he exactly was on August 8th,

20   2006.  He's the one who got a birthday comp for his

21   20th birthday.  The same dates match up, customer 701,

22   that's who Justin St. John is.

23          And what are the elements of distribution to

24   minors?  First, the seller has to be over 18, whether that's

25   the defendant or his employees.  Whoever sold it to him had

1    to be over the age of 18.  And what evidence do we have that

2    that was the case?  We had Special Agent Burkdoll review

3    each of the employee files and looked at their DMV records

4    and determined that they in fact all were over the age of

5    18.  And you also have in the exhibits that you will have

6    with you in your jury deliberations certified copies of a

7    number of the DMV records showing that his employees were in

8    fact over 18.

9            So the seller over 18 sold marijuana to a

10   customer.  And what evidence do we have of that?  We will

11   see receipts in a minute.  They knew it was marijuana.

12   That's really not a dispute.  It came from the marijuana

13   store.  And the customer was under 21 years of age.  And

14   we've proven that by showing you and you will have the

15   certified DMV records of Justin St. John and you also heard

16   from Special Agent Burkdoll testifying that again she looked

17   at other files in his employee file and determined that he

18   was in fact under the age of 21.

19           So with count two, this is the purchase on

20   June 10th, 2006 that shows that marijuana was sold to Justin

21   St. John.  We first have that 701, which is written.  Again,

22   that's his customer ID number and the defendant himself

23   admitted that Justin St. John is customer ID No. 701.  If

24   you remember, the defendant said he has his employees write

25   the number of the customer whenever there is a discount.

1   And here we see a discount of 15 percent.  And then we see

2   the purchases.  He had two purchases of cannabis which is

3   marijuana, one for $170 and the other for a little over $55.

4           So what does that mean?  How much marijuana was

5   actually sold to Justin St. John on that day?  If you

6   remember, on the right-hand side there, Exhibit 55, is the

7   service charge rate sheet.  And Special Agent Burkdoll told

8   you that a purchase of $170 worth of marijuana means that

9   it's 14 grams.  And a purchase of $55, a little over $55,

10  that means it's 3.5 grams.  And you can compare that just

11  based on the rate sheet, but you don't even have to compare

12  it yourself or even listen to what Special Agent Burkdoll

13  told you, because when the defendant was on the stand,

14  Mr. Kowal asked him.  He showed him this exact receipt and

15  asked him how much is $170 worth of marijuana?  He said,

16  14 grams.  How much is $55 worth of marijuana?  3.5 grams,

17  he said.  And the defendant even totaled it up to 17.5 grams

18  on the stand.

19          And I'll explain this to you a little later.  For

20  purposes of the special verdict form all you need to find is

21  that it was over five grams.  But again, even the defendant

22  himself on the stand totaled it up to over five grams and in

23  particular 17.5 grams.

24          So that was count two.  So we've already

25  established count two, marijuana was sold to Justin St.

1   John, in particular definitely over five grams of marijuana.

2   And Justin St. John is a minor or at least was at that time.

3        So count three, this is the purchase on August

4   27th, 2006.  Again, here we see the 701 for his customer ID

5   number.  We see a 15 percent employee discount, and we see a

6   purchase of $187 worth of cannabis, marijuana.  The same

7   analysis as last time, $187 worth of cannabis is 14 grams.

8   And again, the defendant was shown this specific receipt and

9   he again said, yes, $187 worth of marijuana is 14 grams.

10  And again, with this count all you need to do for purposes

11  of the special verdict form is find that Justin St. John was

12  sold over five grams of marijuana.

13       Now we go to count four.  This is possession with

14  intent to distribute marijuana and marijuana plants.  And

15  this is different from the conspiracy count.  The conspiracy

16  count is talking about the possession of marijuana and

17  marijuana plants throughout the entire duration that the

18  store was open.  This is dealing specifically with one day,

19  March 29th, 2007.  That's the day the DEA executed their

20  search warrants.  And so in order to prove possession with

21  intent to distribute, there are two elements.  First, that

22  the defendant knowingly possessed marijuana and/or marijuana

23  plants.  And two, he possessed those things with the intent

24  to deliver it to others.  And what evidence do we have of

25  that?  First, we have all the evidence that was found at

1    both defendant's home and his marijuana store.

2          Now, I know on March 29, you heard testimony that

3    the defendant was at his house at the time these searches

4    were conducted.  So can we say that he really possessed the

5    marijuana that was at his store?  Of course.  It's the same

6    as although you are sitting here today, you still possess

7    all of the items that are found in your house or you still

8    possess all of the items that are found in your desk at

9    work.  The only thing about possession is that you just have

10   to know that it's there and you have the power to control

11   it.

12         Did the defendant know of the marijuana and

13   marijuana plants at his store?  Of course.  That's what he

14   was selling.  Did he have the power to control it?  Of

15   course.  He was the owner.  So he has possessed not only the

16   items that were found at his house, but also at his store.

17   And did he intend to deliver it?  Yes.  That, again, was

18   inventory for his store.  This was the items, the marijuana

19   that was going to be sold to other customers.  So did he

20   possess it with intent to distribute?  Yes.  That's all

21   that's required for a guilty verdict on count four.

22         Count five, maintaining a drug premises.  The

23   elements of this offense, again there are two, is that the

24   defendant opened, leased, used or maintained 780 Monterey

25   Avenue, Suite B, in Morro Bay, California.  That's the

1    address of his marijuana store.  Did he open, lease, use or

2    maintain it?  And two, did he open it or lease it or

3    maintaining it for the purpose of manufacturing or

4    distributing marijuana?  The evidence here again, we see and

5    you saw a lease that the defendant signed to open up his

6    marijuana store.  And again, he was the owner and operator

7    of that store.  He's the one that opened it.  There is no

8    dispute there.  And again, there is no dispute that the

9    purpose of that marijuana store was to distribute marijuana

10   and grow marijuana plants.  Again, that is all that is

11   required for a guilty verdict on count five.

12          Now let's get into the drug quantities.  This is

13   what the judge had indicated you would have to fill out a

14   special verdict form.  And again, so if you find the

15   defendant guilty of the counts that we have just talked

16   about, specifically counts one, two, three and four, which

17   again, the government has proven beyond a reasonable doubt

18   with overwhelming evidence that each of those counts has

19   been established, then you will have to fill out your

20   special verdict form, and you will have to determine how

21   much drugs was actually involved in each of those counts.

22   But to be clear, you don't have to find any amount of drugs

23   in order to find him guilty of counts one through five.  So

24   even though we were just talking about Justin St. John, how

25   much drugs was -- you don't have to find any of them.  All

1    you have to find is the elements and we've already talked

2    about that.  But if you do find him guilty of those earlier

3    counts, then you will have to fill out a special verdict

4    form for counts one through four.

5              And let's talk about the first count.  This is the

6    conspiracy count.  You will have to make two determinations.

7    One, what was the weight of the marijuana involved in the

8    conspiracy and what was the number of marijuana plants

9    involved in the conspiracy.  And you won't have to pick out

10   a specific amount or a specific number, but you will just

11   have to find whether it was over a specific amount.  And how

12   do you go about making that determination?  Again, for this

13   conspiracy count it's dealing from the opening of his store

14   to the closing of his store.  It's the entire time that the

15   defendant had his store open.  And what you can consider is

16   not only the sales that were made inside the store, you can

17   consider the sales made outside of the store, some of the

18   stuff that you had heard about from undercover operations.

19             And you can also consider the amounts, the dollar

20   amount that the defendant received for the marijuana that he

21   actually sold.  And when you look at all that evidence you

22   will find that the weight of the marijuana was over 100

23   kilograms and the number of marijuana plants was over 100

24   plants.

25             Let's go first as to why the marijuana was over

1    100 kilograms.  One, we can look at the total marijuana

2    sales.  This is a chart that Special Agent Burkdoll had

3    created to indicate how much money was received from the

4    sale of marijuana alone, and you will see that over

5    $2 million worth of marijuana was sold at defendant's store

6    from April 2006 through March 2007.  And Special Agent

7    Burkdoll explained to you how she came about making this

8    chart and how she used the defendant's own documents,

9    documents that were found both at his business and also the

10   documents that were found stuffed in his backpack with all

11   that money, almost $30,000 worth of money.

12            So we know that over $2 million worth of marijuana

13   was sold, and then we can also look at the receipts and

14   these, again, are these vendor breakdown sheets that you saw

15   over and over again.  These are the receipts that the

16   defendant had for the purchases he made of marijuana from

17   his suppliers.  And you saw and heard from Special Agent

18   Timothy Nugent who is the former IRS agent and he told you

19   about the charts that he created and you saw -- you have one

20   chart that's 35 pages long where he looked at each of the

21   vendor breakdown sheets and put it into either grams,

22   pounds, ounces, and then he created a summary chart.  And

23   this summary chart shows, one, that the total amount charged

24   for the marijuana that the defendant purchased was over a

25   million dollars worth of marijuana.  And also, when you add

1    everything up, over 136 kilograms of marijuana was purchased

2    by the store.

3            And remember, Special Agent Nugent explained to

4    you why this is a very conservative number.  136 is a very

5    conservative number because he didn't put in there all of

6    the items that he didn't know.  He didn't put in there all

7    of the hash products which remember he told you that Special

8    Agent Burkdoll told him to take out all the hash products,

9    but the chemist even told you that some of the hash products

10   when tested turns out to be marijuana.  So remember, all the

11   hash products aren't even included in this amount.

12           And during Special Agent Nugent's

13   cross-examination the defense said, well, if you were really

14   very conservative wouldn't you have just taken out the not

15   listed all together instead of treating them as likely

16   grams?  Essentially, the defense is asking you to ignore

17   almost half a million dollars worth of marijuana that was

18   purchased.  And again, Special Agent Nugent explained that

19   the reason he treated them as grams, it's the smallest unit

20   of measurement that he saw in any of the vendor breakdown

21   sheets.  So it's a very conservative estimate.  But even

22   under this estimate it's over 100 kilograms of marijuana.

23           And again, the defendant took the stand.  He

24   didn't have to, but he took the stand.  And if Special Agent

25   Nugent was wrong that those items were not grams but should

1    have been treated as something else, he could have said that

2    but he didn't.

3              MR. LITTRELL:  Objection, Your Honor, misstates

4    the burden.  It's his right not to testify, Your Honor.

5              THE COURT:  I don't think she indicated contrary

6    to the burden.  All she testified is that he did testify.

7    So on that issue of law I will overrule the objection.

8              MS. GERGES:  And then how do we know that over 100

9    marijuana plants were at issue here?  One, you heard from

10   Special Agent Burkdoll that on that one day that the search

11   warrant was executed they had over -- they had 104 marijuana

12   plants.  So that alone shows that it's over 100 marijuana

13   plants.  We also heard from Detective Blank, the undercover

14   officer who went into the store, who said that on two

15   separate occasions he saw approximately 200 marijuana plants

16   at that store.  And he also, again, on January 2nd and

17   January 23rd, he himself purchased a marijuana plant on both

18   of those days.  You also saw evidence that on October 5th

19   and December 21st a confidential informant walked out of the

20   store with a marijuana plant.  So throughout this entire

21   time marijuana plants were obviously being sold.

22              You also saw video clips of marijuana plants being

23   sold to customers.  In particular, you saw that on just one

24   day one customer received 11 marijuana plants.  This is from

25   video from his own store and that's what it showed.  But

1   perhaps the most damning evidence of all is the defendant's

2   own documents.  We have inventory documents that showed --

3   this is when the defendant or his employees were just

4   tallying up his inventory, how many marijuana plants do we

5   have, counted it up.  We also have the agreements to grow

6   marijuana plants, and you heard a couple of the witnesses at

7   the end of this trial talk about and you saw those

8   agreements.

9          And you also will see documents about his

10  purchases from vendors.  First, his inventory documents.  On

11  September 26, '06, he had 111 marijuana plants.  This is

12  from his own document, his own inventory count.  On

13  January 12, '07, he -- again, this is a clones count, which

14  clones just means marijuana plants, and that tallied up to

15  184 for January 12th, '07.

16         In January 2007, they had a list of how many dead

17  plants there were and those totaled 148.  Again, these are

18  his own documents that show that the conspiracy involved

19  much more than just 100 marijuana plants.  We also saw those

20  agreements to cultivate marijuana.  And you remember the

21  chart that Special Agent Burkdoll created, and these are

22  just the maximum number of plants that were agreed upon.  We

23  are not saying that that's how many these people actually

24  grew.  It's just the maximum number they could grow.  And

25  that totaled almost $10,000 when you consider the mature

1    plants and the immature plants.  And again, remember, a

2    conspiracy is the agreement itself.  It's not proving that

3    that's how many plants were actually produced from that

4    conspiracy.

5         And then we have the vendor documents.  And the

6    defendant himself was shown this specific vendor sheet when

7    he was on cross-examination, and he said yes, this vendor

8    sheet shows that I or my store, I approved the purchase of

9    301 clones on that specific day.  That alone, on that day,

10   when he received the 301 plants, obviously had more than 100

11   marijuana plants.  And when you add them all up, there were

12   dozens of those vendor sheets.  Special Agent Burkdoll

13   created this chart, Exhibit 108, and which showed that the

14   total amount purchased by the store was over 3,000 marijuana

15   plants.  The government has proven beyond a reasonable doubt

16   that the conspiracy involved more than 100 marijuana plants.

17        So counts two and three, we've already talked

18   about this, so I will go quickly.  Again, all you need to

19   find is that there were over five grams and we've gone

20   through those receipts and they were well over five grams.

21   17.5 for count two and 14 grams for count three.

22        Count four, over 100 marijuana plants were seized

23   on the day of the search warrant.  You heard from Special

24   Agent Burkdoll who told you that she counted 104 and she

25   also told you that she knew exactly how to count marijuana

1    plants, you had to look at the root balls, and that's what

2    she did.  She looked at the root balls and found 104.  She

3    wrote that number on the bag in which the marijuana plants

4    were contained.  She wrote that in the search warrant

5    receipt.  She wrote again in her reports, and in her reports

6    she wrote approximately 104.  And, of course, the defense

7    counsel says ah-ha, that means they could have been less

8    than 104.  But Special Agent Burkdoll explained to you

9    exactly why the word approximately is used.  It's common any

10   time a DEA agent puts an amount before drugs that they use

11   the word approximately, and that's why she put approximately

12   even on the weight of the marijuana to multiple decimal

13   points.  The word approximately here doesn't mean that it

14   was any less than 104.

15         Now, are there problems with Special Agent

16   Burkdoll's count of 104 plants?  Well, we know that the

17   plants were essentially destroyed because they had

18   deteriorated too much from insects and from mold to be able

19   to be counted again.  So the defense was unable to count the

20   marijuana plants.  But what does that mean?  Does that mean

21   that you have to completely ignore Special Agent Burkdoll's

22   testimony?  Of course not.  Special Agent Burkdoll told you

23   why she was counting the plants to begin with.  She was just

24   conducting essentially an inventory so she could write it on

25   the receipt that she left with the search warrant, just as

1     she was counting here is two, three, four computers.  Here

2     is one, two, three money counters.  This is how many plants

3     that she was counting and she told you that she didn't even

4     realize that you, the jury, would ever have to decide

5     whether there were over or under 100 marijuana plants.

6          And she counted 104, no more, no less.  And also,

7     her count is supported by all of the documents that we've

8     seen.  It wasn't unusual for the store to have over 100

9     marijuana plants on any given day.

10          Finally, so now we've gone through all of the

11    government counts.  We've proven beyond a reasonable doubt

12    each of the elements of each of the counts, and we've also

13    gone through the special verdict form that you will have to

14    fill out in terms of the drug quantities.  Now, is there a

15    defense?  The defendant has raised a defense called

16    entrapment by estoppel.  And the court has already

17    instructed you as to the elements, and I will go through

18    these elements to explain to you why that defense does not

19    apply here.

20          First, a few things to know about this defense.

21    First, it's the defendant's burden to prove.  Unlike

22    everything else we've been talking to where the government

23    has the burden of proving beyond a reasonable doubt the

24    elements and the drug amounts, that is not our burden.  It's

25    the defendant's burden to prove.  And he must prove it by a

1   preponderance of the evidence.  It means more likely than

2   not.  So if you are thinking there is a 50/50 chance I just

3   can't decide, that means that the defense cannot apply.

4          And a couple of things also to remember.  As the

5   court has instructed you, this defense cannot apply to count

6   one relating to the agreement to sell to minors.  So if you

7   agree that the defendant has conspired with others to sell

8   marijuana to minors, then you must find him guilty of count

9   one irregardless of this defense.

10         Then we have counts two and three.  Here again,

11  this defense does not apply to counts two and three.  So if

12  you find that the defendant or his employees sold marijuana

13  to Justin St. John, then you must find him guilty of counts

14  two and three irregardless of this defense.

15         So now let's get into entrapment by estoppel.

16  What are the elements?  First, we need an authorized federal

17  agent.  And it's important to know it's a federal agent, not

18  any of the state or local agents that we've heard throughout

19  the trial.  That authorized federal agent had to be made

20  aware of all relevant facts, and that person after being

21  made aware of all the relevant facts had to affirmatively

22  say that the conduct was legal under federal law.  The

23  defendant had to have relied on that statement and the

24  defendant's reliance had to have been reasonable.  Now, what

25  is this defense based on?  This defense is based on one

1   seven-minute conversation the defendant had with DEA back on

2   September 12th, 2005.

3          Did he call the DEA?  Yes.  We saw evidence of

4   that.  We saw the phone bill that showed that he did in fact

5   call a number that belongs to DEA Special Agent Reuter who

6   also testified.

7          Now, what was said during that call?  That is for

8   you to decide.  We know what the defendant wants you to

9   believe was said, and that's that he called that number, the

10  last number, a woman answered, said marijuana task force.

11  She then placed him on hold and transferred him to another

12  agent and that agent told him that it was up to the cities

13  and counties how they wanted to deal with that matter, the

14  marijuana dispensaries.

15         Now, ask yourself, based on everything you've

16  heard throughout this trial and everything you've seen, does

17  it make sense that a DEA agent would actually say that?  It

18  doesn't make sense.  First you heard from Special Agent

19  Deanne Reuter whose phone number that belongs to.  And she

20  told you from the getgo, the way she answers her phone is

21  group two, not marijuana task force.  And why is that

22  important?  There isn't even a marijuana task force.  There

23  is no such thing as a marijuana task force.  And she

24  explained to you that a task force means it's state and

25  federal agents working together, and that's not what group

1    two is.  That's not the group he called.  She told you that

2    when she answers the phone, it's group two.  She also told

3    you that there were three agents in group two who worked on

4    marijuana dispensaries and she checked their time sheets for

5    September 12th, 2005 and none of them were working there.

6    She also told you that because those other three individuals

7    were not there, she would have been the most qualified

8    person to give advice on that day.  And so again, ask

9    yourself why would she have transferred the call to anyone

10   else.

11        And she told you repeatedly that there is no way

12   for a marijuana dispensary to comply with federal law.  She

13   said if someone was asking me that, she would tell them to

14   either close down or don't open.  She made it very clear.

15   She didn't talk about anything about having to defer to

16   state or local officials.  She said it's a matter of federal

17   law.  And she also told you importantly that during that

18   time, the time of the call, her group, her entire group,

19   group two, everyone involved in group two was conducting an

20   investigation into other marijuana dispensaries from down

21   here in Los Angeles all the way up north to San Francisco.

22   So would someone in group two tell him that it's just up to

23   state and local officials?

24        Why else does the story just not make sense?  We

25   also don't have any corroboration of the story.  You heard

1    from the defendant, he didn't get a name of an agent that he

2    spoke to.  He didn't get the title of the agent he spoke to.

3    He never wrote any type of confirming letter.  Again, this

4    is a call that was so important, not just now because it's

5    part of his defense, but supposedly this was such an

6    important call because it determined his entire future

7    business.  Yet, he didn't get a name, didn't get a title, no

8    confirming letter just to say okay, thanks for talking to

9    me, I understand that it's legal under federal law, nothing

10   like that, and he doesn't have any notes of the

11   conversation.  And you can rest assured that if there was

12   any notes of this conversation in any of the documents that

13   were seized and turned over to the defense counsel that

14   defense counsel would have came in and waved it around just

15   as they did with that phone bill.  There were no notes of

16   that conversation.  And again, ask yourself, is that

17   reasonable that such an important call would have absolutely

18   no documentation?  This is the call that started his

19   business supposedly.  And you heard evidence he even kept

20   some envelopes of correspondence.  He kept very detailed

21   records, but he didn't keep any notes of that conversation.

22          Now, even if we can jump through all of those

23   other hurdles, even if true does this defense apply?  First

24   let's go through the elements quickly.  An authorized

25   federal agent.  This, again, has to be a federal agent.

1    It's not any of the local officials that you had heard from

2    or the attorney general of California or even the

3    defendant's landlords or anything like that.  Those don't

4    apply.  It has to be a federal agent.  How do we know that

5    federal agent was authorized?  We don't even know his name

6    or his title.

7              Second, was that federal agent made aware of all

8    relevant facts?  The defendant didn't tell this person his

9    name.  He didn't say, hi, I'm Charles Lynch, I want to open

10   up a store in Morro Bay, California.  He didn't say that.

11   He didn't give any type of location of where the store was

12   going to open.  And he also didn't give any details of his

13   operation.  He didn't talk about how he was going to be

14   selling to minors, selling hash products or growing

15   marijuana plants.  Was the agent made aware of all relevant

16   facts?  The only facts supposedly that the agent was on

17   notice of was I'm thinking of opening up a marijuana store.

18             Third element.  Again, and these are -- each of

19   these elements is -- the defendant has the burden of

20   proving.  Third element, was there an affirmative statement

21   that opening up a marijuana store was legal under federal

22   law?  This has to be more than just a vague statement.  It

23   has to be clear.  Was there a clear statement that this did

24   not violate federal law?  When thinking about this element

25   you also cannot consider what the agent didn't say.  It's

1    not on what was not said.  It's on what was actually said.

2    So you might think well, the agent should have made it more

3    clear.  It's not in the agent's duties to do that.  You have

4    to analyze what words came out of the agent's mouth.

5         And did -- was there an affirmative statement?

6    No.  There was absolutely no discussion of the law in that

7    conversation.  You remember hearing from the defendant, he

8    was talking about how he researched SB 420.  He looked at

9    Prop 215.  He looked at the Tenth Amendment, and then also

10   he even checked out the DEA website which said that

11   marijuana was a schedule one drug, meaning that it was

12   illegal for all purposes.  Did he mention any of these laws

13   during that phone conversation?  No.  He just hung up the

14   phone and then decided on his own what this all meant.  He

15   never asked them anything.

16        Now, did he rely on that statement?  Again, if he

17   really relied on that statement and it was such an important

18   call, don't you think there would be some corroboration,

19   some confirming letter or something?  And importantly, he

20   never relied on the statement in response to a number of

21   setbacks that he had with his business.  When the landlords

22   initially told him no, he never said DEA gave me permission.

23   When his store in the City of Atascadero closed down, he

24   never said why?  The DEA is fine with what I'm doing.  When

25   the police chief said he can't approve the business license

1   and he was just going to abstain, he never mentioned the DEA

2   call.  And again, when the Public Health Department said we

3   can't approve anything your business does because it's

4   illegal, he never said the DEA said it was okay.

5          And then we have the DEA search and seizure on

6   March 29th, 2007.  Here they took the defendant's entire

7   inventory of marijuana and also took almost $50,000 worth or

8   over $50,000 worth of money, and he never challenged that.

9   He never said what's going on, DEA?  I already spoke to you.

10  Everything's fine.  Give me back my money.  Give me back my

11  marijuana.  He never did that.  And he had the opportunity

12  to do that.  You saw Exhibit 182.  This is from the DEA

13  telling him we are going to be seizing almost $30,000, and

14  there was a couple of other notices like this.  He could

15  have challenged it.  There is a whole way, a procedure for

16  him to do that and he didn't do that.  He sat there quietly,

17  never said, the DEA had already given me permission before

18  so give me back my money.

19          In addition, what other evidence is there that he

20  did not rely on this statement?  He reopened the store after

21  the DEA came, handcuffed him, supposedly broke down his

22  doors, all of this stuff.  He reopened the store even though

23  all the marijuana from his store was taken and all his cash

24  was taken.  And why did he do that?  He said well, the DEA

25  didn't tell me I couldn't reopen the store.  Really?  He

1    said well, I thought that was just a scare tactic by the

2    DEA.  Scare tactic for what?  If he thought that the DEA was

3    fine with what he was doing, why would there even need to be

4    a scare tactic?  He didn't care what the DEA said.  He just

5    did what he wanted to do, and it's clear because he never

6    called back the DEA and he never did anything except what he

7    wanted to do and that's why he reopened the store.

8           And real quickly -- and then lastly, even if he

9    did rely, was it reasonable?  And this is -- would a

10   reasonable person who really wants to follow federal law,

11   would they have accepted what was said was true and would

12   not have been put on notice to make any further inquiries,

13   ask any more questions?  So again, would a person who really

14   wants to follow the law just rely on one seven-minute

15   conversation back in 2005 without ever contacting the

16   federal government again?  Probably not.

17          And was the defendant on notice that he should

18   have been asking more questions?  That phone call alone, he

19   should have been asking more questions.  He should have been

20   asking is it legal.  He didn't do that.  He also said that

21   he knew that the DEA was raiding other marijuana stores.  At

22   that point when you learn that, don't you think you should

23   call the DEA and ask why?

24          And then there is a number of documents that he

25   received.  Let's go through those quickly.  The documents --

1    again, the call occurred in September 2005.  Now, in January

2    '06 he's ordering documents from the City of Atascadero and

3    he receives a couple of these documents, Exhibits 176

4    through 178.  And there, in this document -- again, these

5    are documents he ordered put in his own binders.  It says,

6    the Federal Controlled Substance Act prohibits the

7    possession, cultivation and dispensing of marijuana

8    regardless of its purpose.  So his whole understanding that

9    maybe medical marijuana was different, that's not supported

10   by that document.  He should have asked more questions.

11          Another document.  Here, again, the CSA, the

12   Controlled Substances Act, contains no exceptions for the

13   manufacture, distribution or dispensing of marijuana for

14   medical purposes, and the United States Supreme Court has

15   determined that no such exception is implied in the CSA.

16   Thus, under federal law, the distribution of marijuana even

17   for medical purposes and in accordance with the CUA, the

18   state law, could still lead to criminal prosecution.

19          These are documents he ordered because they were

20   important.  He put them in his binder because they were

21   important.  Yet, he never asked any more questions after

22   that.

23          We also got the police chief memo back -- a month

24   later, in February '06, the police chief was determining

25   whether he could make a ruling as to whether he would

1    approve the business license for the City of Morro Bay.  The

2    police chief said, the Supreme Court recently ruled that the

3    use of marijuana for medical purposes does not provide a

4    defense to prosecution under the CSA, the Controlled

5    Substances Act.  He said that.  The defendant should have

6    been asking more questions.

7              THE COURT:  Counsel, you have 13 minutes left.

8              MS. GERGES:  Yes, Your Honor.

9              And again, one document after another.  Here is

10   another document from the Public Health Department sent to

11   Mr. Lynch himself, and there the Public Health Department

12   said, we don't feel we can give approval to anything your

13   business does or plans to do because your business appears

14   to be illegal under federal law, and we don't think we can

15   approve anything that is illegal under federal law.  This is

16   a document he received, yet he never asked any more

17   questions.  He never told the Public Health, no, the DEA

18   said it was fine.

19             And again, one quick -- another e-mail from the

20   police chief.  We see again, this is still a violation of

21   federal law and we cannot authorize a CUP, a conditional

22   permit use, for growing marijuana.  And he said, even though

23   California law may allow it, he can't allow it because it's

24   illegal under federal law.

25             So defendant's defense is really no defense at

1   all.  The defendant heard what he wanted to hear.  He read

2   whatever portions of things he wanted to read, and he did

3   whatever he wanted to do.  This is not a case where the

4   entrapment by estoppel defense applies.  Thank you.

5           THE COURT:  All right.  Why don't we take a

6   ten-minute break and then we will start with the defense

7   closing argument.

8                   *(The jurors exited the courtroom.)*

9                         *(Recess.)*

10          THE COURT:  Let's bring the jury back in.

11              *(The jurors entered the courtroom.)*

12          THE COURT:  All right.  At this point let me ask.

13  Is the defense ready to give their closing argument?

14          MR. LITTRELL:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. LITTRELL:  May I proceed?

17          THE COURT:  Yes.

18

19                    CLOSING ARGUMENT

20  BY MR. LITTRELL:

21      Ladies and gentlemen, for a minute I'd like you to put

22  out of your mind a lot of the figures and the charts and the

23  numbers.  I don't want to talk about those things.  I want

24  to talk about the man sitting at the table.  His name is not

25  defendant.  His name is Charlie Lynch.  And I want to talk

1    to you a little bit about what he did and why he did it, not

2    elements of a crime, but things that he did and the reasons

3    for him doing those things.

4        Mr. Lynch operated a marijuana dispensary and it was

5    called the Central Coast Compassionate Caregivers.  And it

6    was located up in Morro Bay, just a couple hundred miles

7    from here in a small town.  From that dispensary, he made

8    available safe access to medical marijuana for Californians

9    who were eligible to receive it under the state law.  And he

10   did that with the blessing of his community, the community

11   of Morro Bay.

12       Now, Morro Bay has its own police department.  It has

13   its own mayor.  It has its own City Hall, and it has its own

14   city counsel and they all supported Mr. Lynch in what he was

15   doing.  And in fact, the medical marijuana dispensary that

16   he opened was only blocks away from the City hall, only

17   blocks away from the police station.  And from that medical

18   marijuana dispensary Mr. Lynch ran a tight ship.  He paid

19   taxes to the State of California.  He paid taxes to the

20   federal government.  He kept immaculate business records.

21   And in those business records was the private medical

22   information for almost 2400 Californians and they relied on

23   him.  They relied on him to keep their medical records

24   private.  They relied on him to provide them with safe

25   access to medical cannabis.

1           And he had a lot of rules as you saw during the trial.

2     He had a lot of rules about who could access the medical

3     marijuana and under what circumstances.  You saw evidence of

4     agreements that were signed by everybody who went into that

5     medical marijuana dispensary.  You saw agreements that were

6     signed by everybody who took home a marijuana plant to

7     cultivate it.  And you saw evidence that every piece of

8     marijuana or marijuana plant that left that store was

9     accompanied by a notice and that notice was on a white piece

10    of paper.  And we didn't get to talk about what's on that

11    white piece of paper.  The government didn't seem to want

12    you to know what was on that white piece of paper, but it's

13    important and it's in evidence.

14          And so these charts that you've discussed, you will

15    have a chance to see all of those when the case goes to you,

16    but you will also have a chance to see the evidence, see the

17    documents that the government has selectively culled and

18    read the whole thing.  You will have a chance to see the

19    white pieces of paper that were attached to every single bag

20    of medical marijuana that came out of the dispensary.  And

21    take a look at what those say and ask yourself, why are

22    these words so dangerous?  Why was this hidden from me?  Why

23    couldn't I know about it before?  But the mystery will be

24    revealed because you are going to find out about it soon

25    enough.

1            And in addition to all of these things that

2    Mr. Lynch did, in addition to the relationships that he

3    cultivated with his local officials before he ever opened

4    his doors, before he ever attempted to sell any medical

5    marijuana to anyone or make it available according to the

6    strictures of state law, he did his research and he started

7    by looking at the Compassionate Use Act.  That's Proposition

8    215, the Compassionate Use Act.  And in that, the

9    Californians overwhelmingly approved amending the state law

10   to make medical cannabis available to anyone who needed it,

11   who was ill and needed that medicine.

12           And then he took a look at Senate Bill 420, and

13   this is in evidence.  I don't think we've had a chance to

14   see it on the screen, but it has been admitted, and he took

15   a look at that.  And he saw that the California state

16   legislature had voted to enact a law to enhance the access

17   of patients and caregivers to medical marijuana through

18   collective, cooperative cultivation projects.  What does

19   that mean?  Dispensaries.

20           But more importantly, Mr. Lynch, being a thorough

21   man and being a conscientious man, before he opened up his

22   medical marijuana dispensary he wanted to make sure it was

23   legal, and he knew that it was legal under California state

24   law, but he didn't just satisfy himself with that.  He did

25   some checking.  And one of the things that mattered, he knew

1    that federal law -- he had checked the DEA website, so he

2    knew that federal law made the distribution or cultivation

3    of marijuana illegal for any purpose.  But then he went back

4    to the state law and what did he see?  The legislature

5    further finds and declares that this act pursuant to the

6    powers reserved to the State of California and its people --

7    that means the people of Morro Bay, under the

8    Tenth Amendment to the United States Constitution.

9            So the California law that Mr. Lynch looked at

10   before he opened up his marijuana dispensary made explicit

11   reference to federal law.  It made explicit reference to the

12   Tenth Amendment to the United States Constitution.  And what

13   does that say?  The powers not delegated to the United

14   States by the Constitution, nor prohibited by it to the

15   states, are reserved to the states respectively or to the

16   people.  And again, that means the people of Morro Bay.

17           And so Mr. Lynch, when he was deciding what to do,

18   he was deciding whether he could provide this service which

19   his community needed.  He looked at state law and he looked

20   at federal law.  And at that point he could have made the

21   decision that this is good enough.  California law clearly

22   allows me to do this.  My elective local representatives

23   have made it very clear that they are going to permit me to

24   do this.  And the California legislature has specifically

25   carved out an exception for the law for medical marijuana

1    and he could have satisfied himself and opened up his

2    medical marijuana dispensary just like hundreds of people

3    have done in the State of California, but he didn't stop

4    there.

5            He did one last thing and that thing wound up

6    making a big difference in this trial.  Mr. Lynch called the

7    DEA directly.  The DEA is the agency that's responsible for

8    actually enforcing the federal drug laws, so he didn't

9    satisfy himself with what was on a piece of paper, he called

10   because he wanted to talk to a person who was authorized to

11   tell him an answer to his question.  So he started and

12   called the number listed on that sheet there, (510)

13   637-5600.  We saw it on his phone bill.  It's not really the

14   subject of any reasonable dispute.

15           He called that office and he said, sir, what are

16   you going to do about all of the medical marijuana

17   dispensaries all across the state?  And the person didn't

18   have an answer, but he did have a question.  He asked

19   Mr. Lynch, where do you live?  And Mr. Lynch told him, I

20   live in the City of Arroyo Grande and that's just south of

21   Morro Bay here in California.  And so that officer on the

22   phone gave him another line.  He said, well, you need to

23   call your local DEA field office, and that turned out to be

24   the Camarillo field office.  And as it turns out, this call

25   was made on September 12th, 2005, the very same month that

1    Special Agent Burkdoll began her career at the Camarillo

2    office of the DEA.  So he called the Camarillo DEA's office

3    and he repeated his question.  He said, sir, what are you

4    going to do about all of the medical marijuana dispensaries

5    operating across the State of California?  And this time he

6    got the same answer.  We are not sure.  We don't know.

7         Now, he had tried twice now.  He had been referred to a

8    phone number and he had spoken to two live human beings and

9    neither one of them could give him an answer.  Again, this

10   is a point where he could have gone back and he said, well,

11   I have looked at the Tenth Amendment to the United States

12   Constitution.  I have looked at California state law, and I

13   have seen dispensaries operating all through the State of

14   California and they are still operating, but he didn't.  He

15   kept going, because that person gave him a further number

16   and that was to headquarters here in Los Angeles, (213)

17   621-6700.

18        He dialed that number, and on that call as you'll see

19   from his phone bill he was on for quite a while because he

20   asked this question, what are you going to do about all of

21   the medical marijuana dispensaries?  They put him on hold,

22   and when they came back they gave him the inside line, and

23   this is the line that really mattered (213) 621-6789.

24        And so Mr. Lynch made a fourth attempt.  He didn't give

25   up.  He needed an answer.  He made a fourth try.  And he

1    called that phone number and a woman's voice picked up and

2    he said, ma'am, what are you going to do about all of these

3    medical marijuana dispensaries across the State of

4    California?  He got put on hold again.  And he was a little

5    frustrated at this point.  He thought he was getting the

6    runaround, but he stayed on the line and a man picked up, a

7    man's voice, and he repeated his question for a fifth time,

8    what are you going to do about all of the medical marijuana

9    dispensaries throughout the State of California?

10        And does anybody have any doubt that the person who

11   answered that line, who answered that line marijuana task

12   force, who was in the Los Angeles headquarters of the DEA,

13   does anybody have any real doubt about whether that person

14   understood what Mr. Lynch meant when he said medical

15   marijuana dispensary?

16        It's hard to have that doubt after all of the evidence

17   that came in, after all of the state law that Mr. Lynch was

18   able to get through.  It's fair to assume that the person at

19   the DEA who answered that line knew exactly what Mr. Lynch

20   was talking about.  That person finally after all of these

21   calls and all of these efforts gave Mr. Lynch an answer.

22   And he said, sir, that's left to the cities and the counties

23   to decide how they want to handle the matter.

24        And finally he got an answer and he could have hung up

25   the phone right then and said I'm in the clear, I've talked

1    to the DEA, they've given me an answer, it was unambiguous.

2    It's up to the cities and the counties to decide how they

3    want to handle the matter.  And didn't that make sense?

4    Because cities and counties were allowing medical marijuana

5    dispensaries all throughout the state and the state law made

6    it very specific that it was up to the states and their

7    subdivisions to determine how to handle the matter.

8         But he said, just to be clear about what his intentions

9    were, he said, well, sir, what if I want to open my own

10   medical marijuana dispensary?  And the officer slowed down

11   his words, per Mr. Lynch's testimony, slowed down his words

12   to make sure that Mr. Lynch could understand exactly what he

13   was saying, and he repeated, sir, this is up to the cities

14   and the counties to decide how they want to handle the

15   matter.  And Mr. Lynch who is a thorough man as we saw but

16   not necessarily learned in the law, not necessarily able to

17   read Supreme Court decisions, after hearing it a couple

18   times from a couple different sources and after having asked

19   his question five times was satisfied.  And it made sense to

20   him that it was up to the cities and the counties to decide

21   how to -- how they wanted to handle the matter because

22   that's what he saw happening right in front of him.

23        And he took the DEA at their word, because his very

24   next phone call -- if you look at that phone bill, his very

25   next phone call was to the City of Morro Bay which is where

1   he wound up opening his medical marijuana dispensary with

2   the consent of the city attorney, with the consent of the

3   mayor, with the consent of the city council.  And he

4   approached city attorney Rob Schultz and he said, how are we

5   going to do this?  I want to open a medical marijuana

6   dispensary to serve your community.  What do you think?

7       And Rob Schultz did his own research, just like Charlie

8   Lynch did.  And he looked at all of the various voices that

9   were opining about what the law was.  And we saw a lot of

10  memos, and the government has shown you selected portions of

11  the memos.  But he looked at all of those very same memos

12  and there is a voice that I think stood out for Mr. Schultz

13  because it appeared in his memo.  He said, today's ruling,

14  referring to the Supreme Court decision, does not overturn

15  California law permitting the use of medical marijuana but

16  it does uphold a federal regulatory scheme that contradicts

17  the will of California voters and limits the rights of

18  states to provide appropriate medical care for its citizens.

19      Although I am disappointed in the outcome of today's

20  decision, this is your state attorney general speaking, your

21  former state attorney general Bill Lockyer.  And he was

22  disappointed in the outcome of today's decision, but he said

23  legitimate medical marijuana patients in California must

24  know that state and federal laws are no different today than

25  they were yesterday, no different than they were yesterday.

 1    And this memorandum was dated March 13th, 2006.  It was in

 2    reference to a business license application for the Central

 3    Coast Compassionate Caregivers.  That's Mr. Lynch's medical

 4    marijuana dispensary.  And so when city attorney Rob Schultz

 5    who testified that he had 20 years of experience as an

 6    attorney, when he looked for answers, he looked to the

 7    California attorney general.  And he decided that it was in

 8    the best interest of his community and it was in the best

 9    interest of the people of Morro Bay to allow Mr. Lynch to do

10    what he wanted to do.  And so that's what he did.

11        And so Mr. Lynch took the DEA at its word.  He applied

12    for a business license.  He talked to the city attorney, Rob

13    Schultz, and he said, how am I going to operate this

14    dispensary in this city?  What are the needs of the city and

15    how am I going to meet them?  Mr. Schultz negotiated with

16    Mr. Lynch and set forth some conditions for the issuance of

17    a business license.

18        We heard evidence that was undisputed that Mr. Lynch

19    complied with every single thing the City of Morro Bay asked

20    him to do.  These business license conditions are to be

21    displayed conspicuously at the location of the business.

22    And what did Mr. Lynch do?  He actually testified he

23    actually went out and got a really nice frame for his

24    business license because he was proud and he put it in that

25    nice frame and he put it right by the door so that everybody

1    could see it when they came into the dispensary.  And that's

2    where it was until Special Agent Burkdoll took it off the

3    wall and booked it into evidence.  He got a nice frame for

4    his business license.

5        No applicant, agent or employee or any person

6    exercising management authority of a dispensary can have

7    been convicted of a felony.  And what did Mr. Lynch do?  He

8    worked with the City of Morro Bay police department who

9    showed him how to do background checks.  And whatever

10   happened to Dan Eister, the person he wanted to open up the

11   dispensary with?  Mr. Lynch had to tell Mr. Eister, I'm

12   sorry, it turns out you have a felony conviction and so the

13   city's asked me not to allow anybody with any felony

14   conviction to be associated with this.  And so I'm sorry,

15   sir, I can't allow you to do this because I'm going to

16   follow the rules.

17       No person under the age of 18 is allowed in the

18   dispensary except in the presence of his parents or

19   guardian.  I want you to ask yourselves this, do you think

20   that if the City of Morro Bay had told Charlie Lynch that

21   nobody under 21 could enter his medical marijuana

22   dispensary, do you think that Mr. Lynch would have ignored

23   that?  Do you think that he would have let people who were

24   under the age of 21 in there anyway?  No.  He did everything

25   that the City of Morro Bay asked him to do, and the City of

1    Morro Bay asked him not to let anybody under the age of 18

2    in the dispensary.  And there is no evidence at all before

3    you that he ever violated that condition.  And we heard from

4    parents, parents who signed agreements to cultivate plants

5    for their children, but you didn't hear any evidence at all

6    that anybody under the age of 18 ever went into that

7    dispensary.

8         Cannabis cannot be consumed on the premises.  You

9    certainly didn't hear any evidence of that.  And it wouldn't

10   exactly be like Mr. Lynch who applied such strict rules to

11   this dispensary to not prevent that from happening.

12        Now, the rest of the conditions we didn't really have a

13   chance to talk about.  This topic got a little bit

14   uncomfortable and this line of questioning was shut down, so

15   we didn't get to hear much about the rest of these

16   conditions.  But what we didn't hear is that there was any

17   evidence that anybody -- that Mr. Lynch ever allowed any of

18   these conditions to be violated.  Each condition matters

19   because it says that the dispensary shall be operated in

20   compliance with the rules and regulations the City may

21   issue.

22        How did Mr. Lynch comply with that rule set for him by

23   the City of Morro Bay?  Well, it turns out that later his

24   patients wanted access to marijuana plants and that wasn't

25   part of the rules.  And so in order to provide them access

1    to marijuana plants, Mr. Lynch had to go back to the City

2    and get a conditional use permit, a nursery permit.  And if

3    you look at the actual photographs of the marijuana plants

4    you will see that the conditional use permit is hanging

5    right there on the shelf just like Mr. Lynch testified it

6    was, because one of the things he was required to do was

7    display it conspicuously.

8         He didn't do things until he got permission.  He didn't

9    just do what he wanted to do.  He worked closely with the

10   elected officials of Morro Bay, the City of Morro Bay, just

11   like the DEA told him to do.  So if you believe that the DEA

12   told Mr. Lynch that it is up to the cities and the counties

13   to decide how to handle the matter and there is every reason

14   to believe that, then you must come to the conclusion that

15   Mr. Lynch did exactly, exactly what he was asked to do.

16        And through the Central Coast Compassionate Caregivers

17   Mr. Lynch made medical marijuana available to the people in

18   his community.  He joined the Chamber of Commerce.  He

19   appeared before the city council.  He invited elected

20   officials, including the mayor, including the city attorney,

21   including representatives of the county of San Luis Obispo

22   to tour his dispensary and they took him up on that

23   invitation and they did that.

24        You heard testimony that Morro Bay City police

25   department would stop in from time to time, and he filled

1  out emergency contact information so that they knew exactly

2  where to contact him if something went wrong.  This is not a

3  drug trafficker.  This is a man who is operating a business

4  known as the Central Coast Compassionate Caregivers strictly

5  according to state law to provide safe access to medical

6  cannabis to ill Californians, people who need it.

7       Now, for four days we heard a lot of evidence, and you

8  didn't hear many of those facts during the government's

9  case.  They slipped in through the cracks.  Sometimes on

10  cross-examination we were permitted to ask a witness

11  something that would let a little bit of that in.  Do you

12  remember when Detective Blank testified about going into the

13  dispensary and purchasing marijuana and he left out an

14  important detail, do you recall?  It almost seemed as if he

15  just sort of breezed right in there, purchased his marijuana

16  and breezed right out.  But on cross-examination it turned

17  out that he had something with him when he went into that

18  dispensary.  It wasn't just an ID with a fake name.  It was

19  an eight-and-a-half-by-11 piece of paper which he later

20  admitted was a physician's recommendation, not a fake one

21  which he could just draw up himself and sign a fake

22  signature to just like on his driver's license but a real

23  one.

24       Why would an undercover officer feel like he needs to

25  bring a real physician's recommendation into a medical

1    marijuana dispensary?  Why not just bring a fake one?

2    Because he knew that Charlie Lynch or his employees verified

3    every last one.  He knew that a call would be made to the

4    doctor to verify it.

5         Now, one of the things that's most important in this

6    case is the burden of proof.  The government has the burden

7    of proving this case beyond a reasonable doubt.  Now, you

8    heard the instruction.  It tells you that proof beyond a

9    reasonable doubt is proof that leaves you firmly convinced,

10   but it's important to step back and take into account the

11   context in which you got that instruction.  This is a

12   federal criminal trial.  It is extremely important.  And so

13   when you consider whether the government's met its burden of

14   proof beyond a reasonable doubt, think about the proof that

15   you would rely on when making the most important decisions

16   of your life, decisions that have consequences like a

17   federal trial, decisions like the decision to buy a home,

18   the decision about who you are going to marry, the decision

19   about who to leave your young children with.  These are

20   important decisions that have consequences and so you don't

21   leave them to chance.  You don't allow question marks to

22   remain.

23        And so the flip side of the burden of proof beyond a

24   reasonable doubt is those question marks, and they are not

25   big ones, they are little ones.  They are little gaps in the

evidence.  Little facts that you are wondering what they are
and you don't quite know.  Little things that you would like
to know in order to make a decision but you don't know.  And
part of having the burden of proving its case beyond a
reasonable doubt means that the government has to fill in
those facts.  It means the government can't hide the facts
from you and then expect you to do your job.

          Have you ever been driving with your family, packing
up -- picture yourself.  You pack up your car.  You are
going to go on a vacation.  You put the kids in the car.
You put the luggage in the car.  And you are going to be
away for a week and hopefully you are going someplace fun.
And you go to the end of the block and you turn the corner
and you can see your house in the rear-view mirror and a
flash comes -- a thought flashes through your head and you
think, what if I left the oven on?  And you know you didn't
leave the oven on because that's not the kind of thing that
you do and maybe you didn't even cook that day, but that
flash comes through your head and your car is full of your
kids and your stuff and you are going to be gone for a week.
Do you keep going?  Do you just forget about it?  No.  No,
you go back because even though you know you didn't leave
the oven on and that's not the kind of thing that you do,
the thought alone, the question mark is enough to make you
turn around, because the consequences of getting that wrong

1    are just too severe.  And so you go back and you check.

2         Reasonable doubt is like that thought that flashes

3    through your head.  Reasonable doubt is that little question

4    mark that you think you can resolve but you are just not

5    sure.  And so with respect to all the parts of the

6    government's case, including each and every element of all

7    of the offenses, including all of the quantity

8    determinations that the government wants you to make, that's

9    the standard, proof beyond a reasonable doubt.

10        And with that in mind, what did we hear about for four

11   days?  We saw a lot of charts, a lot of paper.  And those

12   charts were prepared ostensibly from things that Mr. Lynch

13   kept on his own.  But they weren't exactly that precise,

14   were they?  I mean, the sales chart that the government has

15   just shown you, we heard testimony from Special Agent

16   Burkdoll that doesn't have any forensic accounting

17   experience that all she did to prepare that chart is circle

18   a bunch of numbers and add them up.  It's pretty simple,

19   right?  It's pretty simple to circle a bunch of numbers and

20   then put them on a chart, but that doesn't make it accurate.

21   There was no attempt to verify those figures.  There is no

22   attempt to compare those to inventory, compare those to bank

23   deposits.

24        And so when your burden of proof is beyond a reasonable

25   doubt, can you just rely on a bunch of numbers that were

1    circled and put into a chart?  What about the charts that

2    talk about sales to underage people, to minors?  Now, those

3    charts look pretty impressive and we just saw them flashing

4    across the screen.  They make it look like the proof that

5    the government has introduced is just quite overwhelming.  I

6    think that was the word that the government used.  But we

7    know that in the end when you just unpack those charts, how

8    are they prepared?  Special Agent Burkdoll made some

9    calculations based on the date of the search warrant and the

10   dates of birth on some California drivers' licenses,

11   compared those to some other documents that were kept in

12   Mr. Lynch's files and then she entered them into an Excel

13   spreadsheet and pushed a button and said that's it.

14        But then Special Agent Burkdoll had one chance to tell

15   us how she did that and she got it wrong, wrong by about a

16   year.  That's not proof beyond a reasonable doubt.  Proof

17   beyond a reasonable doubt, it looks like witnesses.  That

18   means you call a witness and you say, sir, how old are you

19   now?  How old were you on March 29th, 2007, when we executed

20   the search warrant?  You ask a witness their age.  Relying

21   on a bunch of paper that relies on simple arithmetic and

22   entries into an Excel spreadsheet, that's not proof beyond a

23   reasonable doubt.

24        And I think the worst example of it was the chart that

25   was just shown to you that listed a category called not

1    listed likely grams.  Now, there is a category in that

2    chart, this is for the vendors, that listed grams and even

3    in that category there were times at which Special Agent

4    Nugent had to make some inferences based on what he had.  So

5    that the category labeled not listed likely grams, that was

6    an example where Special Agent Nugent couldn't even actually

7    ballpark it to make it get into the grams category.  That's

8    where he had no information.  And so he put in the grams

9    category because he thought that was the least -- that was

10   the smallest number, but we know that concentrates or hash

11   were sold in half gram increments.  And is it ever going to

12   satisfy the burden of proof beyond a reasonable doubt to

13   make those kinds of guesses and put them on paper?  If in

14   the end all you see is a bunch of paper, can you ever

15   conclude that the government's really proven its case beyond

16   a reasonable doubt?

17       And we heard from chemists and they testified about

18   marijuana.  And they confirmed what everybody here already

19   knows, there was marijuana.  What Mr. Lynch was dispensing

20   to his patients was medical-grade marijuana.  But where is

21   that marijuana?  You heard that Special Agent Burkdoll after

22   attempting to count the marijuana plants, it was her first

23   time, and she testified that not only did she not know the

24   significance of 100 plants, that nobody in her office knew

25   the significance of 100 plants.  Now, Special Agent Burkdoll

1    had signed the search warrant.  She's the one that initiated

2    this case, that got the steamroller rolling over Mr. Lynch.

3    But it's not clear whether she even ever read the statute.

4    So is it enough to satisfy your burden of proof beyond a

5    reasonable doubt as to quantities when the government

6    doesn't even bring the plants and they destroy them before

7    the defense ever has a chance to look at them?

8        Now, what else was missing in this case?  Live

9    witnesses.  The witnesses that we heard from were either

10   agents testifying about charts or local police officers.  In

11   all but one case those local police officers never stepped

12   foot in the Central Coast Compassionate Caregivers.

13   Instead, they testified that other people went into the

14   Central Coast Compassionate Caregivers.

15       Now, we have a case where a man's running a medical

16   marijuana dispensary out in the open with the blessing of

17   the City, in the middle of the business district.  Why not

18   just talk to one of Mr. Lynch's patients, ask him what they

19   are doing?  Why not talk to the mayor or the city council

20   who have been inside there and could tell them what's going

21   on?  Why instead camp out in front of Mr. Lynch's medical

22   marijuana dispensary, take pictures of people's license

23   plates, videotape people, follow them home and park in front

24   of their houses and look in their windows?  Why would you do

25   that?  Why would you go to those great extremes?  And why

1    not call the confidential informants that this case is

2    allegedly based on?  We don't even know their names, but we

3    heard a little bit about them.

4         The confidential informant referred to as confidential

5    informant number one, we know that he was directed to go set

6    up one of Mr. Lynch's employees.  If you recall, his name

7    was Abrahm Baxter.  And I listened for Abrahm Baxter's name

8    as the government gave its closing argument.  I listened for

9    him, because don't you remember we spent the whole first day

10   of this trial talking about Abrahm Baxter selling marijuana

11   in a Big 5 parking lot miles away, and now they don't want

12   to talk about him anymore.  Why is that?  Because it's

13   crystal clear that Mr. Lynch had nothing to do with that.

14        We learned about Mr. Lynch and what he does.  We

15   learned about the rules that he set for dispensing marijuana

16   and we learned that he's a conscientious guy, somebody who

17   did everything that the city attorney asked him.  So it's

18   implausible to think that he might have had anything to do

19   with what Abraham Baxter did in that parking lot, and I

20   think that's why you didn't hear anything about that.

21        But what you did hear from is confidential source

22   number one.  Do you remember how he sounded on that tape?

23   Do you remember the vulgar and disgusting and offensive

24   things that he said?  Do you think that Mr. Lynch would have

25   said something like that?  Do you think that any of

1    Mr. Lynch's patients would have said something like that?

2    So is it important enough to prove their case that they

3    would actually bring in confidential informants, not

4    citizens who are doing it out of the kindness of their

5    heart, but criminals working off cases, mercenaries being

6    paid tax dollars to go into a medical marijuana dispensary

7    and do what any eligible Californian can do.  That's why you

8    didn't hear from them is because they are not pretty.

9        And the same goes for confidential source number two.

10   He didn't even have the decency to leave his marijuana at

11   home.  He actually brought it and they had to actually

12   confiscate it before they sent him in to buy marijuana

13   plants.  So these are the caliber of people that the

14   government is sending into the medical marijuana dispensary.

15       And didn't it seem that as we were hearing about these

16   charts and as we were hearing from these witnesses that

17   every time we got close to learning something about Charlie

18   Lynch, the person who is actually sitting here, the person

19   who is on trial, didn't it seem like every time we were

20   about to learn about who he is and what he did and why the

21   government was jumping out of their chairs to object.  They

22   were shouting objections that were so loud that they were

23   shaking this courtroom and they scared me and I think they

24   scared some of you.  What was it that was so threatening

25   about the things that we were saying about Mr. Lynch?

1          Do you remember when I actually put one of the

2    government's exhibits on this projector and I asked you to

3    focus in on a certain part of that exhibit because it was

4    important to the story, because it explained what was really

5    going on, and we heard an objection loudly again and the

6    government jumped out of their chairs and grabbed the thing

7    off the projector so that you couldn't see it?  Why would

8    they do that?

9          But the truth ultimately did come out, didn't it?  It

10   didn't come out through the government's witnesses.  It's

11   not in the charts.  It came out through Charlie Lynch

12   himself.  And he didn't have to testify.  He could have not

13   testified.  That was his right.  But he wanted to testify.

14   He wanted to explain to you what he had done and why.  And

15   although it was a bumpy ride, the truth did come out.  He

16   told you about his background, about his family.  He told

17   you about the jobs he had had before he started his medical

18   marijuana dispensary.  He told you a little bit -- at least

19   he tried to tell you a little bit about why he wanted to do

20   it.  And he told you about his research, and he testified

21   honestly and he's a simple man.  He's not a lawyer and he

22   didn't have a lawyer, but he looked at the laws the best he

23   could.  And the laws appeared to confirm what he already

24   knew which is that the State of California permitted medical

25   marijuana dispensaries, encouraged them.

And so when he called the DEA and they explained to him that it was up to the cities and the counties to regulate the matter, he took them at their word and he went to the city and the county and he relied on people who were maybe smarter than him, maybe more prepared than him, that knew the law better than him, the city attorney, and he did everything that they asked.  And he testified truthfully.  And the government's first response was to stand here -- you saw Mr. Kowal stand here and abuse him, insult him, shout at him, and he did the best he could to answer Mr. Kowal's questions.

When he didn't know, he said I don't know.  When it seemed like Mr. Kowal had asked a question six times in a row, he said, Mr. Kowal, it seems like you asked me that already.  And he didn't make up a self-serving story.  He didn't try to stretch the facts.  He told you what he was thinking and his thinking made sense because it's reflected in a lot of the documents that were shown and it's reflected in what the city attorney told him and it made sense because he saw people across the State of California doing the exact same thing that he was doing.

And when that didn't work after about a half a day of cross examination of Mr. Lynch, when it became clear that his story was consistent, it wasn't going to change, they took it up a notch.  They called Special Agent Deanne Reuter

1    of the DEA.  And she came in here and she confidently

2    marched up to the stand and she said I'm a DEA agent.  I'm a

3    supervisor of group two.  That's my phone number.  And I

4    never would have said anything like that.  But what else did

5    she say?  She said I get hundreds of calls as a duty agent.

6    Yeah, it's kind of a drag having to answer all the public's

7    questions.  That's what she testified to.  And so in fact,

8    she didn't actually remember ever receiving a call from

9    Mr. Lynch.  She didn't remember because it didn't matter.

10   It wasn't important to her.  But she's confident that

11   neither her nor anybody in her group ever gave Mr. Lynch the

12   advice that he says he was given.

13        Now, what makes more sense though?  Does it make

14   sense -- Special Agent Deanne Reuter, she's a supervisor.

15   Now, if she had told Mr. Lynch the things that he says that

16   she told -- or it wasn't even her.  It was a man who

17   answered the phone.  Would it make sense for her to come in

18   here as a supervisor at the DEA and say you know what?  I

19   admit it.  My bad.  They are right.  I said that.  I

20   shouldn't have said it.  I wouldn't say it again.  I'm

21   sorry.  That wouldn't really be good for the government's

22   case, would it?  She didn't come in here to say that.

23        She came in here to say exactly what the government

24   wanted her to say which is that marijuana is illegal under

25   federal law.  I've never had any question about that, and I

1   never would have said those things.  But she didn't actually

2   remember having any conversation.  And in fact, the person

3   that Mr. Lynch spoke to on the phone was a man.  It wasn't

4   even her.  And doesn't it make sense that if she was a

5   supervisor now but she wasn't a supervisor then, that

6   perhaps even assuming it was her that answered the phone,

7   she might have transferred it to somebody else, somebody who

8   was a supervisor and somebody who could answer the question.

9        But think about it this way, Mr. Lynch -- you actually

10  got to see a lot of his heart and you heard a lot of his

11  history and what kind of person he is.  In order to accept

12  the government's version of what happened, you have to

13  accept some things about Mr. Lynch that just don't make

14  sense.  Do you think that Mr. Lynch on September 12th, 2005,

15  hatched a plot, he was going to call the DEA, four different

16  numbers, he was going to pretend that each one of them

17  didn't have the answer and referred him to somebody else and

18  that he was ultimately going to -- by a stroke of luck, he

19  was going to find the inside line and then he was going to

20  have a conversation for seven minutes just so he'd have it

21  on a phone bill, and the reason he would do this so just in

22  case the DEA were to bust him, just in case he would be able

23  to take advantage of this obscure defense called entrapment

24  by estoppel.  Does that make any sense to you?

25       Do you think that Mr. Lynch who doesn't know how to

1    read Supreme Court opinions, who relied on the city attorney

2    for advice, do you think he hatched a plan that took three

3    years to complete in which he was going to fool all of you

4    by taking advantage of this obscure defense called

5    entrapment by estoppel?  And do you think that if that was

6    his plan, don't you think he would have said something a

7    little better than it's up to the cities and the counties to

8    decide how they would want to handle the matter?

9        Do you remember when Mr. Kowal cross-examined him and

10   he said, Mr. Lynch, they never said it was legal.  They

11   never said it's okay, you can open your medical marijuana

12   dispensary.  Now, if Mr. Lynch wanted to hatch a plan and

13   tell a series of lies, don't you think he would have come up

14   with a better one?  And what he did -- his account of the

15   conversation makes a lot of sense given what he did next,

16   because as I told you before, he went and he contacted the

17   City of Morro Bay.  He got his business license.  He

18   complied with all of the conditions, and for a year he

19   provided safe access to medical cannabis to Californians who

20   needed it.  That's what makes sense.

21       And during the voir dire process, we lost a lot of

22   jurors and the reason that we lost them was because they

23   didn't think they could be fair.  And the reason they didn't

24   think they could be fair is because they were told that

25   distribution of marijuana violates federal law under all

1   circumstances.  And so their assumption meant that following

2   the law meant convicting Mr. Lynch.  That's not what it

3   means.  That's not what it means, because there is a

4   defense.

5       You heard a little bit about the defense from the

6   government.  It's called entrapment by estoppel.  It has

7   five elements.  But before I talk about those elements --

8       You can't see?  Okay.  Can we all see?

9       Can everybody see the board okay?

10      THE JURY:  Yes.

11      MR. LITTRELL:  These are the five elements to the

12  entrapment by estoppel defense.  And what's important about

13  this defense, and we talked about it a little bit before and

14  you were instructed as to this, is it has a much lower

15  standard of proof, the preponderance of the evidence.  This

16  is a standard that's not nearly as high as proof beyond a

17  reasonable doubt.  Proof beyond a reasonable doubt, that's

18  the kind of proof you need when you are making crucial,

19  important decisions, life-changing decisions.  This is the

20  kind of proof that you need when you make inconsequential

21  decisions, decisions that don't make much of a difference.

22      Now, preponderance of the evidence means that the

23  facts that Mr. Lynch has to prove, and that's these facts,

24  are more likely true than not true.  It doesn't mean that

25  they are much more likely true than not true.  It doesn't

1    mean that you don't have questions.  It just means that

2    Mr. Lynch's account of these facts makes a little bit more

3    sense than the government, 51 percent.  If the government's

4    story is here and Mr. Lynch's account is here, are you just

5    a little bit more persuaded by what Mr. Lynch has to say?

6    Does it make just a little bit more sense to you?  Not a lot

7    more sense, not eliminating all questions you have, but it

8    just makes a little bit more sense to you.

9           Who came -- did anybody come from far away today

10   and have to take the freeway?  You had to make a decision

11   about whether you were going to take the surface streets or

12   the freeway, and you didn't have full information about that

13   decision.  Maybe you'd tried it both ways and you had to

14   make a split second decision based on what you saw in front

15   of you about what to do.  Maybe you saw a couple of cars on

16   the on-ramp and you said, you know, today I'm going surface

17   streets because that just bodes ill.  I'm just not sure

18   about that.  So if I had to make a decision 51 percent to

19   49 percent, I'm going surface streets today.

20          That's the kind of proof that Mr. Lynch has to

21   submit to you at least with respect to all of these

22   elements.  The first one, Mr. Lynch spoke to an authorized

23   federal government official empowered to render the

24   erroneous advice.  Well, I see evidence of about five

25   authorized federal government officials from the DEA.

1    That's the government's law enforcement agency that enforces

2    the drug laws.  He wasn't satisfied himself with the first

3    one or the second or the third one or even the forth one.

4    He got an answer.  And even if you accept the government's

5    version of the story as true, even if you accept that it

6    rang to Deanne Reuter and she's the one that spoke to him,

7    there is really not a whole lot of question that she's an

8    authorized federal government official.  She works for the

9    DEA.  Okay.  So he's established that one.

10            Mr. Lynch made the official aware of all of the

11   relevant facts.  Well, having the luxury of having the

12   person who actually answered the phone or claims she

13   answered the phone, we were actually able to ask Ms. Reuter.

14       "Q  Ms. Reuter, when we say medical marijuana

15   dispensary, do you know what we mean?

16       "A  Yes.  Yes, I do.

17       "Q  Are you aware of California state law that makes

18   dispensing medical marijuana legal under certain

19   circumstances?

20       "A  Yes, I am.

21       "Q  What are those state laws?

22       "A  Well, it's the Proposition 215 and Senate Bill 420.

23       "Q  So when we say medical marijuana dispensary, do you

24   know what we are talking about?

25       "A  Yes, I do."

1    So the official who answered the phone, we can presume

2    was made aware of all of the relevant facts because they

3    knew that Mr. Lynch wanted to operate a medical marijuana

4    dispensary pursuant to the strictures of California state

5    law.

6        Now, what did that official tell him?  And I will

7    repeat it just one last time.  That agent said, Mr. Lynch,

8    it's up to the cities and the counties to decide how they

9    want to handle the matter.  And what does a reasonable

10   person interpret that to mean, a reasonable person who has

11   taken a look at the California state law, who has taken a

12   look at the reservation of rights in the Tenth Amendment?

13   What does a reasonable person interpret that to mean?  That

14   means that it's up to the cities and the counties to decide

15   how they want to handle the matter.

16       Now, it's true that you can't focus on what they didn't

17   say, but is what they did say enough to give Mr. Lynch some

18   certainty that it wasn't -- that the DEA wasn't later going

19   to bang down his door, put him on the ground and arrest him?

20   They told him that if he went and sought guidance from the

21   city and the county, he'd be okay.  And so that element is

22   satisfied.

23       Now, did Mr. Lynch rely on that incorrect information?

24   Because it turned out to be incorrect and nobody knows that

25   more than Mr. Lynch, that it turned out to be incorrect.

1    But did he rely on it?  He sure did, because the very next

2    phone call he made was to the City of Morro Bay.  And he

3    testified, and he testified credibly, that had he known he'd

4    be sitting in this chair being shouted at by the prosecutors

5    with the threat of five serious drug trafficking convictions

6    hanging over him, had he known that at the time, he never

7    would have opened up that medical marijuana dispensary.  He

8    never would have opened up the medical marijuana dispensary.

9    I don't think there is any dispute about that.  So he relied

10   on that information.

11       And was his reliance reasonable?  Well, he opened it

12   up.  He saw what was going on around the cities.  He had

13   studied the state law and it made sense to him that if he

14   was going to operate he would have to satisfy the local and

15   the state law.  Now, the government has -- so basically,

16   given what he knew at the time and given what he was seeing

17   around him, his reliance was reasonable.  He's not on notice

18   to seek further inquiry and make more questions because he's

19   talked to the guy who is the chief law enforcement officer

20   of the city and that man, Rob Schultz, with 20 years of

21   experience who advises all of the Morro Bay City departments

22   gave him his business license and encouraged him to go ahead

23   and do what he was going to do.  So he's not on notice to

24   make further inquiries because he's inquired from the chief

25   law enforcement officer of his city.

        Now, the government makes an interesting point.  He was
raided.  He was raided in March 2007.  And during that raid
the government is correct, they did bang down his door.
They did take all of his things.  They took his computers.
They took all of the marijuana products in his store.  They
took a lot of his money.  And the government says, well, he
was on notice then, he should have called the DEA.  He
should have called the DEA and asked them to reopen.  But
why take all of those steps?  Why camp out in front of the
dispensary, send in undercover agents, ultimately raid and
hang all these drug trafficking convictions on him?  Why not
just tell Mr. Lynch, sir, we believe that what you are doing
is violating the federal law, so stop.  No one ever told him
that, no phone calls, no letters, none of the people who
were just right across the street ever told him, listen, you
can't do what you are doing.

        And is Mr. Lynch a little naive?  Yeah.  In retrospect,
do you think he wishes he had shut down at that time?  Yeah.
And you know that because that's what he testified to.
Because Mr. Kowal asked him, he said didn't you think that
that's the time when you should have shut down?  And Mr.
Lynch was honest.  He didn't make something up.  He said you
know what?  You know, maybe I should have shut down, but I
have a lot of people depending on me.  And he did have a lot
of people depending on him.

1          And during this trial we would have liked to introduce

2     you to a lot of the people who were depending on him, but

3     you never got to meet them and it's a shame, but they were

4     depending on Mr. Lynch and he was doing things that were

5     making their lives better.  And so his thought was not with

6     the DEA.  His thought was with his patients.  And he did

7     take steps.  He talked to his landlord.  He told him he

8     could go ahead and open back up.  He actually watched the TV

9     and he saw that his local sheriff -- and this is the same

10    sheriff's department that actually participated in the raid

11    of the dispensary.  His local sheriff went on TV and said,

12    Mr. Lynch, we are giving you back the keys.  You are free to

13    do whatever you want with it.

14          THE COURT:  Counsel, let me have you on sidebar.

15          (The following was held at the bench:)

16          THE COURT:  This is the third time you've raised

17    an item of evidence I specifically precluded and it never

18    went in front of the jury.  This is incredibly outrageous.

19    I can't believe you've done this, the third time.  They

20    didn't object, but this is the third time you've done this.

21    What are you doing?

22          MR. LITTRELL:  I'm sorry.  I thought that

23    Mr. Lynch testified about that.  The evidence didn't come in,

24    but he testified about that.

25          MR. KOWAL:  Your Honor, we'd like an instruction

1    at this point.  You made this clear, you weren't going to

2    sustain any evidentiary objections.  You were going to leave

3    it to counsel.  That's why we haven't been objecting.  But

4    this entire thing, he talked about Deanne Reuter saying

5    things that never came in.  He talked about Rob Schultz.

6    That never came in.  He's done it time and time again.  You

7    need to at least instruct the jury that defense counsel has

8    been talking about items which I specifically struck.  If I

9    struck it, you may not consider it.  You may not consider

10   his arguments in this regard.

11        MR. COHEN:  Your Honor, the answer about the

12   sheriff for example came in through Mr. Lynch.  There was no

13   motion to strike.  He testified about it.

14        MR. LITTRELL:  He testified about it.

15        THE COURT:  Let me put it this way.  A lot of

16   things you've mentioned so far I ruled on you couldn't get

17   in.  I was waiting for an objection.  There was not

18   objection.  This is outrageous.

19        MR. KOWAL:  Your Honor, I would have been

20   objecting more but you've made it seem like we couldn't

21   object as to evidentiary matters, you were going to leave it

22   to the jury.

23        THE COURT:  Oh, no.  The thing about this is if

24   there was no evidence, obviously you can raise an objection

25   if there was actually no evidence presented to the jury.

1          MR. KOWAL:  Well, then I've got a lot more

2     objections to make.

3          THE COURT:  That's water under the bridge at this

4     point in time.  Don't do it again.  And let me indicate, you

5     have 13 minutes left.

6          MR. KOWAL:  Can we make instructions to the jury

7     that he's making references to items which were not in

8     evidence?

9          THE COURT:  The problem is that on this last one

10    if they are right then I'm not going to instruct them on

11    this one.  But the problem is on the other ones, you should

12    have raised the objection at the point in time.

13         MR. KOWAL:  We'd also like to ask for an

14    instruction on the Tenth Amendment since they specifically

15    made the argument that the amendment authorizes the State of

16    California just like we said.  So we'd like the one that we

17    proposed.

18         MR. LITTRELL:  The arguments were specifically

19    tailored to what he saw and what he thought, Your Honor, and

20    I think that's well within the bounds.

21         THE COURT:  The other problem is, for example, you

22    made an argument about what the attorney general said and

23    you admitted that the attorney general's interpretation of

24    the law was wrong and then you presented that wrong

25    interpretation of the law to the jury again.

1            MR. LITTRELL:  The thing is, Your Honor, it

2    doesn't matter whether it's right or wrong, it goes to what

3    Mr. Lynch thought and what he read and what he believed.

4            MR. COHEN:  It was admitted for state of mind

5    purposes and nothing else.

6            THE COURT:  But that's not how you admitted it.

7    You need to proffer it.

8            MR. KOWAL:  May I ask the court to give us five

9    more minutes to respond to some of these things?

10           THE COURT:  No.

11               *(End of discussion at sidebar.)*

12           MR. LITTRELL:  There is two ways to find Mr. Lynch

13   not guilty and that's the right result.  So I'd ask you to

14   follow one of those two ways.  The first is to find that

15   because of the quality of the evidence, because the evidence

16   was on paper and a bunch of charts and a bunch of witnesses

17   that never came in.  That shows that the government had

18   something to hide from you.  And when it's their burden of

19   proof.  When it's their burden of proof beyond a reasonable

20   doubt giving you proof that you can rely on of the type that

21   you would rely on in the most important things in your life

22   and they come and they bring paper and descriptions of

23   people who never came to court, that's not proof beyond a

24   reasonable doubt.  And the quality of the proof alone is

25   enough for you to find Mr. Lynch not guilty on all five

1    counts.

2           Mr. Lynch has proven an affirmative defense.  He

3    didn't have to establish it beyond a reasonable doubt.  He

4    had to establish that it was more likely true than not true.

5    And we talked a little bit about the facts that establish

6    this defense.  And ultimately what is for you to decide is

7    was Mr. Lynch misled; is it really fair to hang a bunch of

8    criminal convictions on him when he did his best to follow

9    the law?

10          MR. KOWAL:  Objection, misstates the law, Your

11   Honor.

12          THE COURT:  If the defendant has established by a

13   preponderance of the evidence the elements of entrapment by

14   estoppel, the argument is perfectly proper.  If in fact he's

15   failed to establish the elements of entrapment by estoppel,

16   the argument fails.  But that is based on an evidentiary

17   determination by the jury.  He can make that argument as

18   long as it's interpreted in that fashion.

19          MR. LITTRELL:  You saw the elements.  You saw the

20   facts.  You know the standard of proof.  And you heard

21   directly from Mr. Lynch.  Has he convinced you 51 percent

22   that each of these elements have been met?  Because if so,

23   you can find him not guilty and that's what you should do.

24          Now I have to turn it back over to the government

25   and they may show you some more charts.  And they have the

1    burden of proof and that's the reason why they get the last

2    word here.  Because ultimately if there is a problem, if

3    there is a question mark, it's on them.  That means you have

4    to find Mr. Lynch not guilty.  But I'm concerned.  I'm

5    concerned in turning this over for the government because

6    I'm concerned they are going to make some arguments to you

7    that don't make a whole lot of sense.

8            Now, one thing that I'm confident they will tell

9    you is that you have to follow the law.  And you know what?

10   They are right about that.  But the law doesn't mean

11   convicting Mr. Lynch.  The law is proof beyond a reasonable

12   doubt.  And the law is entrapment by estoppel by a

13   preponderance of the evidence.  And so would an attorney for

14   a man like Mr. Lynch who did everything that the city

15   attorney, did everything that the mayor ever asked him to

16   do, do you think an attorney for a man like Mr. Lynch would

17   ever tell you not to follow the law?  Not likely.  He

18   followed the law and so should you.  But following the law

19   doesn't mean convicting Mr. Lynch.  It means exactly the

20   opposite.

21           They might tell you that based on the evidence

22   that they've presented you must find Mr. Lynch guilty and

23   that's just wrong.  That's wrong in really important ways.

24   Because not only have they not met the burden of proof, they

25   are not the ones that get to decide what you do.  That's why

1    we have a jury.  The prosecutor doesn't decide whether

2    Mr. Lynch is guilty.  The judge doesn't decide whether

3    Mr. Lynch is guilty, and I don't decide that either.

4    Because how easy would it be for us to just sit together and

5    form a huddle and look at the laws and decide what we think

6    they mean.  What happens to Mr. Lynch and what you decide is

7    for you.  And you will be instructed.  You need to come to

8    an independent determination of the verdict.  And there are

9    the facts and there is the law and then there is the

10   decision, but the decision is for you.  It's not for anybody

11   else.

12            Now, the federal government has come like a

13   freight train.  It started -- it basically came from

14   Washington, D.C. and it swept around and it basically

15   pummeled the City of Morro Bay and dragged Mr. Lynch here

16   into the courtroom and through the power of the federal

17   government Mr. Lynch has sat through well over a week of

18   trial.  He's withstood the abuse of the government, but now

19   it's over.  As soon as I sit down and as soon as the

20   prosecutors sit down, it's over, and the power shifts to

21   you.  Because the jury has the ultimate decision about what

22   to do in this case.  It's one of the oldest and most

23   important rights in the world.

24            Back in 1215 there was a king in Europe.

25            MR. KOWAL:  Objection misstates the law, Your

1   Honor.

2              THE COURT:  Which one, about 1215 the king or --

3              MR. KOWAL:  Before.

4              MR. LITTRELL:  Whose decision is it?

5              THE COURT:  Obviously, the decision is up to the

6   jury but the jury has to follow the law.

7              MR. LITTRELL:  Of course.

8              I want to tell you one story and then I'm going to

9   sit down because I'm sure you are done hearing from me by

10  now.

11             There was a king in the year 1215 and he had a lot

12  of power, and back then it was the kings that made these

13  decisions.  They decided whether they were going to just go

14  and take your land.  They decided whether they were going to

15  tax you.  And they made another important decision, whether

16  they were going to take people out of your community and put

17  them behind bars and lock them up, and that was for the king

18  to decide, not the people.  And I think his name was King

19  John actually.  This was in the year 1215.  And what the

20  people did in the English empire is they said enough.  The

21  king's not going to decide this anymore.  The king's not

22  going to take people out of our community and put them

23  behind bars anymore because that's not for the king to

24  decide, that's for us.  And so they actually went into

25  London.  They invaded the castle.  And they dragged that

1    king out of bed and they put a sword to his throat and they

2    said not anymore.  This isn't your decision anymore.  This

3    isn't up to you anymore.  It's up to us.  And they put a

4    piece of paper in front of that king and they made him sign

5    it.  And that piece of paper later became the magna carta.

6    And the magna carta is one of the most revered sources of

7    law all around the world today, and it's the source of the

8    American Constitution and it's the source for the

9    Sixth Amendment.  And the Sixth Amendment is why we have a

10   jury trial and that's why you are here and that's why we're

11   not huddled together figuring out what the law is.  We're

12   not huddled together figuring out what to do with Mr. Lynch.

13   That decision is up to you.

14          THE COURT:  Counsel, you have a minute.

15          MR. LITTRELL:  I beg your pardon.

16          THE COURT:  You have one minute left.

17          MR. LITTRELL:  Don't let them tell you to ignore

18   how you feel.  You have a duty to make a conscientious

19   decision in this case.  What does your conscious tell you --

20          THE COURT:  Counsel, there is a jury instruction

21   that the jury is to decide this case not on the basis of

22   emotion but on the basis of the evidence and the law.

23          MR. LITTRELL:  Yes, Your Honor.

24          There is another instruction that tells you to

25   come to a conscientious decision.  That means consult your

1    conscience.  What does your conscience tell you?  Does it

2    say that Mr. Lynch is a drug trafficker?  Because if he's a

3    drug trafficker, then so is the city attorney --

4            THE COURT:  Counsel, it's over.

5

6                       REBUTTAL ARGUMENT

7    BY MR. KOWAL:

8            MR. KOWAL:  Ladies and gentlemen, the defense

9    counsel talked about a lot of law, but notice he didn't talk

10   about the law that the court instructed you on.  He was

11   talking to you about senate bills and magna cartas and

12   things like that.  But ladies and gentlemen, the judge has

13   instructed you on the law that applies in this case and I

14   submit to you his entire presentation to you was to ignore

15   that law.  His entire presentation was to you to ignore the

16   oath you took to follow the law as it is instructed to you,

17   and his presentation was to ignore the evidence you've seen.

18           Ladies and gentlemen, your memory controls as to

19   what the evidence is, but there were numerous things the

20   defense counsel talked about that were never admitted in

21   trial.  He talked about what Agent Reuter knew from

22   marijuana dispensaries or that things were a drag.  If you

23   recall, ladies and gentlemen, your memory controls.  That

24   evidence was objected to and the court sustained the

25   objections time and time again.  But now he thinks that he

1    can say it in closing argument and fool you into not knowing

2    what the evidence is.  The evidence is your recollection,

3    ladies and gentlemen, but it's what the judge lets into

4    evidence.  It's the evidence Ms. Gerges put before you and

5    explained to you.

6           Ladies and gentlemen, that's what the evidence is

7    and the law is the instructions you have before you by this

8    court.  They govern this case.  They want you to ignore it.

9    They want you to ignore the evidence.  If you follow that

10   evidence, if you follow the law, ladies and gentlemen, it's

11   a simple case, because the evidence is overwhelming.  As to

12   each and every element of each crime he is guilty beyond a

13   reasonable doubt and there is no valid defense.

14          Let me make it even easier for you.  Counts two

15   and three as he forgot to mention, his defense doesn't even

16   apply.  Those are the sales to a minor under 21, Justin

17   St. John, as we explained to you.  The judge has instructed

18   you that the defense doesn't apply to those counts.  And the

19   defendant admitted each point of it, how much marijuana in

20   each of those things, so that's the easiest one.  Counts two

21   and three, when you get to the jury room, check guilty

22   because that's what the evidence shows.  That's what the law

23   says.

24          Ladies and gentlemen, their entire presentation is

25   to try to evoke sympathy, talking about state law and what

1   the city attorney did.  Ladies and gentlemen, look at the

2   jury instructions.  Does any of that matter?  No.

3          Another thing, ladies and gentlemen, you may ask

4   yourself, if the defendant thought he was helping sick

5   people, even if illegal under federal law, can I find him

6   not guilty?  Answer, no.  Even if he thinks he's helping

7   sick people, if it's illegal under federal law he's guilty

8   because the evidence shows beyond a reasonable doubt that

9   each and every element of the crime has been met.  Let's

10  take a look at some of those jury instructions, ladies and

11  gentlemen, the ones -- the real ones that are governing your

12  decision here.  The judge has already instructed you and you

13  have these in the jury verdict room.  This case is governed

14  exclusively by federal law.  And under federal law, the

15  possession, distribution, growing of marijuana for any

16  purpose is prohibited.  Any state law that you may be aware

17  of concerning the legality of marijuana do not override or

18  change federal law.  And, for example, unless I instruct you

19  otherwise, you should not consider references to the medical

20  use of marijuana.

21          How many references did the defense counsel make

22  to the medical use of marijuana in this case in his closing

23  argument and how many references did you see in the

24  evidence?  You didn't see them because it's irrelevant in

25  this case.  They are trying to gain your sympathy.  They are

1    trying to make --

2                        (Laughter.)

3         THE COURT:  Let me just stop.  Let me indicate to

4    the persons in the audience, this is not an entertainment.

5    Don't laugh in court.  I will exclude you from court if you

6    continue to do that.

7         MR. KOWAL:  Now, ladies and gentlemen, you might

8    not like that law.  You might like the California state law

9    as Mr. Lynch does, but your duty here is to follow the law

10   as the court instructs you.  It doesn't matter.  This isn't

11   a political debate.  This isn't the time to change or alter

12   laws.  This is the time for you to follow the law.  And your

13   very first instruction, ladies and gentlemen, says exactly

14   that.  It is your duty to find the facts from the evidence

15   in this case.  To those facts you will apply the law as I

16   gave it to you.  And you must follow the law as I give it to

17   you whether you agree with it or not.  You must not be

18   influenced by personal dislikes, opinions, prejudices or

19   sympathy.  That's all the defense counsel's arguments were

20   about, ladies and gentlemen.

21        Another question, ladies and gentlemen, that you

22   may have when you are in the jury room.  If defendant

23   thought what he was doing was legal, is he still guilty?

24   Yes, unless you believe defendant has proven that a DEA

25   official told him it was legal, not what was in his mind,

1   but what was said.  It doesn't matter what was in his head.

2   It matters what the DEA said.  And if you look at the

3   instructions that the court gave to you, it must be an

4   affirmative statement, an unambiguous statement.  He didn't

5   even purport to talk about the law.  He knew he went to the

6   website and found out marijuana was illegal, but did he ask

7   the DEA about that?  No, he didn't, and they didn't say

8   anything about it.

9         And you heard from Special Agent Reuter what her

10  understanding of the law was at the time and now, that

11  marijuana is illegal under federal law under all

12  circumstances and it's not something that they give to state

13  and local officials.  And she wasn't just talking.  Those

14  weren't just words.  Those were deeds.  Her group was out

15  there walking the walk.  They were at that time

16  investigating stores just like the defendant, investigations

17  that led to arrests that led to prosecutions.  That was the

18  evidence in this case.

19        Given that the defendant didn't mention anything

20  about the law, that he had a short conversation where he's

21  asking ambiguous things, does it make any sense that a DEA

22  agent, any of those in the group -- and she said that every

23  single person in the group was involved in those

24  investigations -- would tell him what he was doing was

25  legal?  And that is what was required.  It doesn't matter

1   what's in his head.  It matters what the DEA said.  All the

2   stuff about what the state officials did or what my city

3   attorney did, my landlord did, that's not relevant to the

4   case.  You have to look at what the DEA agent said.

5          Moreover, what was he relying on?  Why was he

6   operating?  You heard it from his own testimony, ladies and

7   gentlemen.  He knew other people were doing it.  He knew

8   there were other dispensaries in the area that were

9   operating at that very time.  He knew later that they were

10  being raided, but he thought, well, they are not going to

11  get me.  You heard their questions.  Remember when they were

12  cross-examining Agent Reuter about, well, none of them were

13  north of Santa Barbara and they tried to withdraw the

14  question when she gave him the wrong answer?

15         He thought he was just up there in Morro Bay and

16  the DEA wouldn't take a look at him.  He didn't realize that

17  he was already on the radar screen from all these sales out

18  the back door, the sales to Abrahm Baxter, the sales to Ryan

19  Doherty.

20         If he's running such a tight ship, why is he

21  sending Ryan Doherty to bring marijuana to a grower outside

22  of the store?  If he's running such a tight ship, and

23  Mr. Baxter has no idea what's going on, how come every time

24  the DEA or law enforcement shows up they see Mr. Baxter

25  carrying a box?  They see Mr. Baxter on December 5th, 2006,

1    Detective Scott's testimony, looking at marijuana plants.

2    When I asked him about Mr. Baxter, oh, he had no role in

3    supply.  There was a book right on his desk showing that he

4    was dealing with suppliers.

5          So he was on the radar screen eventually, he just

6    didn't know it.  He thought just like a lot of people do,

7    I'm not going to get caught.  It's not unlike someone who's

8    got a tax issue who thinks I'm too small to be audited or

9    someone who is speeding and thinks everyone is speeding.

10   Now, they can be upset when they actually do get caught, but

11   it doesn't mean it's not still against the law.  That's what

12   this case is about.  He told you he knew about other raids.

13   He told you he knew what the DEA administrator was doing.

14   He said there was a new DEA administrator.  Really?  He

15   knows all that about the DEA administration and yet it's his

16   view he had no idea what the law is for the DEA?  It's not

17   plausible, ladies and gentlemen.

18         And if you want to see what kind of a witness he

19   is, ladies and gentlemen, remember how he testified about

20   where the plants were growing in his store.  Remember how

21   many questions he had to be asked until he finally admitted

22   the plants were growing in his store.  Oh, I didn't

23   cultivate marijuana plants.  Well, they weren't growing that

24   tall.  Ladies and gentlemen, the testimony was that there

25   were growing lights, fertilizer, water, books about growing

1  marijuana.  How was it so difficult to answer a question of

2  whether marijuana is growing in the store?  Because he knows

3  it's going to hurt him, because he knows what the jury

4  instructions are in this case, ladies and gentlemen.

5         Your memory controls, ladies and gentlemen, but

6  you may recall that he started talking about propagating and

7  cultivating marijuana plants.  And if you look at your jury

8  instructions you will see propagating, cultivating.  He

9  knows what the law is, ladies and gentlemen, and he's trying

10  to avoid what will hurt him.  He's trying to remember what

11  he wants to remember, to tell you what he wants to tell you.

12         Look at what he did with Abrahm Baxter.  I ran a

13  very tight ship.  I had rules.  I had a piece of paper that

14  prevented him from doing anything.  Well, did you ask him

15  about all those criminal charges and criminal convictions on

16  his record?  No, I didn't do that.  Well, what about the

17  supply of marijuana in your store?  Well, that was the

18  supplier.  That was the clone manager.  How many questions

19  did I have to get before he had to admit that he was

20  personally involved in all those marijuana purchases?

21         THE COURT:  Counsel, one more minute.

22         MR. KOWAL:  Ladies and gentlemen, you don't have

23  to like that the DEA let him operate and then shut him down,

24  but the evidence proves beyond a reasonable doubt that he is

25  guilty of each and every crime.  You don't have to like the

1    San Luis Obispo County Sheriff's Department, but the

2    evidence proves beyond a reasonable doubt that he's guilty

3    of each and every crime.  You don't have to like Detective

4    Fonteccio's funny haircut.  That would be an exercise of

5    your common sense.  You can feel sympathy for the defendant.

6    You can not like the marijuana laws.  You can feel like he's

7    a good guy or you can feel like he's not a good guy.  None

8    of that matters.

9           Ladies and gentlemen, what matters is the law that

10   the court has instructed you on and the fact that the

11   evidence shows under that law that there is no defense and

12   that beyond a reasonable doubt he is guilty of each and

13   every count of the indictment.  And the United States of

14   America asks you to find that verdict based on that law and

15   based on that evidence.  Thank you.

16          THE COURT:  All right.  Let me have the bailiff

17   approach and let me have the clerk swear in the bailiff.

18          THE CLERK:  Please state your name and spell your

19   last name for the record.

20          THE BAILIFF:  Jack Brown, B-r-o-w-n.

21          THE CLERK:  Do you solemnly swear to keep this

22   jury together in some private and convenient place, that you

23   will not permit any person to speak or communicate with

24   them, nor do so yourself, unless by order of the court or to

25   ask them whether they have agreed upon a verdict and that

1    you will return them into court when they have so agreed or

2    when ordered by the court, so help you God?

3             THE BAILIFF:  I do.

4             THE COURT:  Let me have the jurors, the first 12

5    jurors accompany the bailiff into the jury room.  That means

6    that the last two jurors just please remain in your seats

7    and my clerk will tell you what needs to be done.

8

9             *(The jurors exited the courtroom.)*

10            THE COURT:  Let me ask a couple of housekeeping

11   matters.  First of all, were there any objections to the

12   jury instructions as read, obviously with both sides

13   preserving their objections, to the text of the jury

14   instructions?

15            MR. COHEN:  Not from us, Your Honor.

16            MR. KOWAL:  Nothing beyond previously submitted.

17            THE COURT:  Okay.  Also, insofar as the verdict

18   form is concerned, the only thing that I would change as to

19   the verdict forms is that I would include a description as

20   to each of the counts.  For example, count one of the

21   indictment I would put in at the end of that line parens

22   conspiracy, and then as to each of the counts so that the

23   jurors don't have to flip through to figure out what the

24   counts were.  Is there any objection to that?

25            MR. COHEN:  No, Your Honor.

```
1              THE COURT:  Okay.  And then the only remaining
2    problem with the verdict form was I guess would have been
3    question No. 13.  And I understand the defense's objection,
4    but I think that -- well, maybe I don't understand the
5    defense's objection.  Is the defense's objection to the
6    entire question itself or to the way that the question was
7    laid out?
8              MR. LITTRELL:  Your Honor, this is the question
9    that asks for a special verdict on the number of plants in
10   count four?
11             THE COURT:  Yes.
12             MR. LITTRELL:  The objection is the same objection
13   that we stated before which is that we think that it
14   violates the Presentment Clause.
15             THE COURT:  I've already overruled that objection.
16   So if that is the sole basis of the defense's objection to
17   question No. 13 I will allow question 13 to go in.  So that
18   takes care of the verdict form.  I just need obviously the
19   government to amend the form as we've just discussed and so
20   that you can give it to my clerk so he can provide it to the
21   jury.
22             And the next thing, not to criticize the closing
23   argument of defense, but actually in 1215 it wasn't the
24   people of England that did that.  It was the nobles of
25   England that did that and so the analogy is not quite apt,
```

1    but be that as it may.

2            Where are the counsel going to be because,

3    obviously, if the jurors have questions and things of that

4    sort I need to be able to get ahold of you.

5            MR. KOWAL:  Your Honor, we can give the clerk both

6    our office numbers and cell phones and be five or ten

7    minutes away, whatever the court wants.

8            MR. COHEN:  Your Honor, we've given Javier both of

9    our cell phones.  We were hoping to abide by the 20-minute

10   rule that the court had mentioned earlier.

11           THE COURT:  Okay.  You guys are over on Second

12   Street?

13           MR. COHEN:  Yeah, Right in Little Tokyo, and we

14   are pretty quick.

15           THE COURT:  Okay.  Can we do a 15-minute rule?

16           MR. COHEN:  Can you give us 17, Your Honor?

17           THE COURT:  I will give you 17.  Actually, I will

18   give you 17.5.

19           MR. COHEN:  Thank you.

20           THE COURT:  And I obviously will give the same to

21   the government as well.  So 17-and-a-half minutes from when

22   you are called.

23           MR. COHEN:  And we fully expect Javier to call us

24   first as well, Your Honor.

25           MR. KOWAL:  And then, Your Honor, we have exhibits

 1   here and we need to also go through them.

 2           THE COURT:  Obviously before you leave today, you

 3   guys are actually going to talk with Javier to make sure

 4   that you have a booklet that has all of the admitted

 5   exhibits in it aside from the contraband stuff, and when he

 6   comes back you will discuss that with him.

 7           Anything else we need to discuss at this point?

 8           MR. KOWAL:  What are the hours of deliberation,

 9   Your Honor?

10           THE COURT:  They will go today until 5:15 or 5:00,

11   depending upon how they feel, and tomorrow they should be

12   starting -- well, let me do this.  Javier, the jury is going

13   to be ordered back at 8:30?

14           THE CLERK:  It's up to you.  When would you like

15   to have them back at?

16           THE COURT:  Well, actually, why don't we have them

17   back at 9:00 o'clock.

18           Let's go off the record at this point.

19           MR. COHEN:  Your Honor, just briefly before we go

20   off the record.  I'm assuming that before we send the

21   special verdict form back with the amended changes that we

22   can take a look at it.

23           THE COURT:  Obviously.  Why don't you guys wait

24   here today until you guys resolve the exhibits and also the

25   verdict form.

```
 1              MR. COHEN:  Sure.  Thank you, Your Honor.

 2              THE COURT:  All right.  Also, one last-last thing

 3   just for the record, in regards to the 801(d)1(B) argument,

 4   I just realized when both sides were arguing their closing

 5   arguments that Mr. Lynch was notified by state governmental

 6   officials that the operation of the marijuana dispensary did

 7   conflict with federal law and did subject him to federal

 8   prosecution.  I just simply note that for the ruling.

 9              MR. COHEN:  You mean by way of the City of

10   Atascadero's --

11              THE COURT:  Exactly, by the city attorney's office

12   that --

13              MR. COHEN:  That would of course have been during

14   the process of that city --

15              THE COURT:  It was also prior to his discussions

16   with his attorney on the point.

17              MR. COHEN:  I'm not sure that's accurate, but I

18   don't think at this point it matters much.

19              THE COURT:  Well, it's accurate in the sense that

20   it was indicated that he had the discussion with his

21   attorney in June of '06.

22              MR. COHEN:  And, again, Your Honor, it was January

23   of '06 I think --

24              THE COURT:  It was January of'06?

25              MR. KOWAL:  That's what the defense has
```

1    represented.  They believe your tentative was mistaken on

2    that.

3              THE COURT:  Okay.

4              MR. COHEN:  Well before.

5              THE COURT:  Then if it's January, then that

6    argument wouldn't apply.  But if it was June of '06 --

7              MR. COHEN:  No.  I'm sure he had many

8    conversations but they began in January of '06.

9              THE COURT:  Okay.

10             MR. COHEN:  Thank you.

11             THE COURT:  All right.

12

13             (At 4:31 P.M. proceedings were adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          --oOo--

2                        CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6   Title 28, United States Code, the foregoing is a true and

7   correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12  Date:  October 7, 2008

13

14

15                    _____

16                         WIL S. WILCOX
                          U.S. COURT REPORTER
17                          CSR NO. 9178

18

19

20

21

22

23

24

25