CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
REBECCA M. ABEL (Bar No. 298604)
(E-Mail: Rebecca_Abel@fd.org)
Deputy Federal Public Defender
DAVID WASSERMAN (Bar No. 275987)
(E-Mail: David_Wasserman@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
CHARLES LYNCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. CHARLES LYNCH, Defendant. | Case No. CR 07-689-GW **MOTION TO ENJOIN GOVERNMENT SPENDING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS; EXHIBITS** Evidentiary Hearing: October 20, 2022 |

Defendant Charles Lynch, through his counsel of record, Deputy Federal Public Defenders Rebecca M. Abel and David Wasserman, hereby moves this Honorable Court for an order enjoining the government from further spending on his prosecution. Continued spending violates Consolidated and Further Continuing Appropriations Act of 2022, which prohibits all expenditures of federal prosecutions for marijuana-related offenses where, as here, the defendant complied with the state's medical marijuana laws.

1    This motion is based upon the attached Memorandum of Points and Authorities,

2    the attached Declaration of Charles Lynch (Ex. A), Declaration of Alex Kreit (Ex. B),

3    Declaration of Christine Malone (Ex. C), and Declaration of Ofer Lion (Ex. D), all

4    appended exhibits, all files and records in this case, and any further evidence as may be

5    adduced on reply and at the evidentiary hearing on this motion, currently set for

6    October 20, 2022 at 9:30 a.m.

7

8                                            Respectfully submitted,

9                                            CUAUHTEMOC ORTEGA
                                             Federal Public Defender
10

11   DATED:  July 19, 2022           By  /s/ Rebecca M. Abel
                                         REBECCA M. ABEL
12                                       DAVID WASSERMAN
                                         Deputy Federal Public Defender
13                                       Attorney for CHARLES LYNCH

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................... 1

II. PROCEDURAL HISTORY ....................................................................................... 2

III. APPLICABLE LAW ................................................................................................. 4

    A.    The Legal Standard on a Motion to Enjoin Spending ................................ 4

    B.    California Medical Marijuana Law in 2006 and 2007 ................................ 6

        1.    The Compassionate Use Act of 1996 ............................................. 6

        2.    The 2004 Medical Marijuana Program Act ..................................... 7

        3.    The 2008 Attorney General Guidelines ......................................... 11

IV. ARGUMENT ........................................................................................................... 13

    A.    Qualified Medical Marijuana Patients Collectively Associated to Carry Out the CCCC's Medical Marijuana-Related Activity ............................ 13

        1.    The CCCC Only Sold Medical Marijuana to Members, All of Whom Were Qualified Patients ...................................................... 14

                a.    The CCCC Distributed Marijuana to Members over 18 or to Members under 18 with Permission from a Parent or Legal Guardian ................................................................ 16

        2.    The CCCC Vendors Were Members and Qualified Patients .......... 17

        3.    The CCCC Operated Collectively .................................................. 18

        4.    The CCCC Provided the Marijuana Necessary to Supply the Medical Needs of the Members ....................................................... 20

    B.    The CCCC Did Not Operate for Profit ...................................................... 21

        1.    The CCCC's Detailed Financial Records Demonstrate It Earned No Profits .............................................................................. 21

        2.    The Compensation the CCCC Paid to Mr. Lynch was Reasonable Reimbursement for his Labor and Services ............... 23

        3.    The CCCC Operated on a Nearly Break-Even Basis ..................... 25

i

# TABLE OF CONTENTS

Page

4.    The CCCC Operated in Conformity with the Principles of a
      Nonprofit Organization ........................................................................ 26

5.    The Membership Size and Revenues of the CCCC Were in
      Accord with Similar Lawful Collectives and Cooperatives ............ 26

6.    The CCCC's Members Participated in the Collective's
      Operations .......................................................................................... 26

C.    The CCCC Complied with the 2008 Guidelines in Important Respects ... 27

V. CONCLUSION ............................................................................................. 30

ii

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*United Stated v. Kleinman*,
880 F.3d 1020 (9th Cir. 2017) ..........................................................*passim*

*United States v. Evans*,
929 F.3d 1073 (9th Cir. 2019) ...............................................................5, 6

*United States v. Lynch*,
903 F.3d 1061 (9th Cir. 2018) ...............................................................3, 4

*United States v. McIntosh*,
833 F.3d 1163 (9th Cir. 2016) ...............................................................1, 5

*United States v. Pisarski*,
965 F.3d 738 (9th Cir. 2020) ..........................................................6, 10, 12

**State Cases**

*City of Riverside v. Inland Empire Patients Health & Wellness Ctr, Inc.*,
56 Cal. 4th 729 (2013.) ..............................................................................7

*People ex rel. City of Dana Point v. Holistic Health*,
213 Cal. App. 4th 1016 (2013) ......................................................23, 25, 27

*People v. Anderson*,
232 Cal. App. 4th 1259 (2015) ......................................................13, 19, 20

*People v. Baniani*,
229 Cal. App. 4th 45 (2014) ....................................................7, 8, 20, 22

*People v. Colvin*,
203 Cal. App. 4th 1029 (2012) ........................................................*passim*

*People v. Hochanadel*,
176 Cal. App. 4th 997 (2009) .............................................................8, 23

*People v. Jackson*,
210 Cal. App. 4th 525 (2012) .........................................................*passim*

*People v. Kelly*,
47 Cal.4th 1008 (2010) ............................................................................20

iii

# TABLE OF AUTHORITIES

Page(s)

*People v. London*,
  228 Cal. App. 4th 544 (2014).............................................................23, 25

*People v. Mentch*,
  45 Cal. 4th 274 (2008)..............................................................................7

*People v. Orlosky*,
  233 Cal. App. 4th 257 (2015)...........................................................*passim*

*People v. Solis*,
  217 Cal. App. 4th 51 (2013).....................................................................23

*People v. Urziceanu*,
  132 Cal. App. 4th 747 (2005)..........................................................*passim*

**Federal Statutes**

21 U.S.C. § 841(a)(1).......................................................................................2

21 U.S.C. § 841(a)(6).......................................................................................2

21 U.S.C. § 841(b)(1)(B)..................................................................................2

21 U.S.C. § 846.................................................................................................2

21 U.S.C. § 856.................................................................................................2

21 U.S.C. § 856(a)(1)........................................................................................3

21 U.S.C. § 859.................................................................................................2

21 U.S.C. § 859(a).............................................................................................2

**State Statutes**

Cal. Health & Safety Code § 11361(a)............................................................17

Cal. Health & Safety Code § 11362.5(b)(1) (2004) .........................................7

Cal. Health & Safety Code § 11362.7 ........................................................8, 17

Cal. Health & Safety Code § 11362.715(a)(5)................................................17

Cal. Health & Safety Code § 11362.72 (a)(1) ................................................17

iv

## TABLE OF AUTHORITIES

Page(s)

Cal. Health & Safety Code § 11362.765(a)...................................................................9, 21

Cal. Health & Safety Code § 11362.77 .........................................................................20

Cal. Health & Safety Code § 11362.775 .................................................................*passim*

**Miscellaneous**

BUSINESS INSIDER, May 27, 2022, available at:
  https://www.businessinsider.com/legal-marijuana-states-2018-1..............................1

U.S. Census Bureau, available at:
  https://www.census.gov/quickfacts/sanluisobispocountycalifornia.........................21

v

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The government's fifteen-year prosecution of Mr. Lynch for operating a medical marijuana dispensary in Morro Bay, California from April 1, 2006 to March 31, 2007 must be stopped.  This motion is not about the fact that *recreational* marijuana is now legal in 19 states including California, nor that *medical* marijuana is now legal in 38 states.[1]  This motion also is not about the fact that Mr. Lynch has been on bond in this case for nearly fifteen years without any substantive violations.  But these facts are relevant, because right now—in 2022—the government is continuing to prosecute Mr. Lynch for founding and operating the Central Coast Compassionate Caregivers ("CCCC")—a state-law compliant medical marijuana dispensary—in 2006 and 2007.  Over a dozen years later, the government remains insistent that Mr. Lynch spend *five years* in federal prison for distributing medical marijuana to the qualified patients of his storefront dispensary.  It cannot and should not succeed.

The reason is simple and obvious: Mr. Lynch's conduct was in strict compliance with the medical marijuana law in effect in California at the time.  This Court already reached this conclusion when it sentenced Mr. Lynch back in 2010: "[T]he purpose of the CCCC's distribution of marijuana was not for recipients to 'get high' or for recreational enjoyment."  Rather, it was "to provide marijuana to those who, under California law, were qualified to receive it for medical reasons."  (Sent. Memo. at 12, 33, Dkt. No. 327 (alterations and internal quotation marks omitted).)  Although this defense was unavailable at trial, it is available to Mr. Lynch now.  *See United States v. McIntosh*, 833 F.3d 1163, 1177 (9th Cir. 2016).  This Court should do now what it was prohibited from doing at trial and sentencing—enjoin the government from further

---

[1] *See* J. Berke, et al., *Marijuana Legalization is Sweeping the US*, BUSINESS INSIDER, May 27, 2022, https://www.businessinsider.com/legal-marijuana-states-2018-1.

1

prosecution of Mr. Lynch given that the dispensary he operated was in strict compliance with then-applicable California medical marijuana law.

## II. PROCEDURAL HISTORY

From April 1, 2006 through March 29, 2007, Mr. Lynch operated the Central Coast Compassionate Caregivers ("CCCC"), a medical marijuana dispensary in Morro Bay, California.  On March 29, 2007, the Drug Enforcement Agency ("DEA") raided the CCCC and Mr. Lynch's home, pursuant to a federal search warrant.  On July 13, 2007, the federal government filed an Indictment charging Mr. Lynch with five drug-related counts, all of which arose out of his establishment and operation of the CCCC.  (Dkt. No. 1.)  Federal authorities arrested Mr. Lynch on July 17, 2007.  (Dkt. No. 10.)  Two days later, a magistrate judge ordered him released on bond.  (Dkt. No. 12.)  Mr. Lynch has been under the supervision of U.S. Probation and Pretrial Services ever since.

Following a ten-day trial in July and August 2008, at which the jury was instructed that California medical marijuana laws were irrelevant to the case, a jury found Mr. Lynch guilty on all five federal drug counts.  (Jury Inst., No. 2, Dkt. No. 172; Verdict, Dkt. No. 175.)  The conviction on Count One was for a conspiracy to possess and distribute at least 100 kilograms of marijuana, at least 100 marijuana plants, and items containing tetrahydrocannabinol ("THC"), in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B), 856, and 859.  The convictions on Counts Two and Three were for sales of more than 5 grams of marijuana to a person under the age of 21 on June 10, 2006 and August 27, 2006, in violation of 21 U.S.C. §§ 841(a)(1) and 859(a).  The conviction on Count Four was for possession with the intent to distribute approximately 14 kilograms of marijuana and at least 50 but less than 100 marijuana plants on March 29, 2007, in violation of 21 U.S.C. §§ 841(a)(6) and (b)(1)(B).  The conviction on Count Five was for maintaining a premises at 780 Monterey Avenue, Suite B, Morro Bay, California under the name CCCC for the purpose of growing and

distributing marijuana, in violation of 21 U.S.C. § 856(a)(1).  (Dkt. Nos. 161, 175; *see* Sent. Memo. at 3-4.)  Absent the application of the safety valve, Mr. Lynch faced a five-year mandatory minimum sentence on Count One.  (Sent. Memo. at 22.)  He faced a one-year mandatory minimum on Counts Two and Three.  (*Id.*)  On April 29, 2010, this Court determined Mr. Lynch qualified for the safety valve and sentenced him to one year and one day in custody, followed by four years of supervised release.  (Dkt. No. 326.)  This Court wrote a detailed sentencing memorandum, making numerous factual findings applicable to this motion, as discussed herein.  (Dkt. No. 327.)

Mr. Lynch appealed his conviction and sentence, and the government cross-appealed the sentence, seeking a five-year prison term.  (Dkt. Nos. 330, 336.)  The appeal was pending for nearly eight years.  During that time, "Congress passed an appropriations measure, which, as relevant here, states that 'None of the funds made available in this Act to the Department of Justice may be used, with respect to,' among others, California, 'to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.'" *United States v. Lynch*, 903 F.3d 1061, 1069 (9th Cir. 2018) (quoting Consolidated and Further Continuing Appropriations Act of 2015 § 538, Pub. L. No. 113-235, 128 Stat 2130).  After passage of the appropriations rider, in 2016, Mr. Lynch filed motions with the Ninth Circuit and with this Court, arguing that further prosecution of him was prohibited by the rider because his conduct was authorized by state medical marijuana laws.  *See id.*; Dkt. No. 453.  This Court refused to grant an evidentiary hearing or rule on the issue while the appeal was pending.  *See Lynch*, 903 F.3d at 1069.

In its appellate opinion in this matter, the Ninth Circuit remanded the case "for a factual determination from the district court as to whether Lynch's activities were in compliance with state law, and particularly whether CCCC operated under the required collective form."  *Id.* at 1086-87.  To determine "whether Lynch strictly complied with California marijuana laws," the appellate court explained that the district court may

3

1   need to make "specific findings of fact, as well as legal determinations." *Id.* at 1087.

2   The Ninth Circuit also affirmed Mr. Lynch's conviction, but reversed this Court's

3   application of the safety valve and remanded for resentencing. *Id.*

4     On remand, the parties briefed preliminary legal issues to this Court, including

5   the scope of the state laws that apply here, as discussed more fully below.  (Dkt. No.

6   498.)  Subsequently, the parties reciprocally disclosed the experts they intend to rely on

7   in this proceeding and a summary of their expected testimony.  (*See* Dkt. No. 541 ¶¶ 2-

8   3.)

9     In accordance with the Ninth Circuit's remand, this motion requests that this

10  Court enjoin the government from spending additional funds on his prosecution, as

11  doing so violates the current appropriation's rider.  This motion is based on this

12  memorandum of points and authorities and the supporting declarations and exhibits

13  offered by (1) Mr. Lynch (Ex. A); (2) Alex Kreit, the defense's experts on medical

14  marijuana law circa 2006 and 2007 (Ex. B); (3) Christine Malone, the defense's expert

15  on the CCCC's financial position (Ex. C); and (4) Ofer Lion, the defense's expert on

16  the CCCC's not-for-profit operation (Ex. D).  Following the government's opposition

17  and the defense's reply, an evidentiary hearing on this motion is set for October 20,

18  2022 at 9:30 a.m.  Any potential resentencing of Mr. Lynch must be deferred pending

19  the Court's ruling on the present motion.

20          **III. APPLICABLE LAW**

21  **A. The Legal Standard on a Motion to Enjoin Spending**

22    Since December 16, 2014, congressional appropriations riders have "prohibited

23  the use of any Department of Justice ("DOJ") funds that prevent states with medical

24  marijuana programs (including California) from implementing their state medical

25  marijuana laws." *United Stated v. Kleinman*, 880 F.3d 1020, 1027 (9th Cir. 2017).  All

26  the riders enacted for the last eight years are "essentially the same." *Id.* (quotation

27

28

            4

omitted).  The current version, which will remain in effect until at least September 30 2022, reads at Section 531:

> None of the funds made available under this Act to the Department of Justice may be used, with respect to any of the States of . . . California . . . , to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated Appropriations Act 2022, Pub. L. 117-103 § 531, 136 Stat. 49, 150-51 (2022).

In *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), the court held that the rider "prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." *Id.* at 1177.  To enforce this rider, "federal criminal defendants may seek to enjoin the expenditure of those funds" on marijuana prosecutions. *Id.* at 1173.  When defendants, like those in *McIntosh* and Mr. Lynch here, move to enjoin the government's spending, courts must hold "evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they strictly complied with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." *Id.* at 1179.  The relevant state law is "only 'those *specific* rules of state law that *authorize* the use, distribution, possession, or cultivation of medical marijuana.'" *United States v. Evans*, 929 F.3d 1073, 1077 (9th Cir. 2019) (emphasis in original) (quoting *McIntosh*, 833 F.3d at 1178).

In performing this analysis, the court examines "the conduct forming the basis of a particular charge, which requires a count-by-count analysis to determine which charges, if any, are restricted by [the rider]." *Kleinman*, 880 F.3d at 1028.  In other words, the rider "prohibits the expenditure of DOJ funds in connection with a specific charge involving conduct that is fully compliant with state laws regarding medical marijuana." *Id.*

5

To succeed on a motion to enjoin spending, defendants "bear the burden of showing that they are entitled to such an injunction by persuading the court that it is more likely than not that the state's medical-marijuana laws 'completely authorized' their conduct." *Evans*, 929 F.3d at 1077 (internal quotation omitted); *see United States v. Pisarski*, 965 F.3d 738, 742 (9th Cir. 2020) ("To prevail in a *McIntosh* hearing, Pisarski and Moore must prove by a preponderance of the evidence that they have strictly complied with state medical marijuana laws."). This standard "does not allocate a Herculean burden to" defendant. *Pisarski*, 965 F.3d at 743.

If a defendant meets this burden, then the rider "bar[s] the DOJ from continuing to [pursue] this prosecution." *Kleinman*, 880 F.3d at 1028. Because it is more likely than not that conduct forming the basis of the charges against Mr. Lynch was completely authorized by the California medical marijuana law in effect at the time, the government cannot continue to pursue Mr. Lynch's prosecution and he cannot be resentenced.

**B.   California Medical Marijuana Law in 2006 and 2007**

At the time Mr. Lynch operated the CCCC, there were two medical marijuana laws in effect in California: the Compassionate Use Act of 1996 ("CUA") and the 2004 Medical Marijuana Program Act ("MMPA"). (Ex. B, Kreit Decl. ¶ 5.) As this court previously held, the versions of the CUA and MMPA in effect in 2006 and 2007 are the laws applicable here. (Dkt. No. 498 at 8.) In 2008, after the CCCC ceased operations, the California Attorney General promulgated Guidelines, which included certain operating recommendations for dispensaries.

**1.   The Compassionate Use Act of 1996**

The voters passed the CUA in 1996, which provided immunity from prosecution for marijuana possession and cultivation for patients and a patient's primary caregiver, who "possesses or cultivates marijuana for the personal medical purposes of the patient upon a doctor's recommendation." *People v. Colvin*, 203 Cal. App. 4th 1029, 1034

6

(2012).  The voters explained that the purpose of the CUA was, *inter alia*, "[t]o ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction" and "[t]o encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana."  Cal. Health & Safety Code § 11362.5(b)(1) (2004).[2]

"The legal status of retail medical marijuana sales under the CUA was the subject of dispute."  (Ex. B, Kreit Decl. ¶ 6.)  Some believed that the CUA authorized the retail sale of medical marijuana so long as the patient first designated the dispensary as his or her primary caregiver.  (*Id.*)  "As a result, it had become standard practice for members of medical marijuana collectives and cooperatives to designate the collective as their primary caregiver."  (*Id.*)  Ultimately, this interpretation of the CUA was rejected by the California Supreme Court in *People v. Mentch*, 45 Cal. 4th 274 (2008).

## 2.    The 2004 Medical Marijuana Program Act

In 2004, the Legislature followed through on providing a plan for the distribution of medical marijuana by passing the MMPA.  The MMPA "expanded the scope of protection beyond that initially provided by the CUA."  *People v. Baniani*, 229 Cal. App. 4th 45, 55 (2014).  Among other things, the MMPA was intended to "enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects."  *City of Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc.*, 56 Cal. 4th 729, 744 (2013.)

Specifically, at Section 11362.775, the MMPA provided that "[q]ualified patients, persons with valid identification cards, and the designated primary caregivers

_____

[2] Unless otherwise indicated, all statutory references are to the California Health and Safety Code in effect in 2006 and 2007.  There were no statutory changes to the relevant provisions of the CUA or MMPA between its passage on January 1, 2004 and the end-date of the relevant conduct here, March 29, 2007.

7

of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions" for marijuana sales, distribution, and related crimes.  § 11362.775.  The statute defined a "qualified patient" as someone with "a qualifying medical condition and a recommendation or approval from a physician."  *People v. Urziceanu*, 132 Cal. App. 4th 747, 786 (2005); § 11362.7(f).[3]  The statute did not define the terms "collectively" or "cooperatively."  (*See* Ex. B, Kreit Decl. ¶ 10.)

By its terms, § 11362.775 imposed only two requirements necessary to satisfy the defense.  (Ex. B, Kreit Decl. ¶¶ 4, 9.)  **First**, qualified patients were permitted to collectively or cooperatively associate to cultivate and distribute marijuana.  *See People v. Jackson*, 210 Cal. App. 4th 525, 529 (2012).  Although the statute speaks of "cultivation" (§ 11362.775), California courts have interpreted this defense to encompass "collective endeavors involving the distribution of marijuana to large numbers of persons who are not involved in the cultivation activity."  *People v. Orlosky*, 233 Cal. App. 4th 257, 268 (2015); *see Kleinman*, 880 F.3d at 1036-37 (The MMPA "does not prohibit exchanging money for marijuana among members of a collective" and "does not require that collective members grow marijuana in order to be considered participants of the collective."); *Jackson*, 210 Cal. App. 4th at 537 ("[T]he MMPA permits retail dispensaries."); *People v. Hochanadel*, 176 Cal. App. 4th 997,

---

[3] The statute also defined "person with an identification card" to be "a qualified patient who has applied for and received a valid identification card pursuant to this article." § 11362.7(c).  However, at the time the CCCC operated, the County of San Luis Obispo Department of Public Health had not yet developed an identification card program. *See* Ex. A-9, Ltr. from Cty of San Luis Obispo Pub. Health Dept., May 16, 2006.

The statute also defined a "primary caregiver." *See* § 11362.7(d). For purposes of this motion, Mr. Lynch does not argue that any of the relevant participants in the CCCC were primary caregivers.

1018 (2009) (explaining that a defense under § 11362.775 is available to a "storefront dispensary"); *Baniani*, 229 Cal. App. 4th at 60-61 (rejecting the state's argument that § 11362.775 did not apply to "the sale of medical marijuana" by a collective or cooperative); Ex. B, Kreit Decl. ¶¶ 8-9, 11. **Second**, the collective or cooperative could not "cultivate or distribute marijuana for profit." § 11362.765(a). This requirement was in a separate, seemingly unrelated section of the MMPA, but California appellate courts have interpreted this provision to require that collectives or cooperatives must engage in not-for-profit operation. *Jackson*, 210 Cal. App. 4th at 538-39.

Although the MMPA created the collective and cooperative defense, the statute provided no guidance to medical marijuana distributors or cultivators as to how to legally operate a medical marijuana collective or cooperative, aside from the two conditions noted above. *See* Ex. B, Kreit Decl. ¶ 10; *Orlosky*, 233 Cal. App. 4th at 267–68 ("Although section 11362.775 clearly provides for collective cultivation, it does not specify what the Legislature meant by an association of persons who engage in collective or cooperative cultivation for medical purposes."). Further, in 2006 and 2007, there were no regulations, guidelines, or advisory opinions issued by the state to assist collectives or cooperatives with interpreting § 11362.775. (*See* Ex. B, Kreit Decl. ¶¶ 10-11.) Finally, case law interpreting § 11362.775 was sparse in 2006 and 2007. (*See* Ex. B, Kreit Decl. ¶ 10.) In fact, as of 2007, "there was only one published case interpreting the MMPA's application to dispensaries—*People v. Urziceanu*, 132 Cal. App. 4th 747 (2005)." (*Id.*) To this day, the California Supreme Court has never addressed § 11362.775's application to collectives or cooperatives. (*Id.*) Accordingly, dispensaries operating in 2006 and 2007 lacked any guidance on how to legally operate a collective or cooperative in accordance with § 11362.775. (*See* Ex. B, Kreit Decl. ¶ 11.)

Because it was the only published case addressing § 11362.775 in existence at the time of Mr. Lynch's charged conduct, *People v. Urziceanu*, 132 Cal. App. 4th 747

(2005) is instructive.  There, the defendant, who had a physician recommendation for marijuana, was operating a dispensary known as FloraCare out of his home.  *Id.* at 759.  To join, members had to complete a series of membership forms, show their identification and physician recommendation, and pay $25 per year, plus the cost of the marijuana.  *Id.* at 760, 764.  FloraCare generally verified the physician recommendation by calling the provider's office, unless the member belonged to another dispensary.  *Id.* at 761, 764.  Defendant estimated there were "a few hundred members," but only a few dozen assisted in FloraCare's growing and membership operation.  *Id.* at 764.  There was no consistent method for keeping track of the members or the amounts due; officers found "pay/owe" sheets recording sales.  *Id.* at 762-64.  FloraCare obtained marijuana for its members from plants cultivated by the defendant and other members, but because "FloraCare had problems providing marijuana to its members," "defendant would sometimes buy marijuana on the black market by the pound to supply the members."  *Id.* at 764.  Given these facts, the Court found that the "defendant produced substantial evidence that suggests he would fall within the purview of section 11362.775."  *Id.* at 786.  The Court specifically pointed out that defendant and his codefendant were qualified patients, and there was "evidence of the policies and procedures FloraCare used in providing marijuana for the people who came to him," including prescription verification, membership fees, and reimbursements for costs incurred.  *Id.*

Case law applying § 11362.775 that post-dates the CCCC's operations is similarly flexible.  As the Ninth Circuit explained, "state court have declined to interpret [§ 11362.775] rigidly, explaining that the legislature did not mention formality, permissible number of persons, acceptable financial agreements, or distributions in the statute."  *Pisarski*, 965 F.3d at 744 (citing *Orlosky*, 233 Cal. App. 4th at 267-68).  The *Pisarski* court "note[d] it is difficult to cherry pick a single principle from state case law to apply in the *McIntosh* context, because courts have

1  emphasized that their findings rest on multiple non-dispositive factors" and courts

2  conclusions that a § 11362.775 defense is available are "highly factual." *Id.* (citing

3  *Jackson*, 210 Cal. App. 4th at 539 and *People v. London*, 228 Cal. App. 4th 544

4  (2014)).

5  　　　　**3.　　The 2008 Attorney General Guidelines**

6  　　　　Eventually, in August 2008—after the CCCC ceased its operations—the

7  California Attorney General issued nonbinding guidelines to, among other things, "help

8  patients and primary caregivers understand how they may cultivate, transport, possess,

9  and use medical marijuana under California law." (Ex. B-2 at 1, Cal. Atty. Gen.,

10  Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use,

11  August 2008 [hereinafter 2008 Guidelines].)  The 2008 Guidelines recommended

12  provisions not present in the statutory text.  For example, the 2008 Guidelines

13  recommend that collectives and cooperatives "provide adequate security," "acquire

14  marijuana only from their constituent members," and "complete a written membership

15  application." (Ex. B-2 at 9-11.)  At the time of their issuance, "none of these terms

16  existed in the text of the MMPA or in interpretive case law." (Ex. B, Kreit Decl. ¶ 15.)

17  Moreover, none of the Attorney General's recommended additions to the MMPA were

18  knowable or foreseeable to dispensary operators in 2006 and 2007.  (*See id.* ¶ 14)

19  Perhaps anticipating these concerns might be raised by existing dispensary operators,

20  the 2008 Guidelines were "not expressly made retroactive." (*Id.*)  And, no court has

21  considered whether they apply retroactively.

22  　　　　In addition, by their own terms, the provisions of the 2008 Guidelines were not

23  mandatory.  Instead, they offered "some suggested guidelines and practices" for

24  operators of collectives or cooperatives.  (Ex. B-2 at 8.)  Furthermore, the 2008

25  Guidelines expressly contemplate that collectives and cooperatives need only

26  "substantially comply" with the recommendations made therein.  (*Id.* at 11.)  As

27  explained by Professor Kreit, "although substantial compliance with the guidelines

28

11

provided collectives and cooperatives assurance that the Attorney General would consider their operations to be lawful, a lack of full or even substantial compliance with the guidelines did not establish a violation of state law."  (Ex. B, Kreit Decl. ¶ 16.)

California and federal courts that have considered the 2008 Guidelines, including this Court, have concluded that they do not carry the force of law and are not binding. *Jackson*, 210 Cal. App. 4th at 536 n.2; *Pisarski*, 965 F.3d at 745; Dkt. No. 498 at 7. Applying them primarily to post-2008 conduct, courts do give the Guidelines "considerable weight," but, just like the Guidelines themselves, courts do not require absolute compliance with all their terms.  *Jackson*, 210 Cal. App. 4th at 536 n.2; *see* Ex. B, Kreit Decl. ¶ 13.  In its ruling on preliminary legal issues, this Court agreed.  It found that the Guidelines were "recommendation[s] rather than [] requirement[s]" and were "merely an interpretation of and guide for enforcing" the MMPA.  (Dkt. No. 498 at 7-8.)  As California courts have made clear, to the extent they are relevant at all, the 2008 Guidelines should be viewed holistically, and the court can evaluate whether a collective or cooperative complied with the Guidelines in "important respects." *Jackson*, 210 Cal. App. 4th at 535.

Moreover, since they are non-binding, if the 2008 Guidelines contradict the court's evidentiary findings, they can be disregarded.  After this Court's ruling on preliminary legal issues, in *Pisarski*, the Ninth Circuit acknowledged that the 2008 Guidelines state that "'excessive amounts of cash' and 'weapons' are indicia of illegal marijuana sales," but the Court found the defendants' possession of excessive cash and weapons did not bring them outside of strict compliance with the MMPA because the "guidelines are non-binding and do not trump evidentiary findings."  *Pisarski*, 965 F.3d at 745-46.  Accordingly, as this Court previously found, the 2008 Guidelines are only "*potentially* persuasive authority for determining the requirements of the law."  (Dkt. No. 498 at 8 (emphasis in original).)

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV. ARGUMENT

Mr. Lynch strictly complied with the California medical marijuana law in effect at the time of the conduct charged against the CCCC, which occurred from April 1, 2006 to March 29, 2007.  (PSR ¶¶ 2-7, 9, Dkt. No. 259.)  The "conduct forming the basis of the charge[s]" against Mr. Lynch all arise out of his operation of the CCCC. *Kleinman*, 880 F.3d at 1028; PSR ¶¶ 2-29; Sent. Memo. at 1.  Therefore, Mr. Lynch addresses the CCCC's conduct generally, focusing on the overt acts alleged in the Indictment.  (*See* Dkt. No. 1 at 4-8.)

As detailed below, the CCCC complied with § 11362.775 of the MMPA and in conformity with the non-binding, and at the time of the CCCC's operation, non-existent, 2008 Guidelines in important respects. First, the CCCC was comprised of qualified patients, who collectively associated to cultivate and distribute marijuana among its membership.  Second, the CCCC did not operate for profit.  Finally, the CCCC complied in all important respects with the 2008 Guidelines.

### A.   Qualified Medical Marijuana Patients Collectively Associated to Carry Out the CCCC's Medical Marijuana-Related Activity

The CCCC satisfies the first element required of collectives operating lawfully under § 11362.775.  California courts have stated that "to be entitled to a defense under section 11362.775, a defendant, who must himself be a qualified patient, "must associate with like person to collectively or cooperatively cultivate marijuana." *Colvin*, 203 Cal. App. 4th at 1037.  Stated another way, "a medical marijuana collective or cooperative protected by section 11362.775" includes entities where the "day-to-day business operations [] involve buying from grower members and selling to consumer members, so long as all members are patients or primary caregivers." *People v. Anderson*, 232 Cal. App. 4th 1259, 1277 (2015).  Mr. Lynch has demonstrated by a preponderance of the evidence that these requirements are satisfied here because (1) the CCCC only sold marijuana to members, all of whom were qualified patients; (2) the

13

CCCC purchased marijuana primarily from members; (3) the CCCC operated collectively; and (4) the amount of marijuana cultivated by the CCCC was reasonably related to its members combined medical needs.

### 1. The CCCC Only Sold Medical Marijuana to Members, All of Whom Were Qualified Patients

Mr. Lynch implemented a process to ensure that it only sold marijuana to CCCC members, all of whom were qualified patients. Courts have found policies and procedures nearly identical to the CCCC's to satisfy § 11362.775. *See Urziceanu*, 132 Cal. App. 4th at 786 (holding defendant presented "substantial evidence" of compliance with § 11362.775 where he introduced "the policies and procedures FloraCare used in providing marijuana for the people who came to him, including the verification of their prescriptions and identities"); *Colvin*, 203 Cal. App. 4th at 1039–40 (finding dispensary entitled to defense under § 11362.775 where " Holistic required potential members to produce a valid doctor's recommendation or prescription and identification" and "applicants for membership in Holistic had to fill out an application and pay a membership fee").

When a potential member arrived at the CCCC, a security guard at the door reviewed the individual's driver's license and their doctor's cannabis recommendation and then permitted entry into the reception area. (Ex. A, Lynch Decl. ¶ 57.) CCCC staff would review the documents again. (*Id.* ¶ 58.) The staff member would contact the doctor's office who supplied the cannabis recommendation to verify its authenticity and validity. (*Id.* ¶ 59.) The CCCC staff would also review the California Medical Board's website to verify that the doctor who issued the recommendation was a licensed physician in good standing. (*Id.*) Once complete, the staff member would mark the membership "approved." (*Id.*; Ex. A-18 at 3, Sample Member File.) Potential members who could not provide the required documents, whose documents were expired, or whose documents could not be verified were denied membership. (Ex. A, Lynch Decl. ¶ 60; Ex. B, Kreit Decl. ¶ 19; Ex. B-3.)

Members completed two membership forms.  (Ex. A, Lynch Decl. ¶ 61.)  The forms certified that the member suffered from a medical condition that limited his or her life activities and that the patient had "obtained a recommendation or approval from a licensed physician to use medical marijuana to treat [the] illness."  (Ex. A-18 at 1, Sample Member File.)  The Membership Agreement limited the patient's use of marijuana requiring, among numerous specific restrictions, that the marijuana only be used for medicinal purposes and that the member "abide by the laws of the State of California regarding medical cannabis."  (*Id.* at 2.)  The form also warned that violation of any of the rules could result in termination of membership.  (*Id.*)  The member signed and dated the forms, one of which was cosigned by a CCCC staff member, and a member number was issued to the qualified patient.  (*Id.* at 1-2.)

The CCCC kept files on each approved member, which included photocopies of their driver's license, physician recommendation, and any membership cards from other dispensaries.  (Ex. A, Lynch Decl. ¶ 58; Ex. A-18.)  The CCCC also entered the members' information into an Access database, which included their name, expiration date of the physician recommendation, membership number, and a photograph.  (Ex. A, Lynch Decl. ¶ 62.)  Finally, the CCCC issued the member a plastic membership card printed with their picture, member number, and expiration date.  (Ex. A-19, Sample Member ID Card.)

Mr. Lynch himself was a qualified patient and member.  (Ex. A, Lynch Decl. ¶ 64.)  By March 29, 2007, the CCCC had approximately 2,400 members.  (*Id.* ¶ 66; Ex. A-22, Access Database of CCCC Members.)

The CCCC only sold medical marijuana to members.[4]  (Ex. A, Lynch Decl. ¶ 66; Ex. B, Kreit Decl. ¶ 19; Ex. B-3 (police report describing confidential informant who

_____

[4] The Indictment includes overt acts involving CCCC employees potentially conducting illicit marijuana sales to nonmembers.  (See, e.g., Dkt. No. 1 at 4-8 ¶¶ 17-18.)  After considering all the evidence at trial and at sentencing, this Court made clear

was not permitted to buy medical marijuana at the CCCC because his physician recommendation was expired).)  Upon arrival to the CCCC, the security guard signed in each member on a "Daily Patient Log," logging their CCCC member number, last name, time of arrival, and California driver's license number.  (Ex. A-17, Trial Ex. 125A, Unredacted Daily Patient Log, Jan. 19, 2007.)  Entrance to the dispensary area of the CCCC was limited to qualified patients, law enforcement, government officials, and parents or legal guardians of qualified patients.  (Ex. A, Lynch Decl. ¶ 56.)  All sales of marijuana to qualified patients were recorded by the CCCC.  Every item available for purchase was labeled with the name of the item, the warning "for medicinal use only," and had a barcode.  (Ex. A, Lynch Decl. ¶ 94; Ex. A-31, Trial Ex. 11, Photo of CCCC Packaged Marijuana.)  Once purchased, the CCCC staff member would scan the barcode, the connected computer would register the sale, and a receipt was generated.  (Ex. A, Lynch Decl. ¶ 94; Ex. A-32, Sample Receipt.)  These procedures ensured that the CCCC only sold medical marijuana to its qualified patient members.

### a. The CCCC Distributed Marijuana to Members over 18 or to Members under 18 with Permission from a Parent or Legal Guardian

Counts Two and Three of the Indictment charged Mr. Lynch with two sales of marijuana to J.S., a person over the age of 18 but under the age of 21.  (Dkt. No. 1 at 9.) Several of the overt acts charged in the conspiracy in Count One concern sales of marijuana to individuals over 18, or to individuals under 18, who were accompanied by one of their parents.  (*See id.* at 4-8 ¶¶ 12, 15, 27, 30, 32.)

---

factual findings about Mr. Lynch's lack of knowledge of and culpability for those acts. (*See* Sent. Memo. at 34 ("While the Government has cited to certain instances where some of the CCCC's marijuana may have been obtained by persons through fraudulent medical authorizations or may have been diverted by a few employees to unlawful recipients, there is no evidence . . . that Lynch himself was aware of and/or participated in that misfeasance."); 16 n.13, 17-18 & n.16, 39.)

Under California medical marijuana law, these acts were legal. Anyone over 18 years old could qualify as a "qualified patient" under the MMPA, and those under 18 years old could be qualified patients with their parent or legal guardian's permission. *See* § 11361(a) (prohibiting unlawful sales to individuals under 18 years old); § 11362.715(a)(5) (permitting persons of any age to apply for a medical marijuana identification card and requiring those under 18 to provide a certified copy of a birth certificate as proof of identity); § 11362.72 (a)(1) (setting the criteria for verifying the information on a qualified patient's application for a medical marijuana identification card and requiring that "[i]f the person is less than 18 years of age, the county health department or its designee shall also contact the parent with legal authority to make medical decisions, legal guardian, or other person or entity with legal authority to make medical decisions, to verify the information"); § 11362.7(e) ("A primary caregiver shall be at least 18 years of age, unless the primary caregiver is the parent of a *minor child who is a qualified patient or a person with an identification card . . . .*" (emphasis added)). Therefore, the CCCC's sales to qualified patients over 18, or to qualified patients under 18 with a parent present, were not in violation of the MMPA and are consistent with a defense under § 11362.775.

## 2. The CCCC Vendors Were Members and Qualified Patients

Individuals who supplied marijuana to the dispensary, who the CCCC described as vendors or caregivers, were CCCC members. (Ex. A, Lynch Decl. ¶ 67.) The CCCC confirmed that vendors were qualified patients via the same process as any other member. (*Id.*)

In addition, the vendor completed a "Designated Caregiver Agreement Form." (Ex. A-23 at 2, Sample Vendor File.) That form provided that: "To meet the needs of CCCC patients, qualified members of CCCC will be designated as a Caregiver for a given number of patients and will be granted the right to process transport and possess medical cannabis on behalf of their assigned patients as allowed by California State

17

Law." (*Id.*)  The caregiver further agreed that the cannabis he or she cultivated, possessed, and transported would be used exclusively for CCCC patients and only for medical use.  (*Id.*)  Finally, the caregiver agreed that the CCCC could inspect the caregiver's growing facility.  (*Id.*)  A CCCC staff member, usually Mr. Lynch, interviewed potential caregivers, and if approved, cosigned their agreement.  (Ex. A, Lynch Decl. ¶¶ 72-73.)

When a caregiver provided marijuana to the CCCC, a staff member, commonly Mr. Lynch, recorded the purchase on a "CCCC Vendor Breakdown Sheet."  (Ex. A, Lynch Decl. ¶ 77.)  Among other things, that form recorded the vendor's CCCC membership number, again confirming that the supplier was a qualified patient.  (*Id.*)

Although most marijuana was supplied to the CCCC by vendors, the CCCC struggled to meet the needs of its members.  (Ex. A, Lynch Decl. ¶ 75.)  To meet that need, the CCCC occasionally obtained marijuana from other dispensaries legally operating in California.  Such conduct is indisputably permissible under the only published case in existence at the time the CCCC operated.  *See Urziceanu*, 132 Cal. App. 4th at 764, 786 (finding the "defendant produced substantial evidence that suggests he would fall within the purview of section 11362.775," where "FloraCare had problems providing marijuana to its members" and "defendant would sometimes buy marijuana on the black market by the pound to supply the members").  Therefore, these purchases do not disqualify the CCCC from establishing a defense under § 11362.775.

### 3.    The CCCC Operated Collectively

Case law provides no strict definition for what it means to operate collectively or cooperatively.  *See Colvin*, 203 Cal. App. 4th at 1038 ("The MMPA's legislative history tells us little about section 11362.775 or what it means to associate to 'collectively or cooperatively . . . cultivate [medical] marijuana.'" (alteration in original)); *Orlosky*, 233 Cal. App. 4th at 271 (noting that "neither the statute itself, nor case law has specified any size or formality requirements for the proper creation of the

18

1  cooperative endeavor").  Instead, courts offer general guidance, suggesting that

2  cooperatives, for example, operate as "organizations that provide services for use

3  primarily by their members," "perform functions its individual members could not do

4  alone as effectively," and "conduct business for the mutual benefit of members."

5  *Colvin*, 203 Cal. App. 4th at 1038.  The 2008 Guidelines are in accord.  They state that

6  "a collective should be an organization that merely facilitates the collaborative efforts

7  of patient and caregiver members."  (Ex. B-2 at 8, 2008 Guidelines.)

8       Courts have refused to imply any additional collective or cooperative

9  requirements on organizations operating under § 11362.775.  "[I]n a lawful cooperative

10 or collective, members need not necessarily participate personally in cultivation or any

11 other particular duties, and [] the exchange of marijuana for money does not, by itself

12 make a transaction unlawful within a collective or cooperative."  *Anderson*, 232 Cal.

13 App. 4th at 1274.

14      As the case law makes clear, by proving medical marijuana to its members, the

15 CCCC operated as a collective for purpose of § 11362.775.  The Membership Form

16 makes clear that the CCCC operated to provide this service to its members.  (Ex. D,

17 Lion Decl. ¶ 33.)  Further, although not required, the CCCC and Mr. Lynch in

18 particular, relied on the "critical input" of members, who made suggestions regarding

19 the CCCC's operation, to improve the collective and make marijuana more accessible

20 to all.  (Ex. A, Lynch Decl. ¶ 20.)  In addition, the CCCC provided services to its

21 members beyond medical marijuana.  As the Court already found, the CCCC "not only

22 sold the marijuana but also advised customers on which varieties to use for their

23 ailments and on how to cultivate any purchased marijuana plants at their homes."

24 (Sent. Memo. at 8.)  Ultimately, the "policies and procedures" the CCCC "used in

25 providing marijuana for the people who came" in constitutes "substantial evidence"

26 that the CCCC operated as a collective "within the purview of section 11362.775."

27 *Urziceanu*, 132 Cal. App. 4th at 786.

28

19

### 4. The CCCC Provided the Marijuana Necessary to Supply the Medical Needs of the Members

Originally, the MMPA contained limits on the amount of marijuana a qualified patient could possess. § 11362.77. However, in *People v. Kelly,* 47 Cal.4th 1008 (2010), the California Supreme Court struck down these limits and clarified that a person could possess the amount of marijuana necessary to meet the qualified patient's current medical needs. *Id.* at 1043-49. Therefore, in evaluating the applicability of § 11362.775, some courts have inquired into whether the amount of marijuana cultivated by the collective "is reasonably necessary for the membership's medical needs." *Anderson*, 232 Cal. App. 4th at 1277; *see also* 2008 Guidelines at 10 ("[C]ollectives and cooperatives may cultivate and transport marijuana in aggregate amounts tied to its membership numbers."). However, the applicability of this factor is questionable as most courts never address it. *See Jackson*, 210 Cal. App. 4th at 529; *Baniani*, 229 Cal. App. 4th at 59-61.

The CCCC possessed only those amounts of marijuana reasonably necessary to meet the needs of its 2,400 members. As Mr. Lynch explains, when vendors completed a Designated Caregiver Agreement Form, the CCCC assigned them "a certain number of patients for whom they could provide marijuana and agreed to limit their cultivation" to the number of plants and ounces of marijuana listed therein. (Ex. A, Lynch Decl. ¶ 69.) The CCCC kept track of the patient limitations in the vendor's profile on the Access database. (*Id.*) The CCCC "align[ed] the total number of patients allotted on the Designated Caregiver Agreements with or below the total number" of CCCC members. (*Id.* ¶ 74.) Thus, the caregivers were not permitted to produce more marijuana than was necessary for the CCCC's membership. The CCCC tracked the amount of marijuana purchased by the collective using the Vendor Breakdown Sheets, and it tracked the inventory available on Inventory Logs. (*See* Exs. A-22, Sample Vendor Breakdown Sheets; Ex. A-32, Inventory Logs.) In practice, the CCCC struggled to meet the patients' medical needs, as the demand by the membership was

often greater than the available supply from its vendors.  (Ex. A, Lynch Decl. ¶ 75.)  As the only dispensary in the county, the CCCC was the sole source of medical marijuana for the 261,000 residents of San Luis Obispo County.  (*Id.* ¶ 10.)[5]  This evidence demonstrates that, to the extent required, the CCCC supplied only the marijuana reasonably necessary to meet its patients' needs.  *See Orlosky*, 233 Cal. App. 4th at 272 (finding that testimony "supported the view that the amount of marijuana possessed by defendant was reasonably related to defendant's and Jones's combined medical needs").

**B.     The CCCC Did Not Operate for Profit**

The second element of a lawful collective under § 11362.775 is that the operation not "distribute marijuana for profit."  § 11362.765(a).  Case law has clarified that there is no requirement that the entity be established or organized as a nonprofit entity. *Jackson*, 210 Cal. App. 4th at 539; *Orlosky*, 233 Cal. App. 4th at 271.  However, organization formation is included as one of the non-exclusive factors to consider when determining whether the collective operated as a "nonprofit enterprise," which also include:

> "testimony of the operators of the enterprise" as to its nonprofit nature; "its formal establishment as a nonprofit organization"; "the presence or absence of any financial records"; "the presence or absence of processes by which the enterprise is accountable to its members"; "the size of the enterprise's membership"; and "the volume of business it conducts."

*Id.*  Applying these factors, it is evident that the CCCC did not distribute marijuana for profit.  (Ex. D, Lion Decl. ¶ 3; Ex. B, Kreit Decl. ¶¶ 22-29.)

**1.     The CCCC's Detailed Financial Records Demonstrate It Earned No Profits**

The CCCC kept detailed financial records.  (*See* Ex. C, Malone Decl. ¶¶ 5-8; Sent. Memo. at 15; PSR ¶¶ 37-38.)  These records included Daily Sales Reports, which were generated by the CCCC's point-of-sale system and listed the "total patient sales,

---

[5] https://www.census.gov/quickfacts/sanluisobispocountycalifornia.

returns, and discounts provided," and "broke down whether the sales were in cash, by check, or by credit or gift card. (Ex. A, Lynch Decl. ¶¶ 94-95; Ex. A-33, Jan. 2007 Daily Sales Reports.) From these Daily Sales Reports, the government calculated the CCCC's gross income to be $2,155,011.44 during the relevant period. (Ex. A, Lynch Decl. ¶ 97; Ex. C, Malone Decl. ¶ 9; Ex. C-2.) The CCCC financial records also included Vendor Breakdown Sheets, which logged the date and time the caregiver arrived, an invoice number, the caregiver's member number, the strain, its weight, and the amount the caregiver charged for the marijuana. (Ex. A, Lynch Decl. ¶ 77; Ex. A-24, Sample Vendor Breakdown Sheets.) From the Vendor Breakdown Sheets, the government calculated the amount the CCCC paid for marijuana during the relevant period to be $1,492,870.11. (Ex. A, Lynch Decl. ¶ 79; Ex. C, Malone Decl. ¶¶ 10-12; Ex. C-3, C-4, C-5.) Accordingly, nearly 70 percent of the funds the CCCC took in as fees from members was reinvested into the CCCC as funds to caregivers to cultivate additional marijuana. (Ex. C, Malone Decl. ¶¶ 9-12.) These financial records support that the CCCC was not operating for profit. *See Colvin*, 203 Cal. App. 4th at 1040 (discussing the 2008 Guidelines and finding it relevant that "money Holistic receives from members goes back into the cooperative"); *Baniani*, 229 Cal. App. 4th at 60 (collective entitled to a § 11362.775 defense where "the money provided in exchange for marijuana was given to the growers to reimburse them for their costs").

In determining the amount to charge members for marijuana, the CCCC considered the cost to cultivate it, the market price at other dispensaries, and the CCCC's expenses. (Ex. A, Lynch Decl. ¶ 100.) The CCCC regularly provided 25 percent discounts to needy patients, and it gave away free marijuana to those who were severely struggling financially or severely ill. (*Id.* ¶ 104.) The amounts the CCCC charged members and the discounts offered support the conclusion that the CCCC did not operate for profit. *Compare Colvin*, 203 Cal. App. 4th at 1041 (finding § 11362.775 applies, in the context of the 2008 Guidelines, where the dispensary "bases

22

membership fees on the cost to cover the member's needs") *with People v. Solis*, 217 Cal. App. 4th 51, 59 (2013) (finding § 11362.775 did not apply where the dispensary operator "merely offered that he bought about a pound of marijuana every week for some unspecified price and sold it for double what he paid").

The CCCC's remaining income, after subtracting out the over $1.4 million it reinvested into marijuana cultivation by members, was primarily used to cover overhead costs and expenses, such as employee compensation, rent, insurance fees, licenses and permits, nursery supplies, legal fees, taxes, and utilities, among others. (Ex. C, Malone Decl. ¶¶ 13-18; Ex. A, Lynch Decl. ¶ 88.)  Each of these expenses were documented in the CCCC's QuickBooks ledger and correlated to the CCCC's bank account statements.  (Ex. C, Malone Decl. ¶¶ 8, 13-18; Ex. A, Lynch Decl. ¶¶ 18, 88.) Reimbursement of overhead costs and operating expenses is permissible under the MMPA.  *See London*, 228 Cal. App. 4th at 566 (operators entitled to "reimbursement [for] the amount of out-of-pocket costs incurred in cultivating the marijuana"); *Hochanadel*, 176 Cal. App. 4th at 1011 (discussing 2008 Guidelines' recommendation that collectives can reimburse the "amount necessary to cover overhead costs and operating expenses"); *see also* Ex. D, Lion Decl. ¶ 16.

### 2. The Compensation the CCCC Paid to Mr. Lynch was Reasonable Reimbursement for his Labor and Services

In addition to the expenses to run the collective, the CCCC also paid compensation to Mr. Lynch for his labor and services.  Such compensation is permissible under the MMPA.  *See London*, 228 Cal. App. 4th at 561 ("[A] qualified patient or valid identification cardholder is entitled to receive only reasonable compensation for his labor or services rendered in cultivating medical marijuana for other qualified patient members of his nonprofit group."); *People ex rel. City of Dana Point v. Holistic Health*, 213 Cal. App. 4th 1016, 1021 (2013) ("Valid nonprofit expenditures expressly include executive compensation.").  Mr. Lynch's testimony and that of the experts establishes that his compensation of $110,200 during the relevant

23

period was reasonable given his labor and services.  (Ex. D, Lion Decl. ¶¶ 16-22.)  Mr. Lynch was the founder and operator of the CCCC during the relevant period and "was present at the CCCC overseeing day-to-day operations nearly every day that it was open."  (Ex. A, Lynch Decl. ¶ 17.)  His responsibilities included: "developing all of the procedures, creating all of the forms, managing the employees (including hiring and termination), overseeing vendor purchases, building maintenance, managing the finances and keeping financial records, addressing all technological and computer issues, overseeing the day-to-day operations, and handling all legal and business affairs."  (*Id.* ¶ 16.)  Mr. Lynch also paid all the CCCC's bills and attended many city and county meetings concerning dispensaries to stay abreast of local regulations.  (*Id.* ¶¶ 18-19.)  He worked a minimum of 60 hours per week as Chief Operating Officer of the CCCC.  (*Id.* ¶ 21.)  Mr. Lion, an expert in nonprofits, opines that Mr. Lynch's compensation "appears to be commensurate with compensation paid to the chief executive of similarly situated nonprofit organizations" in California.  (Ex. D, Lion Decl. ¶ 20.)

Separate from Mr. Lynch's compensation, the CCCC reimbursed Mr. Lynch $50,463 as repayment of startup expenses.  (Ex. C, Malone Decl. ¶ 16.)  This repayment was made directly from the CCCC to credit card accounts in Mr. Lynch's name as reimbursement for expenses he incurred prior to and during the formation of the CCCC.  (*Id.*)  These expenses included the "security deposit and rent for the month prior to opening, purchase of all desks, display furniture, safes, and shelving, investment in a point-of-sale system, purchase of a membership card printer and associated computer system, purchase of all computers and software, purchase and setup of QuickBooks and Intuit for payroll, purchase and installation of security cameras and related systems, improvements to the building, obtaining insurance for the business and building, and payments to my initial business partner Dan Eister."  (Ex. A, Lynch Decl. ¶ 91; *see also id.* ¶¶ 4-15.)  Repayment of startup expenses is permissible

for any nonprofit, and particularly for collectives operating in conformity with the MMPA.  *See* Ex. D, Lion Decl. ¶¶ 16-23; *London*, 228 Cal. App. 4th at 559 (discussing permissible "out-of-pocket costs and expenses" to include the defendant's "estimate[ that] he had invested $10,000 in his lights and other growing equipment and he testified he expected to be reimbursed for that amount").

Although the CCCC repaid Mr. Lynch for some of the expenses he incurred prior to and during the opening the CCCC, Mr. Lynch "never recouped [his] initial investment," which he afforded by refinancing his home.  (Ex. A, Lynch Decl. ¶ 92.) Ultimately, because the CCCC had not fully reimbursed Mr. Lynch prior to the federal government's indictment in this case, he was unable to repay the refinanced loan and lost it to foreclosure.  (*Id.*)  In addition, on April 30, 2009, Mr. Lynch was forced to file for bankruptcy due in large part to debt he accrued from the CCCC's business and startup expenses.  (*Id.* ¶ 93; Ex. A-30, Bankruptcy Petition.)  Therefore, Mr. Lynch personally did not earn a profit from the CCCC.

### 3.    The CCCC Operated on a Nearly Break-Even Basis

After accounting for all the CCCC's operating expenses, overhead costs, and reasonable compensation paid to Mr. Lynch, the CCCC was essentially operating on a break-even basis during the relevant period.  (Ex. C, Malone Decl. ¶ 19; Ex. C-5, CCCC Profit & Loss Statement.)  On March 29, 2007, the CCCC had a cash flow of $58,831.94.  (Ex. C-5, CCCC Profit & Loss Statement.)  Given the CCCC's total budget, this minimal cash flow is indicative of a not-for-profit enterprise.  As Mr. Lion explains, "[n]onprofit organizations may retain assets in reserve as are reasonably needed to cover current and future operating expense and capital investments," and the funds held by the CCCC are a "reasonable in amount for CCCC to have held in reserve for such purposes."  Ex. D, Lion Decl. ¶ 15; *see Holistic Health*, 213 Cal. App. 4th at 1028 ("[T]he mere excess of income over expenses does not destroy the entity's nonprofit character.").  Because the CCCC intended to continue to operate after March

29, 2007, it needed some minimal cash flow to continue to pay the collective's daily expenses. (*See* Ex. A, Lynch Decl. ¶ 98; Ex. C, Malone Decl. ¶ 20.)  This minimal cash flow is indicative of an entity operating on a break-even basis, in other words, not for profit.

### 4. The CCCC Operated in Conformity with the Principles of a Nonprofit Organization

Although the CCCC was technically organized as a sole proprietorship, this fact is not determinative. *See Orlosky*, 233 Cal. App. 4th at 271 ("[N]either the statute itself, nor case law, has specified any size or formality requirements for the proper creation of the cooperative endeavor.").  As explained by nonprofit expert Ofer Lion, the CCCC operated in conformity with the principles of a nonprofit organization. (*See* Ex. D, Lion Decl. ¶¶ 3-4, 34.)

### 5. The Membership Size and Revenues of the CCCC Were in Accord with Similar Lawful Collectives and Cooperatives

The CCCC's size and volume of business are also in line with dispensaries that operated legally under § 11362.775.  The CCCC, which was the only dispensary in San Luis Obispo County at the time, had 2,400 members and approximately $2.1 million in revenues. (Ex. A, Lynch Decl. ¶¶ 10, 66; Ex. C, Malone Decl. ¶ 9.)  This is less than the dispensary at issue in *Colvin*, which the Court found complied with § 11362.775 despite having over 5,000 members. *Colvin*, 203 Cal. App. 4th at 1037.  The CCCC's revenues are drastically less than that of Oakland's Harborside Health Center, which was found in compliance with the MMPA despite generating over $5 million in revenue in 2007. (*See* Ex. B, Kreit Decl. ¶ 26.)  Therefore, neither CCCC's size nor volume of business indicate for-profit operation.

### 6. The CCCC's Members Participated in the Collective's Operations

Finally, the CCCC encouraged member participation in the operations of the collective.  Mr. Lynch regularly interacted with members and solicited suggestions for improvement. (Ex. A, Lynch Decl. ¶ 20.)  In addition, at members' requests, the CCCC

26

operated a discount program for members struggling financially or medically.  (*Id.* ¶¶ 103-104.)  A more comprehensive discount program, with a formal application process, was in the works at the time of the DEA's raid.  (*Id.* ¶ 105; Ex. A-37.)  Finally, the CCCC offered personal assistance to members struggling with basic needs, such as a member with no arms who needed assistance moving household items from his trailer.  (Ex. B, Kreit Decl. ¶ 29.)  This type of membership engagement is indicative of not-for-profit operation.  (*See id.*)

In sum, applying the relevant factors and analyzing the financial records, the CCCC amply demonstrates that it did not cultivate or distribute marijuana for profit.  *See Colvin*, 203 Cal. App. 4th at 1040-41 (finding that cooperative did not operate for profit); *Dana Point*, 213 Cal. App. 4th at 1027-28 (holding that dispensary presented a prima facie case for demonstrating that it "was neither organized to make a profit, nor in fact made one").

## C.   The CCCC Complied with the 2008 Guidelines in Important Respects

Although the 2008 Guidelines did not exist at the time of the CCCC's operations, the practices of the CCCC aligned with their recommendations in "important respects." *Jackson*, 210 Cal. App. 4th at 535.

As applied to collectives, the 2008 Guidelines recommended that "potential members complete a written application, and that the collective "verify the individual's status as a qualified patient" by making "personal contact with the recommending physician," "verif[ying] [] the physician's identity, as well as his or her state licensing status," and making copies of the potential member's documentation.  (2008 Guidelines at 9.)  The CCCC implemented each of these recommendations.  (*See* Ex. A, Lynch Decl. ¶¶ 55-63.)

The CCCC also implemented each of the following recommendations in the 2008 Guidelines: that the members should agree to use the marijuana only for medical purposes (*see* Ex. A-18 at 2); that the collective should maintain membership records

27

1   (*see* Ex. A-21); that the collective should track when members' medical marijuana
2   recommendations expire (*see id.*); and should enforce membership conditions by
3   excluding those whose "physician recommendation are invalid or have expired, or who
4   are caught diverting marijuana for non-medical use" (*see* Ex. A, Lynch Decl. ¶¶ 60, 63;
5   Ex. B-3).  (2008 Guidelines at 9.)  In further alignment with the 2008 Guidelines, the
6   CCCC tracked members' purchases of marijuana from the collective though its point-
7   of-sale system and Daily Sales Reports, and it also tracked and recorded the source of
8   the marijuana through its Vendor Breakdown Sheets.  (*See* 2008 Guidelines at 10; Ex
9   A, Lynch Decl. ¶¶ 77-78, 94-96, 106.)  The record adequately demonstrates that the
10  CCCC employed these suggestions years before they even existed.

11          The CCCC also largely operated as a "closed-circuit of marijuana cultivation and
12  consumption with not purchases or sales to or from non-members."  (2008 Guidelines
13  at 10.)  As detailed above, the CCCC only sold marijuana to members.  (Ex. A, Lynch
14  Decl. ¶ 66.)  In addition, most of its marijuana purchases were made from members.
15  (*Id.* ¶ 67.)  However, the CCCC occasionally purchased from qualified patients at other
16  dispensaries.  At the time of the CCCC's operation, case law expressly permitted this
17  conduct, and in fact permitted the collective to make purchases on the "black market"
18  to supply members.  *See Urziceanu*, 132 Cal. App. 4th at 764, 786.  Because this
19  recommendation in the 2008 Guidelines is contrary to the requirements of the law in
20  place at the time of the CCCC's operation, it does not demonstrate non-compliance
21  with the MMPA.

22          At several places, the 2008 Guidelines recommended that collectives and
23  cooperatives comply with local laws, including obtaining a business license when
24  required.  (2008 Guidelines at 9, 11.)  There is abundant, undisputed evidence that Mr.
25  Lynch complied with the local laws put in place by Morro Bay.  (*See* Ex. B, Kreit Decl.
26  ¶ 30; Sent. Memo. at 13-15, 34-35; Gov't Second Cross Appeal Br., Dkt. No. 453-3, at
27  81 ("Defendant offered ample evidence on the undisputed issue of his compliance with
28

local law.").)  As Mr. Lynch describes, the CCCC applied and was approved for a business license before opening.  (Ex. A, Lynch Decl. ¶¶ 25-27.)  The CCCC complied with the eight conditions issued with the license.  (*Id.* ¶¶ 28-35.)  City and county officials toured the CCCC before and after its opening and the Chamber of Commerce held a ribbon cutting at which many city officials were present.  (*Id.* ¶¶ 36-38, 43.)  The CCCC also obtained a sign permit, passed a fire inspection, carried liability insurance, and obtained a business tax license from the City.  (*Id.* ¶¶ 39-41, 46.)  In June 2006, the CCCC obtained a conditional use permit from Morro Bay to operate a small nursery of marijuana plants within the dispensary.  (*Id.* ¶ 42.)  City officials, including City Council members, the Mayor, and the City Attorney, were all supportive of the CCCC and submitted declarations or testimony confirming the CCCC's compliance with all local regulations.  (*Id.* ¶¶ 45; Ex. A-8, Declarations from the Mayor and City Councilpersons; Sentencing Tr., Dkt. No. 367 at 61 (Testimony from City Attorney).)

The 2008 Guidelines included provisions recommending that collectives maintain physical security of the premises.  (2008 Guidelines at 11.)  The CCCC employed numerous security measures, including on-site security guards present during operating hours; eight security cameras and a computer to view and record the footage; a security monitoring system with keypad, siren, and motion detector; and safes for storing cash and marijuana.  (Ex. A, Lynch Decl. ¶¶ 48-53.)  These measures more than satisfy any criteria the 2008 Guidelines subsequently added regarding security, which were nowhere mentioned in the MMPA.

Regarding collectives, the 2008 Guidelines made clear that there was no requirement that they be organized in any particular form.  (*See* 2008 Guidelines at 8 ("[A] collective is not a statutory entity, but as a practical matter it might have to organize in some form of business to carry out its activities.").)  The only limitation was that neither the collective nor any individual could "profit from the sale or distribution of marijuana."  (*Id.* at 9.)  In that regard, the Guidelines explain that money

29

paid by members to the collective for marijuana "should only be an amount necessary to cover overhead and operating expenses." (*Id.* at 10.)  In addition, the fees charged by the CCCC for marijuana should be determined "based on fees that are reasonably calculated to cover overhead costs and operating expenses." (*Id.*)  As detailed above, to the extent they have found the Guidelines relevant, courts look at these same factors when analyzing the nonprofit operation of a collective or cooperative. *See Colvin*, 203 Cal. App. 4th at 1040-41.  For the same reasons outline in Part IV.B, the CCCC complied with the profit limitation, and the associated limits on reimbursable costs and expenses.

Accordingly, "to the extent these guidelines have any weight, they contemplate" collectives like the CCCC. *Colvin*, 203 Cal. App. 4th at 1041.

## V. CONCLUSION

Mr. Lynch respectfully requests that the Court enjoin the government from any further spending on his prosecution and that his resentencing be indefinitely stayed.


Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender


DATED:  July 19, 2022          By  */s/ Rebecca M. Abel*
                                  _____
                                  REBECCA M. ABEL
                                  DAVID WASSERMAN
                                  Deputy Federal Public Defenders
                                  Attorneys for CHARLES LYNCH